UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

**04  10884 RGS**

MASSACHUSETTS INSTITUTE OF
TECHNOLOGY and
REPLIGEN CORPORATION,

Plaintiffs,

v.

IMCLONE SYSTEMS, INC.,   MAGISTRATE JUDGE

Defendant.

Civil Action No.:

RECEIPT #
AMOUNT $
SUMMONS ISSUED
LOCAL RULE 4.1
WAIVER FORM
MCF ISSUED
BY DPTY. CLK
DATE

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs Massachusetts Institute of Technology and Repligen Corporation by their attorneys, Fish & Richardson P.C., complain of Defendant ImClone Systems, Inc. as follows:

### Nature of the Action

1.      This is an action for patent infringement under 35 U.S.C. § 271, *et seq*, by Plaintiffs against ImClone for infringement of United States Patent No. 4,663,281 (the '281 patent) through ImClone's manufacture and sale of the recently-approved cancer treatment Erbitux™. The manufacture of Erbitux™ owes its existence to the pioneering technology claimed in the '281 patent, and, through the actions complained of herein, ImClone has willfully and knowingly exploited that technology in defiance of the rights of Plaintiffs.

### The Parties

2.      Plaintiff Massachusetts Institute of Technology ("MIT") is a Massachusetts corporation with its principal place of business at 77 Massachusetts Avenue, Cambridge, MA. MIT is the assignee of the '281 patent, which is entitled "Enhanced Production of Proteinaceous Materials in Eucaryotic Cells." A copy of the '281 patent is attached at Exhibit A.

3.      Plaintiff Repligen Corporation ("Repligen") is a Delaware corporation with its principal place of business at 41 Seyon Street, Building #1, Suite 100, Waltham, MA. Repligen has licensed the '281 patent from MIT and has the exclusive right to grant sublicenses to the '281 patent.

4.      Upon information and belief, Defendant ImClone Systems Incorporated ("ImClone") is a Delaware corporation with its principal place of business at 180 Varick Street, New York, New York.

## Jurisdiction and Venue

5.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, and 1338(a).

6.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b) and 1400(b).

## The '281 Patent—A Pioneering Discovery to Enhance Protein Production

7.      The genetic mechanisms by which the mammalian immune system operates are complex and intricate. When stimulated by exposure to a foreign substance, certain cells of the immune system produce (or "express") proteins, known as "antibodies," to rid the body of the foreign substance.

8.      Dr. Susumu Tonegawa of MIT has spent his professional life exploring this complex system. In recognition of his pioneering contributions, Dr. Tonegawa received the 1987 Nobel Prize in Physiology or Medicine for his discovery of "the genetic principle for generation of antibody diversity."

9.      Dr. Tonegawa and a colleague at MIT, Dr. Stephen Gillies, discovered that cells that produce antibodies contain tissue-specific enhancers—fragments of DNA that stimulate gene expression. The discovery was remarkable. The announcement of their discovery prompted some members of the scientific community to state that it was the "first unequivocal

2

demonstration that enhancers, which were originally identified in the genomes of viruses, are found in cellular genes."

10.     The Gillies and Tonegawa discovery had broad implications. Most animal cells produce relatively modest amounts of any one type of protein. Certain cell types, however, can produce and secrete large amounts of proteins. By employing their enhancer discovery, Gillies and Tonegawa were able to use recombinant DNA technology to create a cell that produced abundant amounts of virtually any protein they desired.

11.     Drs. Gillies and Tonegawa filed a patent application on their invention and assigned their rights in the invention to MIT. MIT, in turn, licensed the invention to Damon Biotech, Inc., a predecessor to Repligen. On May 5, 1987, the United States Patent and Trademark Office duly and legally issued the '281 patent.

## Dr. Gillies Creates the Cell Line for Producing Erbitux™ Using the Inventions of the '281 Patent

12.     In January 1988, the National Cancer Institute ("NCI"), a federal agency within the National Institutes of Health ("NIH"), issued a request for proposal ("RFP") for development and large-scale production of chimeric monoclonal antibodies. A chimeric antibody is an antibody that combines genes from different species.

13.     In response to the RFP, Damon Biotech submitted a proposal detailing its expertise and patented technology (including the '281 patent) for development and large-scale production of mouse/human chimeric antibodies.

14.     Damon designated Dr. Gillies, who now worked for Damon, as the Principal Investigator for the proposed chimeric antibody project.

15.     NCI approved of Damon's proposal and awarded Damon a Master Agreement Award, which qualified Damon as a contractor for activities to be conducted from time-to-time according to specific Master Agreement Orders.

16.    NCI and Damon executed a Master Agreement Order in September 1989. This was a fixed-fee, one-year contract calling for Damon to develop a chimeric antibody that binds to the extracellular domain of the human epidermal growth factor receptor ("EGFR") and a cell line for producing large-scale quantities of the antibody.

17.    Under Dr. Gillies supervision and pursuant to the Master Agreement Order, Damon used the inventions claimed in the '281 patent to genetically engineer the antibody, known as "C225", and create a cell line that overexpressed C225 (the "Gillies Cell Line"). The Gillies Cell Line is covered by the '281 patent. By using the Gillies Cell Line, one can readily and economically manufacture large quantities of C225.

18.    As required by the Master Agreement Order, Damon delivered a sample of the C225 antibody and the Gillies Cell Line to NCI.

19.    Because NIH had funded the research at MIT that led to the '281 patent, NCI had a nonexclusive, nontransferable, irrevocable, paid-up license to practice the invention claimed in the '281 patent, and, therefore, NCI did not owe Damon a royalty payment to use C225 or the Gillies Cell Line for governmental purposes.

20.    By fulfilling the Master Agreement Order, however, Damon did not grant NCI the right to transfer or sublicense the C225 antibody to others, the right to transfer or sublicense the Gillies Cell Line, or otherwise affect the scope of the government's rights, in any manner, in the '281 patent.

### ImClone Begins Using the Gillies Cell Line to Make C225

21.    On information and belief, sometime between 1992 and 1994, the Gillies Cell Line, created by Damon and covered by the '281 patent, was transferred without Damon's knowledge or permission from NCI to ImClone.

22.    On information and belief, ImClone received approval from FDA in 1994 for an investigational new drug application for C225, which allowed ImClone to begin testing C225 in human clinical trials. On information and belief, ImClone employed the Gillies Cell Line to

4

make C225. Since that time, ImClone has made reference to its possession and use of C225 and the Gillies Cell Line in various advertisements, publications, and submissions to the Securities and Exchange Commission.

### After Repligen Learned of ImClone's Use of the Gillies Cell Line, Repligen Requested ImClone to License the '281 Patent But ImClone Declined

23.     In 1996 Repligen learned that ImClone had come into possession of C225 and the Gillies Cell Line when NCI contacted Repligen to obtain the sequence of the recombinant DNA Damon used to create the Gillies Cell Line. On information and belief, ImClone requested that NCI contact Repligen because ImClone needed the DNA sequence for its regulatory submissions to FDA.

24.     Thereafter, Repligen contacted ImClone and offered ImClone a license to the '281 patent explaining that the use of the Gillies Cell Line was an infringement of the '281 patent. ImClone declined the offer. Initially, ImClone claimed that because it had obtained C225 and the Gillies Cell Line from NCI, no license was necessary. In response, Repligen provided ImClone with documents demonstrating that ImClone had no right to use the inventions of the '281 patent despite the fact that ImClone had obtained the Gillies Cell Line from NCI. After learning of this, ImClone changed its story and claimed that it did not require a license at that time because its manufacture, use and sale of C225 for clinical trials were related to its regulatory submissions to the FDA and fell under the "safe harbor" of 35 U.S.C. § 271(e)(1).

25.     The "safe harbor" of § 271(e)(1) states that "[i]t shall not be an act of infringement to make, use, offer to sell, or sell within the United States . . . a patented invention . . . solely for uses reasonably related to the development and submission of information under a Federal law which regulates the manufacture, use, or sale of drugs or veterinary biological products." By invoking the "safe harbor" of § 271(e)(1), ImClone admitted that it was making, using, offering to sell, or selling the "patented invention" of the '281 patent.

26.     ImClone has never denied that it was making, using, or selling the patented invention of the '281 patent.

### ImClone Receives FDA Approval to Market C225 as Erbitux™ and Receives An Enormous Windfall Based on its Use of the Gillies Cell Line

27.    On October 31, 2001, ImClone submitted biologic license application (BLA) number 125084 to FDA seeking approval for the use and sale of C225 made using the Gillies Cell Line. ImClone renamed C225 "Erbitux™." FDA issued a refusal to file letter on December 28, 2001. ImClone supplemented the BLA with additional information on August 14, 2003.

28.    On February 12, 2004, the FDA approved the use and sale of Erbitux™ as an injectable liquid for treating certain patients with EGFR-expressing, metastatic colorectal cancer in the United States.

29.    The estimated annual incidence of colorectal cancer in the United States is 150,000 patients. Of these patients, between 72% and 90% will have tumors expressing EGFR. These patients are potential candidates for treatment by Erbitux™.

30.    On information and belief, ImClone is currently studying the possibility of using Erbitux™ to treat cancers of the head and neck, lung, pancreas, esophagus, cervix, ovary, bladder, prostrate, and breast.

31.    In addition to the U.S. market, ImClone is marketing Erbitux™ in Europe. Erbitux™ has received regulatory approval in Switzerland.

32.    Erbitux™ is the first monoclonal antibody approved to treat this type of cancer. The FDA approved Erbitux™ under an accelerated program saying "FDA believes it is crucial for cancer patients to have many proven treatment options in their battle against this disease." Erbitux™ is expected to be a significant and important new therapy in the fight against colon cancer. According to published reports, Erbitux™ sales are projected at $138 million in the U.S. for 2004 and $279 million in 2005. Annual sales are estimated to peak in the U.S. at $1.5 billion in 2012. Estimated sales in Europe are forecast at $37 million for 2004 and $102 million in 2005, with peak annual EU sales of $600 million by 2012. As of this date, ImClone has received $650 million in milestone payments from its marketing partners in connection with Erbitux™ including a $250 million payment in March of 2004.

### ImClone's Willful Infringement Of The '281 Patent

33.    On information and belief, ImClone is making, having made, using, offering to sell, and/or selling C225 under the trade name Erbitux™ within the United States.

34.    On information and belief, ImClone and its manufacturing partners have been, and still are, manufacturing C225 for sale as Erbitux™ by culturing cells originating from the Gillies Cell Line.  This cell line is covered by the claims of the '281 patent.  ImClone's use of the Gillies Cell Line infringes the '281 patent.

35.    ImClone has used and is still using the Gillies Cell Line to produce Erbitux™ with full knowledge that this use infringes the '281 patent.

### COUNT I
### (Infringement of U.S. Patent No. 4,663,281)

36.    Paragraphs 1-35 of this Complaint are incorporated herein by reference.

37.    Upon information and belief, ImClone is directly infringing, actively inducing others to infringe, and/or contributing to the infringement of the '281 patent by making, using, offering to sell, and/or selling within the United States patented inventions covered by the '281 patent and will continue to do so unless enjoined by this Court.

38.    Upon information and belief, ImClone's infringement is continuing despite knowledge of the '281 patent making such infringement willful under 35 U.S.C. § 284. ImClone has caused and will continue to cause Plaintiffs damage by infringing the '281 patent.

WHEREFORE, Plaintiffs pray that this Court:

A.    Enter judgment that ImClone has infringed the '281 patent;

B.    Award Plaintiffs their damages resulting from ImClone's patent infringement pursuant to 35 U.S.C. § 284;

C.    Find that ImClone's infringement has been willful and increase the damages awarded to Plaintiffs to three times the amount assessed, pursuant to 35 U.S.C. § 284;

D.    Award Plaintiffs their prejudgment interest on their damages and their costs, pursuant to 35 U.S.C. § 284;

E.    Find that this is an exceptional case and award Plaintiffs their reasonable attorney fees, pursuant to 35 U.S.C. § 285; and

F.    Award Plaintiffs any such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

FISH & RICHARDSON, P.C.

Dated:  May 4, 2004

*Gregory A. Madera*

Gregory A. Madera (BBO #313,020)
FISH & RICHARDSON, P.C.
225 Franklin Street
Boston, MA  02110-2804
Telephone:  (617) 542-5070
Facsimile:  (617) 542-8906

Of Counsel:
Jonathan E. Singer
Michael J. Kane
Chad A. Hanson
FISH & RICHARDSON P.C., P.A.
3300 Dain Rauscher Plaza
60 South Sixth Street
Minneapolis, Minnesota 55402
Telephone:  (612) 335-5070

Juanita Brooks
FISH & RICHARDSON, P.C.
12390 El Camino Real
San Diego, CA 92130
Telephone:  (858) 678-5070

Attorneys for Plaintiffs
Massachusetts Institute of Technology and
Repligen Corporation