LEXSEE 30 U.S.P.Q.2D 1881

Copyright (c) 1994 The Bureau of National Affairs, Inc.

UNITED STATES PATENTS QUARTERLY

In re Recombinant DNA Technology Patent and Contract Litigation

MDL Docket No. 912

U.S. District Court Southern District of Indiana

30 U.S.P.Q.2D (BNA) 1881

Decided December 22, 1993, March 2, 1994, and March 22, 1994

**CASE HISTORY and DISPOSITION:** Six patent litigation cases, consolidated for pre-trial proceedings by the Judicial Panel on Multidistrict Litigation, arising out of research arrangements and license agreements involving the University of California, Genentech Inc., and Eli Lilly & Co. On various pre-trial motions.

 Prior decisions: 27 USPQ2d 1241, 22 USPQ2d 1748, 21 USPQ2d 1201, 19 USPQ2d 1668, and 14 USPQ2d 1909.

**HEADNOTES:**
PATENTS

 [**1H]  Patentability/Validity -- Anticipation -- Prior art (115.0703)

Claims for artificial human proinsulin gene cannot, on motion for summary judgment, be held anticipated by prior patent, since prior patent does not specify amino acid sequence for human proinsulin, and since genuine issues of fact exist as to whether sequence was within common knowledge of technologists in field at time of prior patent's issuance, and whether sequence was thus implicit in that patent.

 [**2H]  Title -- Construction of license agreement (150.07)

License agreement that prohibits licensee from "initiating" suit against alleged infringer does not prohibit licensee from participating in infringement action that has been initiated by licensor.

 [**3H]  Infringement -- Defenses -- Fraud or unclean hands (120.111)

Patent misuse -- In general (140.01)

JUDICIAL PRACTICE AND PROCEDURE

Procedure -- Pleadings (410.26)

Accused patent infringer can amend its pleadings to assert defense of patent misuse, even though action was initiated in 1987, since any additional discovery resulting from new factual and legal issues would not be unduly burdensome, and since any delay in final disposition must be balanced against public interest in ensuring that patentee does not extend patent beyond its statutory monopoly; such amended pleadings, for purposes of determining applicability of 1988 Patent

30 U.S.P.Q.2D (BNA) 1881, *; USPQ Headnotes 1881, **

Misuse Reform Act, *35 USC 271*(d), do not relate back to filing date of original action but rather statute's applicability is governed by date amended pleadings were filed.

PATENTS

[**4H]  Patent misuse -- Particular licensing arrangements (140.05)

1988 Patent Misuse Reform Act, *35 USC 271*(d), applies both to "tie-in" tying arrangement, in which patentee conditions patent license upon licensee's agreeing to use some specific unpatented product, and also to "tie-out" tying arrangement in which licensee must agree not to use competitor's products or devices; thus, statute applies to license agreement in which licensor retained right to terminate agreement if licensee sells recombinant insulin produced or derived without use of licensor's micro-organisms or patent technology, and precludes summary judgment on accused infringer's defense of patent misuse.

[**5H]  Infringement -- Willful (120.16)

JUDICIAL PRACTICE AND PROCEDURE

Procedure -- Bifurcation (410.28)

Separate trials on issues of liability and damages are warranted in consolidated infringement actions involving genetics technology, since bifurcation will lessen jury confusion and will promote judicial economy, with issue of willfulness being tried as part of damages trial; stay of discovery on damages is not warranted, however, except as to issue of willfulness.

JUDICIAL PRACTICE AND PROCEDURE

[**6H]  Jurisdiction -- Venue; transfer of action -- In patent actions (405.1907)

Transfer, from federal district court in California to federal district court in Indiana, of action arising out of licensing and research arrangements involving genetics technology is warranted, since case is one of six that have been consolidated before Indiana court for pre-trial proceedings and thus Indiana court has familiarity with issues, and since only location in which allegedly infringing process is used is located in Indianapolis.

[**7H]  Procedure -- Discovery -- Matters discoverable -- Attorney/client privilege (410.4002.03)

Procedure -- Discovery -- Matters discoverable -- Work product privilege (410.4002.05)

Party's inadvertent disclosure of documents constitutes waiver of any privilege it may have had in those documents, since party's screening procedures, which were reasonable, were not applied to those documents, since party delayed for two weeks, after learning of inadvertent disclosure, before objecting, since scope of discovery at issue, although not insignificant, was manageable, and since fairness dictates that any privilege be waived.

Particular patents -- Chemical -- Human proinsulin genes

4,431,740, Bell, Pictet, Goodman and Rutter, DNA transfer vector and transformed microorganism containing human proinsulin and pre-proinsulin genes, motion for summary judgment of invalidity denied.

**CLASS-NO:** 115.0703, 120.111, 120.16, 140.01, 140.05, 150.07, 405.1907, 410.26, 410.28, 410.4002.03, 410.4002.05

**COUNSEL:** Donald R. Dunner, Robert D. Bajefsky, Charles E. Lipsey, Susan H.  Griffen, Darrel C. Karl, James K. Hammond, Kenneth M. Frankel, and Mark W.  Lauroesch, of Finnegan, Henderson, Farabow, Garrett & Dunner, Washington, D.C.; Jerry E. Hyland and John W. Houghton, of Barnes & Thornburg, Indianapolis, Ind.; Gerald V. Dahling, Douglas K. Norman, and Amy E. Hamilton, Indianapolis, for Eli Lilly & Co.

30 U.S.P.Q.2D (BNA) 1881, *; USPQ Headnotes 1881, **

John E. Kidd, of Rogers & Wells, New York, N.Y.; Nicholas L. Coch, of Shea & Gould, New York; David T. Kasper, of Locke, Reynolds, Boyd & Weisell, Indianapolis, for Genentech Inc.

Gerald P. Dodson, of Howard, Rice, Nemerovski, Canady, Robertson & Falk, San Francisco, Calif.; Robert C. Miller, Jean- Paul Lavalleye, and John H. Weber, of Oblon, Spivak, McClelland, Maier & Neustadt, Arlington, Va.; Thomas D. Nevins, of Broad, Schulz, Larson & Winberg, San Francisco,, Calif.; Susan B. Tabler, of Ice, Miller, Donadio & Ryan, Indianapolis, for University of California.

**OPINIONBY:** Dillin, J.

**OPINION:**
Entry Denying Lilly's First Motion for Partial Summary Judgment That Claims Five and Six of U.S. Patent No. 4,421,740 Are Invalid; Denying Lilly's Motion for Leave to File a Supplemental Reply Brief; and Denying UC's Motion to Defer Ruling on Lilly's First Motion for Summary Judgment and to Remand the Same to the Northern District of California

December 22, 1993 This cause comes before the Court on Eli Lilly and Company's First Motion for Partial Summary Judgment That Claims Five and Six of U.S. Patent No. 4,421,740 Are Invalid; on Eli Lilly and Company's Motion for Leave to File a Supplemental Reply Brief; and on the Regents of the University of California's Motion to Defer Ruling on Lilly's First Motion for Summary Judgment and to Remand the Same to the Northern District of California. For the following reasons, all motions are DENIED.

 Background The motions before the Court are related to cause number IP-92-0224-C, one of five cases consolidated in this Court for pretrial proceedings by the Judicial Panel on Multidistrict Litigation.  See In re Recombinant DNA Technology Patent and Contract Litig. , Docket No. 912 (J.P.M.L., Feb. 19, 1992), aff'd, *In re Regents of the Univ. of Cal. , 964 F.2d 1128 [ 22 USPQ2d 1748]* (Fed. Cir. 1992). The consolidated cases arise out of various research arrangements between the Regents of the University of California (UC), Genentech, Inc. (Genentech), and Eli Lilly & Company (Lilly).

The instant action was initiated when UC, a public corporation under the laws of the State of California, filed a patent infringement action on February 7, 1990, in the Northern District of California against Lilly, a corporation organized to do business under the laws of the State of Indiana. UC amended its complaint April 24, 1991, and the amended complaint alleges that Lilly is willfully infringing three of UC's patents.

The patent relevant to the present motions is U.S. Patent Number 4,431,740 (the '740), issued to UC on February 14, 1984. This patent was issued for an invention entitled, "DNA Transfer Vector and Transformed Microorganism Containing Human Proinsulin and Pre-Proinsulin Genes." A limited review of modern biology assists in comprehending the science underlying the issues before the Court.

All living things are composed of cells, which can be thought of as microscopic, biological building blocks. Deoxyribonucleic acid (DNA), in various compositions, is found in all living cells. In higher organisms known as eukaryotes, such as humans, DNA is contained within the nucleus of the cell.  In  [*1883]  lower organisms known as prokaryotes, such as bacteria and algae, DNA is found in the cytoplasm of the cell.

The DNA molecule contains, in effect, coded instructions for the manufacture of chemicals necessary for life, including proteins such as insulin and growth hormone in humans. The molecular structure of DNA is in the form of a double helix, generally conceptualized as an enormously long twisted rope ladder. The length and specific structure of DNA corresponds to the complexity of the organism. It is estimated that the human DNA ladder contains several billion "rungs."

Each rung of any DNA molecule consists of a pair of base chemicals, of which there are only four--adenine, thymine, guanine and cytosine. In large part, the varying pattern of these chemicals gives each complete DNA molecule its uniqueness. In addition, each rung in the DNA molecule contains a joint, thereby enabling a rung to be broken by the cell and reattached. Thus, a cell can duplicate its DNA or copy small sections of it.

30 U.S.P.Q.2D (BNA) 1881, *; USPQ Headnotes 1881, **

A section of DNA that contains the coded instructions for the manufacture of a particular protein is called a gene. When the information contained in a particular gene is communicated to other parts of the cell, the cell can produce that protein encoded in the gene.

Scientists have discovered that the form of information in DNA is not unique to a particular species. For example, single cell bacteria can read sections of human DNA when such DNA sections are attached to the bacteria's own DNA and can then produce the chemicals encoded therein.

Molecular biologists and chemists only recently have developed the techniques necessary to isolate a particular human gene, determine its sequence, i.e., its structure, copy or synthesize it, insert it into the DNA of bacteria, and coax the bacteria to follow the gene's directions and express the desired chemical. Since bacteria replicate very rapidly and the altered DNA of the bacteria is duplicated in the replication process, the production of the desired chemical by bacteria can become commercially feasible. This recombinant DNA biotechnology underlies the present dispute. n1

> n1 Recombinant DNA is "DNA that has been artificially introduced into a cell so that it alters the genotype and phenotype of the cell and is replicated along with the natural DNA." Dorland's Medical Dictionary (26th ed. 1981).

Significant to the partial summary judgment motion is gleaning from the above review that there are both natural (cDNA) genes and artificial (or synthetic) genes n2 that will produce a desired protein--in this case, human proinsulin. cDNA can be derived from human tissue that produces insulin and is made in test tubes ( in vitro ). The artificial gene is made in vitro using a series of repetitive chemical reactions to build up a desired DNA sequence. The desired sequence is determined in advance based on the known protein sequence (sequence of amino acid building blocks) of the material one wants the cell to produce.

> n2 UC notes that there are at least four methods of obtaining genes, including natural (cDNA) genes and artificial (synthetic) genes--cDNA, synthetic DNA, semisynthetic DNA and site-directed mutagenesis-derived DNA--which genes if encoding the same DNA sequence are indistinguishable from each other.

Apparently, the gene Lilly uses in manufacturing human proinsulin is a combination of the natural and artificial processes.  n3 It is Lilly's use of this proinsulin gene in its commercial production of human proinsulin--a precursor to the protein human insulin used in the treatment of diabetes--that forms the basis for Lilly's partial summary judgment motion, the first of three motions to which we now turn.

> n3 The record indicates some disagreement between the parties regarding the portion of the gene that is natural and the portion of the gene that is artificial.

Discussion Lilly has moved the Court for partial summary judgment that claims five and six of the '740 patent are invalid as a matter of law. Because claim six of the '740 patent is dependent on claim five, the following discussion often is phrased only in terms of claim five. We begin our analysis by addressing the standards applicable in an action challenging patent validity.

I. Partial Summary Judgment Motion n4 A. Presumptions and Burdens  [*1884]  "A patent is presumed valid and the burden of persuasion to the contrary is and remains on the party asserting invalidity." *Ralston Purina Co. v. Far-Mar-Co, Inc. , 772 F.2d 1570, 1573 [ 227 USPQ 177]* (Fed. Cir. 1985) (citing *W.L. Gore & Assoc., Inc. v. Garlock Inc. , 721 F.2d 1540, 1553, 220 U.S.P.Q. 303, 313 (Fed. Cir. 1983),* cert. denied , 469 U.S. 851, 105 S. Ct. 172, 83 L.Ed.2d 107 (1984)). The clear and convincing standard applies. *American Hoist & Derrick Co. v. Sowa & Sons , 725 F.2d 1350, 1360 [ 220 USPQ 763]* (Fed. Cir.), cert. denied , 469 U.S. 821, 105 S. Ct. 95, 83 L.Ed.2d 41 [ 224 USPQ 520] (1984). Furthermore, the party challenging the validity of the patent also bears the initial burden of going forward to establish a

30 U.S.P.Q.2D (BNA) 1881, *; USPQ Headnotes 1881, **

legally sufficient prima facie case of invalidity. *Ralston Purina Co.* , *772 F.2d at 1573.* Should the challenger meet this burden, the party relying on the validity of the patent then must produce evidence to the contrary. Id. B. Summary Judgment Standard Summary judgment is appropriate when there is no genuine issue of material fact, and the movant is entitled to judgment as a matter of law. *Continental Can Co. USA, Inc. v. Monsanto Co.* , *948 F.2d 1264, 1265 [ 20 USPQ2d 1746 ]*(Fed. Cir. 1991) (citing Fed.R.Civ.Pro. 56 (c); *Anderson v. Liberty Lobby. Inc.*, *477 U.S. 242, 106 S. Ct 2505, 91 L.Ed.2d 202 (1986); Celotex Corp. v. Catrett* , *477 U.S. 317, 325-26, 106 S. Ct. 2548, 2554, 91 L.Ed.2d 265 (1986); Scripps Clinic & Research Found. v. Genentech, Inc.* , *927 F.2d 1565, 1571, 18 U.S.P.Q.2d 1001, 1005 (Fed. Cir. 1991)).* The moving party must illustrate that no fact material to the issue is in dispute even when all factual inferences are considered in the light most favorable to the non-movant. Id .

n4 Lilly argues that UC's failure to cite to the examiner of the United States Patent and Trademark Office (PTO) the works of Dr. Keiichi Itakura and Dr. Arthur Riggs on proinsulin eases dramatically Lilly's burden of proving the invalidity of claim five of the '740 patent. See *American Hoist & Derrick Co. v. Sowa & Sons* , *725 F.2d 1350, 1360 [ 220 USPQ 763]* (Fed. Cir.) (holding that although deference generally is accorded the decision of the PTO, when an attacker of a patent produces prior art that was not considered by the PTO examiner, no reason exists to defer to the PTO so far as that prior art's effect on validity is concerned), cert. denied , *469 U.S. 821, 105 S. Ct. 95, 83 L.Ed.2d 41 [ 224 USPQ 520* ] (1984). UC counters that the PTO did consider the results of the prior work Lilly cites. In deciding this motion, we need not determine whether the PTO examiner had all the relevant prior art cited before him in considering the '740 patent. The deference or lack of deference due the PTO does not change the presumption of validity, the burden of proof, or the standard of proof. Id . In some cases, new prior art not before the PTO may clearly invalidate the patent such that the attacker's burden is fully sustained merely by proving its existence. Id . Nevertheless, the facts before us do not warrant such an invalidation. The issues of fact discussed infra in the text illustrate that Lilly has not met the requisite burden of proof for invalidating the '740 patent as a matter of law even if the PTO examiner did not have before him the works Lilly cites.

Although summary judgment is as available in patent cases as in other litigation areas, *Continental Can Co. USA, Inc.* , *948 F.2d at 1265* (citing *Chore-Time Equip., Inc. v. Cumberland Corp.* , *713 F.2d 774, 778-79, 218 U.S.P.Q. 673, 675 (Fed. Cir. 1983)),* an improvidently granted summary judgment prolongs litigation and increases its burdens. Id . at 1265-66. C. Legal Theories Offered by the Parties for Determining Patent Validity: *35 U.S.C. Sections 102,* 112 and 103 Lilly first argues that its proinsulin production process does not infringe UC's '740 patent because claims five and six of the '740 patent encompass work previously invented by Dr. Keiichi Itakura (Itakura) and Dr. Arthur Riggs (Riggs). Thus, Lilly asserts, claims five and six of the '740 patent are invalid under *35 U.S.C. Section 102* n5 because such claims were anticipated by the prior work of Itakura and Riggs. n6 Specifically, Lilly contends that Itakura and Riggs invented the DNA synthesis techniques for making artificial genes before UC, thereby invalidating UC's claim to an artificial human  [*1885]  proinsulin gene. Alternatively, Lilly asserts, should UC now suggest that the techniques of Itakura and Riggs are inoperable so that the prior work of Itakura and Riggs did not place an artificial gene for human proinsulin within the public's grasp, then UC is claiming subject matter which neither UC nor Itakura and Riggs have taught the public to make. In this case, Lilly continues, claims five and six would be invalid because they would fail to enable one skilled in the art to make and use the inventions as required by *35 U.S.C. Section 112.* n7

n5 Lilly cites the following portion of *35 U.S.C. Section 102* as pertinent to its motion: n5 Conditions for patentability; novelty and loss of right to patent.

A person shall be entitled to a patent unless --

(a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent, or . . . .

(e) the invention was described in a patent granted on an application for patent by another filed in the United States before the invention thereof by the applicant for patent . . . . or

30 U.S.P.Q.2D (BNA) 1881, *; USPQ Headnotes 1881, **

(g) before the applicant's invention thereof the invention was made in this country by another who had not abandoned, suppressed, or concealed it.

n6 This prior work of Itakura and Riggs includes their U.S. patent application filed November 8, 1977 (from which U.S. Patent Number 4,704,362 was issued), their European patent application published May 16, 1979 (identifying the original U.S. application by serial number), and their U.S. Patent Number 4,704,362 (the '362 patent) issued November 3, 1987. The European patent application and the '362 patent have corresponding disclosure and both include the disclosure of the original U.S. patent application. Thus, while we discuss the issues in terms of the '362 patent, this patent does encompass the relevant teachings of all the works Lilly cites as prior art.

n7 The first paragraph of *35 U.S.C. Section 112* stipulates: n7 The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

It should be noted that although Lilly in its principal brief argues enablement as an alternate point for invalidation, Lilly states in its reply brief that this challenge is moot. Enablement is discussed further infra in the text at Section I.C.2.

On the other hand, UC posits that its research leading to the '740 patent was the first to determine experimentally the amino acid sequence of human proinsulin--a sequence that is needed to make an artificial human proinsulin gene and a sequence not specifically included in the work of Itakura and Riggs. Therefore, UC argues, claims five and six of the '740 patent are valid notwithstanding the work of Itakura and Riggs.

UC further contends that Section 102 anticipation has a narrow application and that the facts of this case do not fit within it. Further, UC maintains, Lilly is incorrect in its assertion that claims five and six of the '740 patent are non-enabling and invalid under Section 112 if not anticipated by Itakura and Riggs' prior work. Rather, UC argues that the proper ground for determining validity of the '740 patent is not Section 102 anticipation or Section 112 enablement, but *35 U.S.C. Section 103* obviousness. n8 1. *35 U.S.C. Section 102,* Anticipation Anticipation is a question of fact. *Scripps Clinic & Research Found. , 927 F.2d 1565, 1576 [ 18 USPQ2d 1001]* (Fed. Cir. 1991) (citing *Shatterproof Glass Corp. v. Libbey-Owens Ford Co. , 758 F.2d 613, 619, 225 U.S.P.Q. 634, 637* (Fed. Cir.), cert. dismissed , *474 U.S. 976, 106 S. Ct. 340, 88L.*Ed.2d 326 (1985)). A patent is anticipated only if all the elements and limitations of the claim are found within a single, prior art reference. *Id* . (citations omitted). No difference may exist between the claimed invention and the reference disclosure, as viewed by a person of ordinary skill in the field of invention. *Id* .

n8 UC cites the following portion of *35 U.S.C. Section 103* as pertinent to the instant motion: n8 A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

In some instances, extrinsic evidence is admissible to explain the disclosure of a reference. "Such factual elaboration is necessarily of limited scope and probative value, for a finding of anticipation requires that all aspects of the claimed invention were already described in a single reference: a finding that is not supportable if it is necessary to prove facts beyond those disclosed in the reference in order to meet the claim limitations." Id . Although extrinsic evidence may be used to explain to the decisionmaker what the reference meant to persons of ordinary skill in the field of the invention, such evidence may not be used to fill gaps in the reference. Id . (citing Studiengesellschaft Kohle, mb*H v. Dart Indus., Inc. , 726 F.2d 724, 727, 220 U.S.P.Q. 841, 842 (Fed. Cir. 1984)* (although additional references may serve to reveal what a reference would have meant to a person of ordinary skill, it is error to build "anticipation" on a combination of

these references)). The extrinsic evidence "must make clear that the missing descriptive matter is necessarily present in the thing described in the reference, and that it would be so recognized by persons of ordinary skill." *Continental Can Co. USA, Inc. v. Monsanto Co.*, *948 F.2d 1264, 1268 [ 20 USPQ2d 1746]* (Fed. Cir. 1991).

"This modest flexibility in the rule that anticipation requires every element of the claims to appear in a single reference accommodates situations where the common knowledge of technologists is not recorded in the reference; that is, where technological facts are known to those in the field of the invention, albeit not known to judges." *Id*. *at 1269.* [*1886]

The Federal Circuit has held that if more than one reference is necessary to provide the missing disclosure of the claimed invention, the proper ground for analyzing validity of a patent is not Section 102 anticipation, but Section 103 obviousness. *Scripps Clinic*, *927 F.2d at 1577;* see *Continental Can*, *948 F.2d at 1269.*

To succeed in its partial summary judgment motion under Section 102, Lilly must convince the Court either: 1) that all elements of claims five and six of the '740 patent appear in a single prior reference; or 2) that although more than one reference is necessary, the additional references merely serve to illustrate the common knowledge of technologists in the field. Lilly uses the latter approach in arguing that the Court should grant partial summary judgment.

Lilly contends that the inventions of Itakura and Riggs in U.S. Patent Number 4,704,362 (the '362 patent), whose assignee is Genentech, anticipate claims five and six of the '740 patent. The '362 patent application was filed November 8, 1977; the '740 patent application was filed September 12, 1979. In claim six of the '362 patent, inventors Itakura and Riggs claim " [a] recombinant cloning vehicle according to claim 2 wherein said polypeptide is human proinsulin." In claim five of the '740 patent, inventors Graeme Bell, Raymond Pictet, Howard Goodman and William Rutter claim " [a] DNA transfer vector comprising a deoxynucleotide (DNA) sequence coding for human pro-insulin consisting essentially of a plus strand having the sequence: [selected from among all possible DNA sequences encoding human proinsulin]."

Lilly argues that claim six of the '362 patent anticipates claims five and six of the '740 patent even though the inventors on the '362 patent did not specify the amino acid sequence for human proinsulin. In claim five of the '362 patent, as the preceding paragraph illustrates, the inventors only listed the protein human proinsulin by name. Lilly contends that the amino acid sequence was within the common knowledge of technologists in the field and, thus, was implicit in the '362 patent. UC points out that the '362 patent does not disclose an amino acid sequence and avers that the inventors on the '740 patent are they who finally determined the amino acid sequence for human proinsulin. Thus, UC insists, the amino acid sequence of the protein cannot be implicit in the '362 patent.

Because we find that there are genuine issues of material fact regarding whether the amino acid sequence for human proinsulin was within the common knowledge of technologists in the field when the '740 patent application was filed, we hold that summary resolution of the anticipation issue is inappropriate. First, we reiterate the formidable standard of proof Lilly must carry to succeed in this summary judgment motion. Lilly clearly must convince the Court that the extrinsic evidence it offers illustrates that the descriptive matter missing in the '362 patent--the amino acid sequence--is necessarily present in that reference. We do not believe that Lilly has met this burden.

Lilly argues that all of the researchers on this record consulted either the Atlas of Protein Sequence and Structure ( Atlas ) or an article entitled "Studies on Human Proinsulin" for amino acid sequence information when conducting insulin research. Lilly claims that these two works were authoritative sources on amino acid sequence information for proteins between 1977 and 1979 and, as such, their contents constitute common knowledge.

However, the 1972 Atlas and its 1976 and 1978 supplements make clear that the entire amino acid sequence for human proinsulin was not known with certainty. In each of these publications, the (total of) four basic residues that flank the C-peptide chain of human proinsulin are enclosed in special punctuation that indicates to the reader that the sequence therein only has been determined with 90 percent confidence.

Additionally, when an attorney questioned inventor Riggs about the most authoritative source available for amino acid sequence information, Riggs was unable to recall a name. Lilly Ex. 59 at 85-87. When the attorney specifically asked Riggs if the Atlas was the authoritative source on amino acid sequence for proteins from 1977 through 1979, Riggs responded, "I think it was."

30 U.S.P.Q.2D (BNA) 1881, *; USPQ Headnotes 1881, **

Go to Headnotes  [**1R]  The foregoing paragraphs illustrate genuine issues of material fact requiring a denial of Lilly's motion for partial summary judgment. First, whether listing the amino acid sequence for human proinsulin with 90 percent certitude should be viewed as rendering it "within the common knowledge of those in the field" is a disputed factual issue not proper for summary determination.

Second, Lilly's reliance on Riggs' testimony to verify that the Atlas is an authoritative source for amino acid sequence information does not convince the Court of that proposition. Riggs' response could be interpreted as meaning that either 1) Riggs thinks--but is not sure--that the Atlas was an authoritative source during the relevant time period; 2) Riggs, himself, thinks the Atlas [*1887] is authoritative but expresses doubt that others would agree; or 3) Riggs, himself, thinks the Atlas is an authoritative source. Lilly points to no follow-up questions to clarify the ambiguity in Riggs' deposition.

Other issues of fact are revealed in the 1971 article on which Lilly relies, "Studies on Human Proinsulin" (the Oyer et al . article). In that article, the authors n9 reported the proinsulin amino acid sequence later catalogued in the Atlas . The Oyer et al . article discusses the four basic residues that are listed with uncertainty in the Atlas . In a description of an illustration of a " [p]roposed partial amino acid sequence of human proinsulin based on the known structures of human insulin . . . and of the human C-peptide," the authors state that " [t]he four open circles indicate the probable locations of the 4 additional basic residues present in human proinsulin . . . based on the known structures of bovine and porcine proinsulins." (Second emphasis added).

> n9 The authors are Philip E. Oyer, Sooja Cho, James D. Peterson and Donald F.  Steiner, from the University of Chicago, Department of Biochemistry.

In the text of the article, the authors note, "It is highly probable that these residues are arranged in human proinsulin, as they are in bovine and porcine proinsulin, at either end of the C-peptide and linking it to the insulin regions. Thus from these data it is inferred that human proinsulin is an 86-residue single chain polypeptide . . . ." (Emphasis added). Furthermore, the authors later add, "Thus, although direct confirmation of this structure by isolation and sequence determination of human proinsulin is still necessary , all the data presently available are consistent with our tentative conclusion that the isolated peptide is identical in structure to the C-peptide region of human proinsulin." (Emphasis added).

The authors use of terms such as "probable" and "tentative" and phrases such as "highly probable" and "direct confirmation . . . is still necessary" demonstrates uncertainty in the authors' conclusions. UC and Lilly's polarized positions as to the significance of this qualifying language create a material issue of fact. n10

> n10 Lilly offers Application of Krukovsky to support its argument that the prior art anticipated the '740 patent. *184 F.2d 333 [ 87 USPQ 110]* (C.C.P.A. 1950). In Krukovsky , the Court determined that the prior work anticipated the subsequent patent application even though the authors stated their conclusions in the disjunctive and prefaced their conclusions with the word "probably." Krukovsky , however, was an appeal from denial of a patent rather than an action challenging an issued patent's validity. Thus, the standard used in that case is not identical to the standard applicable in the instant case.

Lilly also relies on United States Patent Number 3,953,418 (the '418 patent), issued in 1976, to persuade the Court that there was no uncertainty about the amino acid sequence for human proinsulin at the time the '740 patent application was filed in November of 1979. The '418 patent does state the structure of human proinsulin. However, its cited reference for this structure is an article in a 1970 publication. Thus, it would appear that the '418 patent's reference could be no more certain than either the later-published Atlas or Oyer et al . article.

In conclusion, we find that there are genuine issues of material fact and, therefore, we must deny Lilly's motion for partial summary judgment on the issue of anticipation.

2. *35 U.S.C. Section 103* Obviousness and *35 U.S.C. Section 112* Enablement As previously mentioned, UC contends that the validity of the '740 patent must be determined under *35 U.S.C. Section 103* obviousness, rather than *35 U.S.C. Section 102* anticipation. However, since Lilly does not argue that partial summary judgment should be granted for obviousness, we need not address this issue. Furthermore, a determination of obviousness at this stage would be premature "for the need to determine obviousness presumes anticipation is lacking." *Structural Rubber Products v. Park Rubber , 749 F.2d 707, 716 [ 223 USPQ 1264]* (Fed. Cir. 1984).

Also discussed earlier, Lilly argues in its principal brief that if UC now should argue that the techniques of Itakura and Riggs are inoperable so that their prior work did not place an artificial gene for human proinsulin within the public's grasp, then UC would be claiming subject matter that neither UC nor Itakura and Riggs have taught the public to make. Thus, Lilly concludes, claims five and six would be invalid because they would fail to enable one skilled in the art to make and use the inventions as required by *35 U.S.C. Section 112.*

In UC's Statement of Genuine Issues and Statement Controverting Lilly's Proposed Findings and Conclusions of Law, UC reports that it does not oppose Lilly's motion by arguing that "the chemical synthesis techniques of Itakura and Riggs, referenced in the [ '740] patent, did not enable those skilled in the art to make all of the compounds encompassed by claims 5 and 6 at the time UC's patent application was filed . . . ." Page 31, Para. 18 (first occurrence). Thus, UC contends, Lilly's Section 112 enablement argument is irrelevant to the instant motion. [*1888]

Finally, in Lilly's reply brief, Lilly states that because UC is not challenging the adequacy of the Itakura and Riggs' disclosure in the '362 patent, Lilly's enablement argument is moot. Given the positions of the parties, it is unnecessary for the Court to discuss further the enablement issue Lilly originally raised.

 II. Lilly's Objections to Certain of UC's Exhibits In its reply brief to Lilly's First Motion for Partial Summary Judgment that Claims 5 and 6 of U.S. Patent No. 4,431,740 Are Invalid, Lilly in footnote one objects to the admissibility of several of UC's exhibits accompanying UC's opposition to Lilly's motion. UC filed a response to Lilly's objections. Following UC's response, Lilly filed a Motion for Leave to File a Supplemental Reply Memorandum, accompanied by its supplemental reply brief.

Because none of the UC exhibits put in issue by Lilly was necessary in deciding this partial summary judgment motion, we need not address their admissibility. Consequently, we deny Lilly's Motion for Leave to File a Supplemental Reply Memorandum.

 III. UC's Motion to Defer In response to Lilly's first partial summary judgment motion, UC moved the Court to defer ruling and to remand the motion for decision to the Northern District of California after completion of pretrial discovery. As noted earlier, UC originally filed this action in the Northern District of California.

After reviewing the text of *28 U.S.C. Section 1407* and appropriate case law, we believe that the transferee court is the proper court to decide summary judgment motions arising in actions consolidated by the Judicial Panel on Multidistrict Litigation.  n11 See , e.g. , *Humphreys v. Tann , 487 F.2d 666, 667-68 (6th Cir. 1973)* ("Various motions may properly be made as part of pretrial proceedings, including motions for summary judgment. The statute which permits the transfer of a case in multidistrict litigation provides for the remand of the case to the district from which it was transferred, at or before conclusion of pretrial proceedings, 'unless it shall have been previously terminated.' *28 U.S.C. Section 1407.* . . . We adhere to our opinion in *Reidinger v. Trans World Airlines, Inc. , 463 F.2d 1017 (6th Cir. 1972),* that the judge of a transferee court does have the power to hear and decide motions for summary judgment."), cert. denied , *416 U.S. 956, 94 S. Ct. 1970, 40 L.Ed.2d 307 (1974); In re Korean Air Lines Disaster of Sept. 1, 1983 , 829 F.2d 1171 (D.C. Cir. 1987)* (Ginsburg, J., concurring) ("Indeed, Congress contemplated that transferred cases might never return to the transferor courts, but instead might be settled or resolved by summary judgment in the transferee court, or else transferred under section 1404(a) to that same transferee court for joint trial."), aff'd , *490 U.S. 122, 109 S. Ct. 1676, 104 L.Ed.2d 113 (1989).* In light of the foregoing, the Court denies UC's motion to defer.

n11 UC argues that the sovereign immunity provided by the Eleventh Amendment of the United States Constitution counsels that this summary judgment motion should be returned to California for decision.

However, as the Federal Circuit recently pointed out in an opinion pertaining to one of the five actions consolidated in this Court, Congress enacted legislation on October 28, 1992, abrogating a state's immunity from suit for violation of patent law. Genentech, Inc. v. Eli Lilly & Co. , *998 F.2d 931 [ 27 USPQ2d 1241* ] (Fed. Cir. 1993) (citing Patent and Plant Variety Protection Remedy Clarification Act, Pub. L. No. 102-560, 106 Stat. 4230 (1992)). Thus, UC's Eleventh Amendment argument fails.

 IV. Conclusion For the aforementioned reasons, the Court: (1) denies Lilly's First Motion for Partial Summary Judgment; (2) denies Lilly's Motion for Leave to File a Supplemental Reply Memorandum; and (3) denies UC's Motion to Defer Ruling on Lilly's First Motion for Summary Judgment and to Remand the Same to the Northern District of California. Entry Granting Lilly's Motion for Leave to Amend Its Answer to Add a Counterclaim for Relief if Genentech Is Found Liable for Infringement

March 2, 1994

This cause comes before the Court on Lilly's motions in IP-90-1679-C and IP-92-0223-C for leave to amend its answer to add a counterclaim for relief if Genentech is found liable for infringement. For the following reasons, the motions are GRANTED.

 Background Cause number IP-90-1679-C was initiated on August 6, 1990, when Genentech, Inc. (Genentech) filed suit against Eli Lilly & Company (Lilly) and the Regents of the University of California (UC) in the Southern  [*1889] District of Indiana.  Genentech amended its complaint on August 27, 1990, and the amended complaint seeks a declaratory judgment that one of UC's patents, the '877 patent, is invalid, noninfringed and unenforceable. The complaint also includes antitrust and pendent state law claims. n12

> n12 Although the complaint included antitrust claims, yet the Federal Circuit in a July 1, 1993, opinion held that Genentech, in its complaint, did not plead facts that if proved would constitute violation of the antitrust laws. The Court concluded that the district court correctly had dismissed Genentech's claims of antitrust violation in the licensing arrangement pursuant to Rule 12(b)(6), Fed. R. Civ. P. *Genentech, Inc. v. Eli Lilly & Co., 998 F.2d 931, 949 [ 27 USPQ2d 1241]* (Fed. Cir. 1993).

In early 1991, the Southern District of Indiana dismissed UC from IP-90-1679-C, leaving Lilly, the exclusive licensee of the '877 patent, as the remaining defendant. UC's dismissal was granted on the ground that the suit was barred by the University's immunity and, alternatively, on exercise of the Court's discretion to decline to entertain the declaratory judgment action. On July 1, 1993, the Federal Circuit held that dismissal of UC was improper.  *Genentech, Inc. v. Eli Lilly & C o., 998 F.2d 931, 949 [ 27 USPQ2d 1241]* (Fed. Cir. 1993).

The Federal Circuit's holding prompted UC on October 22, 1993, to file an answer to Genentech's complaint, a compulsory counterclaim, and a request for a jury trial. On this same day, Lilly filed the motion currently before us. As exclusive licensee of the '877 patent, Lilly seeks to add a counterclaim for relief in the event that Genentech is found liable for infringement of the '877 patent.

Cause number IP-92-0223-C was initiated when UC filed a patent infringement action against Genentech in the Northern District of California on August 7, 1990. In this action, UC alleges that Genentech willfully is infringing the '877 patent. n13

> n13 As stated earlier in the text, after the Federal Circuit found that UC properly was a party to IP-90-1679-C, see *Genentech, Inc. v. Eli Lilly & Co., 998 F.2d 931, 949 [ 27 USPQ2d 1241* ] (Fed. Cir. 1993), UC filed an answer and a counterclaim in that case.  UC's counterclaim in IP-90-1679-C mirrors UC's complaint in IP-0223-C.  Moreover, Genentech's answer to UC's complaint in IP-92-0223-C mirrors Genentech's complaint in IP-90-1679-C. Resolution of IP-90-1679-C, filed one day before IP-92-0223-C, apparently would resolve IP-92-0223-C.

30 U.S.P.Q.2D (BNA) 1881, *; USPQ Headnotes 1881, **

On March 6, 1991, Genentech filed an amended answer to UC's complaint and counterclaims against UC and Lilly. Subsequently, on June 10, 1991, Lilly filed its answer to these counterclaims. Finally, on March 16, 1993, Lilly moved for leave to amend its answer to add a counterclaim for relief if Genentech is found liable for infringement in IP-92-0223-C.

Lilly's motions for leave to amend its answer in both IP-90-1679-C and IP-92-0223-C currently are before the Court.

Discussion I.  Standing to Sue -- IP-90-1679-C and IP-92-0223-C

UC and Genentech contend that Lilly does not have standing to add the proposed counterclaim for relief in either IP-90-1679-C or IP-92-0223-C.  Specifically, they argue that the terms of the 1989 agreement between UC and Lilly, in which UC granted Lilly an exclusive license to the '877 patent, limit Lilly's right to sue.  Such limitation, UC and Genentech assert, prevents the amendment Lilly seeks.  Lilly contends, however, that although the license agreement does limit Lilly's right to initiate suit against an infringer, yet it does not prevent Lilly from joining an action UC initiates.

Initially, we note that if the terms of the 1989 agreement do not prohibit Lilly from filing its proposed counterclaim, Lilly's requested amendment should be granted unless such amendment unduly would prejudice UC or Genentech. It is clear from case law that although an exclusive licensee may not have a right to sue at law in its own name, the licensee is permitted, if not encouraged, to join such an action when the patent owner is a party.  See, e.g. , *Arachnid, Inc. v. Merit Industries, Inc. , 939 F.2d 1574, 1579 n.7 [ 19 USPQ2d 1513]* (Fed. Cir. 1991) (noting that " . . . additional exceptions . . . confer standing upon non-patent owners to join infringement suits as co-plaintiffs with the patentee; see, e.g., *Kalman v. Berlyn Corp. , 914 F.2d 1473, 16 U.S.P.Q.2d 1093 (Fed. Cir. 1990)* (sole licensee with clearly defined nexus to patentee); *Weinar v. Rollform Inc. , 744 F.2d 797, 223 U.S.P.Q. 369 (Fed. Cir. 1984)* (exclusive vendor of patented product), cert. denied , *470 U.S. 1084, 105 S. Ct. 1844, 85 L.Ed.2d 143 (1985)*."); *Duplan Corp. v. Deering Milliken Research Corp. , 522 F.2d 809 [ 186 USPQ 369]* (4th Cir. 1975) (holding that joinder of exclusive use licensee proper to permit such licensee, inter alia , to protect its portion of the royalty).

"A license agreement is a contract governed by ordinary principles of state contract law." *Power Lift, Inc. v. Weatherford Nipple-Up Sys. , 871 F.2d 1082, 1085 [ 10 USPQ2d 1464]* (Fed. Cir. 1989). The license agreement in issue stipulates that California law  [*1890]  shall govern the instant action.  n14 Thus, we apply California contract law to resolve the issue at hand.

n14 Section 13.05 of the license agreement reads: n14 Governing Law.  This agreement shall be interpreted and construed in accordance with the laws of the State of California.

Lilly's Ex. B at 22.

California contract law stipulates that " ' [a] contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful.' " *Siligo v. Castellucci , 1994 WL 4614,* at *4 (Cal. Ct. App. Jan. 10, 1994) (quoting Cal. Civ.  Code Section 1636). A contract must be interpreted in a way which makes it " 'lawful, operative, definite, reasonable and capable of being carried into effect, if it can be done without violating the intention of the parties.' " *Id* . (quoting Cal. Civ. Code Section 1643). " 'However broad may be the terms of a contract, it extends only to those things concerning which it appears that the parties intended to contract.' " *Id* . (quoting Cal. Civ. Code Section 1648). On the issue of reasonable interpretation, California courts have stated that " [c]ourts should avoid an interpretation which will make a contract 'unusual, extraordinary, harsh, unjust or inequitable. . . .' " *Southland Corp. v. Emerald Oil Co. , 789 F.2d 1441, 1443 (9th Cir. 1986)* (quoting *Yamanishi v. Bleily & Collishaw, Inc. , 29 Cal. App. 3d 457, 462, 105 Cal. Rptr. 580 (1972)* (quoting *Hertzka & Knowles v. Salter , 6 Cal. App. 3d 325, 335, 86 Cal. Rptr. 23 (1970)).*

Returning to the instant actions, Section 12.02 of the license agreement between UC and Lilly, in relevant part, provides:

30 U.S.P.Q.2D (BNA) 1881, *; USPQ Headnotes 1881, **

During the term that this license is exclusive, if Lilly shall provide The Regents with evidence comprising a prima facie case of substantial infringement of one or more Regents' Patent Rights by one or more third parties, Lilly may in writing request The Regents to take steps to enforce the Regents' Patent Rights. If The Regents fails within three (3) months following receipt of such written request (i) to cause such infringement to terminate, or (ii) to initiate and pursue in good faith, according to established legal norms, legal proceedings against the alleged infringers, no royalties shall be due The Regents from Lilly based upon sales of Licensed Product in the country in which the infringement occurs for the term following the three (3) month period during which such infringement continues unchallenged by legal proceedings. If The Regents fails to initiate legal proceedings, Lilly may at its option and in its own name elect to initiate such proceedings where it had an exclusive license during the period of alleged infringement and the law of that jurisdiction allows such exclusive licensee suits, in which event Lilly's royalty obligations hereunder will continue or resume if discontinued. In such event, The Regents will cooperate with Lilly in such proceedings. . . .

Lilly's Ex. B at 19-20.

Go to Headnotes  [**2R]  UC and Genentech apparently interpret this provision of the license agreement to prohibit Lilly not only from initiating suit against an alleged infringer, but also from choosing to participate in an infringement proceeding once initiated by UC. Although we agree that the license agreement prohibits Lilly from initiating an infringement action if UC chooses to do so, we do not believe that the agreement reasonably can be construed to imply that Lilly cannot participate in an action after its initiation by UC.

In IP-90-1679-C, Genentech filed a declaratory judgment action on August 6, 1990. UC responded on October 22, 1993, with a counterclaim for infringement of the '877 patent. After UC filed its counterclaim, Lilly, as exclusive licensee of the '877 patent and co-defendant in Genentech's complaint, filed a motion to amend its answer to include a counterclaim for relief, one of the two instant motions. Thus, the facts illustrate that, contrary to UC and Genentech's contentions, Lilly did not attempt to initiate an infringement action against an alleged infringer. Rather, Lilly responded to Genentech's complaint, awaited UC's counterclaim, and now seeks to add its own counterclaim.

In IP-92-0223-C, UC initiated suit against Genentech, Genentech counterclaimed against UC and Lilly, and now Lilly, exclusive licensee of the '877 patent, is requesting permission to amend its answer to Genentech's counterclaims. Lilly seeks to include a counterclaim against Genentech for damages and an injunction should UC prevail in its attempt to prove that Genentech is infringing the '877 patent.

We recognize that neither of these cases presents the usual scenario in which the exclusive licensee desires to join as co-plaintiff an action originally filed by the patent owner.  See, e.g., *Kalman , 914 F.2d 1473 [ 16 USPQ2d 1093]; Duplan Corp. , 522 F.2d 809 [ 186 USPQ 369].* It is true that in IP-92-0223-C Lilly could have sought the same relief by attempting to join as co-plaintiff  [*1891]  after UC initiated the suit. However, Lilly's status as co-defendant in IP-90-1679-C and as co-counterclaim defendant in IP-92-0223-C rather than as co- plaintiff certainly provides no reason to deny Lilly's request. The amendment Lilly seeks as a co-defendant/co-counterclaim defendant accomplishes nothing substantively different from the relief Lilly would be entitled to as a co-plaintiff.

Furthermore, were we to accept UC and Genentech's interpretation of the contract, we would have to conclude that in the agreement Lilly either (1) implicitly agreed that it was entitled to no damages in the event UC brought an infringement action on the '877 patent; or (2) implicitly agreed that in order to recover damages from an infringer, Lilly would have to bring a later suit against the infringer or file a suit against UC for Lilly's portion of the royalty.

It is very difficult to imagine that Lilly -- as exclusive licensee entitled to a minimum of 97 percent of the sales of the licensed product -- would be willing to enter into an agreement leaving Lilly with no remedy in the event that UC should choose to initiate litigation against an alleged infringer. Consequently, our mandate to interpret a contract reasonably prevents us from interpreting the agreement so as to implicitly deny Lilly redress against infringers. n15

n15 Section 5.03 of the 1989 license agreement also addresses the relationship of the parties in the event that an alleged infringer is sued. In relevant part, that section provides that the royalty due UC for the licensed product sold by Lilly will be reduced by 0.5 percent if "an action is brought by either The Regents or Lilly against a third

party for infringement of Regents' Patent Rights; . . . ." Lilly's Ex. B at 7. n15 We do not believe that this provision is any indication that UC and Lilly were limiting Lilly's rights to participate in an infringement proceeding. The provision in no way suggests that such a reduction is the licensee's sole remedy in the event that UC initiates suit.

Moreover, it does not seem reasonable to surmise that the agreement requires a second lawsuit in order for Lilly to recover its damages. n16 Certainly, such a provision would be in derogation of judicial economy. Thus, the Court further is persuaded that UC and Genentech's interpretation does not represent the intention of the parties.

n16 In Duplan Corp. v. Deering Milliken Research Corp., the Fourth Circuit noted that if the exclusive use licensee is denied permission to join as a co-plaintiff in an infringement action initiated by the patent owner, "any award of damages might be limited to that portion of the use royalty which would accrue to the patent owner alone." *522 F.2d 809, 815 [ 186 USPQ 369* ] (4th Cir. 1975) (citing *Cold Metal Process Co. v. E.W. Bliss Co., 285 F.2d 231, 240-42 [ 128 USPQ 49* ] (6th Cir. 1960), cert. denied , *366 U.S. 911, 6 L.Ed.2d 235 [ 129 USPQ 502]* (1961); *Bakelite Corp. v. Lubri-Zol Dev. Corp., 34 F.Supp. 142, 144 [ 46 USPQ 303* ] (D. Del. 1940)). The court went on to note that there is some doubt as to whether a licensee could maintain a second action against the alleged infringer to recover its portion of the royalty. *Duplan Corp., 522 F.2d at 815* (citing *Holliday v. Long Mfg. Co., 18 F.R.D. 45, 49 [ 106 USPQ 259]* (E.D.N.Y. 1955)).

We believe that either of the above interpretations would fall into the category of " 'unusual, extraordinary, harsh, unjust or inequitable. . . .' " *Southland Corp. , 789 F.2d at 1443* (quoting *Yamanishi , 29 Cal. App. at 462, 105 Cal. Rptr. at 583* (quoting *Hertzka & Knowles , 6 Cal. App. 3d at 335, 86 Cal. Rptr. at 23)).* The Court concludes that a reasonable interpretation indicates that the provisions of the contract did not extend to the issue before us. Consequently, we find that the agreement does not prohibit Lilly from amending its answer in IP-90-1679-C or IP-92-0223-C to add its proposed counterclaim for relief.

While standing was the only issue addressed by UC and Genentech in IP-90-1679-C, they argued further in IP-92-0223-C that delay and prejudice prevent the amendment Lilly requests. Thus, our discussion turns to these issues.

II.  Delay and Prejudice -- IP-92-0223-C

In IP-92-0223-C, UC and Genentech contend that Lilly should not be permitted to amend its answer to include the proposed counterclaim because such amendment would be prejudicial. UC argues that Lilly's "untimely intervention" would further delay the trial and add to the complexity of the action. Genentech asserts that Lilly's amendment request should be denied because Lilly's delay in asserting the counterclaim is inexcusable. In their arguments against allowing amendment, UC and Genentech focus on the length of time that elapsed between August 7, 1990, when UC filed its complaint alleging infringement, and March 16, 1993, when Lilly filed its motion for leave to amend.

Deciding whether to grant or deny a motion to amend pursuant to Rule 15(a), Fed. R. Civ. P., lies within the discretion of the district court. *Ippolito v. WNS, Inc. , 864 F.2d 440, 454 (7th Cir. 1988)* (citing *Textor v. Board of Regents , 711 F.2d 1387, 1391 (7th Cir. 1983)).* Furthermore, " [w]hile delay [*1892] in itself does not constitute a sufficient basis for denying a motion to amend, *Feldman v. Allegheny Int'l, Inc. , 850 F.2d 1217, 1225 (7th Cir. 1988),* 'the longer the delay, the greater the presumption against granting the leave to amend.' " *Perrian v. O'Grady , 958 F.2d 192, 194 (7th Cir. 1992)* (quoting *Tamari v. Bache & Co. S.A.L. , 838 F.2d 904, 909 (7th Cir. 1988)* (further citations omitted)).

 In light of Seventh Circuit case law, we do not believe that a lapse of two and one-half years between the complaint and the instant motion is, without more, justification for denying Lilly's requested amendment. Additionally, we are not convinced that UC or Genentech will be prejudiced if Lilly's motion to amend is granted.

In light of this Court's recent decision to bifurcate the liability and damages issues in this action, UC's contention that such amendment would delay the trial is without merit. Even if discovery of the damages issues was not completed on schedule, trial on the issue of liability nonetheless could begin.  Furthermore, considerable time remains for discovery

30 U.S.P.Q.2D (BNA) 1881, *; USPQ Headnotes 1881, **

of damages-related issues before the Court's April 19, 1994, discovery deadline arrives. n17 The Court anticipates that this schedule provides the parties with sufficient time to complete discovery on both liability and damages issues.

> n17 The Court Order dated July 23, 1993, reads in relevant part: n17 3. By April 18, 1994, the parties shall complete all discovery other than that related to expert witnesses. . . .

Moreover, we are not persuaded that Lilly's proposed counterclaim would add the degree of complexity UC alleges. Lilly's amendment would add no " . . . different cause of action or different theories of infringement or validity." Lilly's Br. at 5.

Bearing in mind that " . . . leave [to amend] shall be freely given when justice so requires," Rule 15(a), Fed. R. Civ. P., we find that Lilly's motion to amend should be granted. By so granting, should Genentech be found liable for infringement, Lilly has an opportunity to seek relief without the necessity of a subsequent action if, indeed, a subsequent action would be permissible. See discussion, supra , at 9 n.5 and accompanying text.

For all the foregoing reasons, we grant Lilly's motions to amend its answers in IP-90-1679-C and IP-92-0223-C to add a counterclaim for relief should Genentech be found liable for infringement. Entry Granting Lilly's Motions for Leave to Amend, Denying Lilly's Motion for Summary Judgment as to Patent Unenforceability in IP-87-0219-C, and Denying Lilly's motion for Summary Judgment for Unenforceability As to All Counts in IP-88-1463-C

March 2, 1994

This cause comes before the Court on Lilly's motion for leave to amend its reply to Genentech's amended answer and counterclaim in IP-87-0219-C; Lilly's motion for leave to amend its answer and cross demands in IP-88-1463-C; Lilly's motion for summary judgment as to patent unenforceability in IP-87-0219-C; and Lilly's motion for summary judgment for unenforceability as to all counts in IP-88-1463-C. n18 For the following reasons, Lilly's motions for leave to amend are GRANTED, and Lilly's motions for summary judgment are DENIED.

> n18 The Court grants all the parties' motions for leave to file supplemental memorandums concerning the four motions currently before us. The supplemental materials, thus, have been considered for purposes of this Entry.

Background These actions are two of the six cases consolidated in this Court for pretrial proceedings by the Judicial Panel on Multidistrict Litigation. See In re Recombinant DNA Technology Patent and Contract Litig. , Docket No. 912 (J.P.M.L., Feb. 19, 1992), aff'd, In re Regents of the Univ. of Cal. , 964 F.2d 1128 [ 22 USPQ2d 1748] (Fed. Cir. 1992). The consolidated cases arise out of various research arrangements and license agreements among the Regents of the University of California (UC), Genentech, Inc. (Genentech), and Eli Lilly & Company (Lilly).

One of the actions currently before us, IP-87-0219-C, involves several patents potentially used in the production of human insulin and/or human growth hormone (hGH). Lilly initiated this cause of action on March 6, 1987, and amended its complaint on November 9, 1987. Lilly seeks a declaratory judgment that eight of Genentech's United States patents are invalid and not infringed. These patents are patent numbers 4,366,246; 4,601,980; 4,604,359; 4,634,677; 4,512,922; 4,518,526; 4,620,948; and 4,511,502. Genentech, in its counterclaims filed in IP-87-0219-C, alleges that Lilly willfully is infringing not only the patent numbers for which Lilly seeks the declaratory judgment, but also patent numbers 4,342,832; [*1893] 4,425,437; 4,431,739; 4,704,362; and 4,898,830.

Two agreements involving these patents and other unpatented materials are relevant to the motions in this case. First, on August 25, 1978, Lilly and Genentech entered into the Lilly-Genentech Insulin Agreement (Insulin Agreement). Under the Insulin Agreement, Lilly acquired the right to use certain of Genentech's biological materials and know-how "for the limited purpose of manufacturing, selling and using Recombinant Insulin without regard to Genentech Patent Rights . . . . Rights granted hereunder shall include the right to practice under any applicable Genentech Patent Right." Insulin Agreement, Section 6.01, Lilly Ex. 2 at 19.

30 U.S.P.Q.2D (BNA) 1881, *; USPQ Headnotes 1881, **

Second, on August 1, 1978, KabiGen AB (Kabi) n19 and Genentech entered into the Kabi-Genentech hGH Agreement (hGH Agreement). Under this agreement, Genentech granted Kabi the right to use certain of Genentech's biological materials and know- how for the limited purpose of manufacturing, selling and using hGH for human purposes "without regard to Genentech Patent Rights." hGH Agreement, Section 8.01, Lilly Ex. 13 at 18.

n19 Kabi is a Swedish corporation that manufactures and sells human growth hormone under a patent license from Genentech.

The second action before the Court is IP-88-1463-C, initiated by Genentech on November 6, 1987. Genentech amended its complaint on December 18, 1987, and the amended complaint alleges as causes of action willful infringement, breach of contract, fraud, unfair competition, theft of trade secrets, tortious interference with prospective business advantage, breach of fiduciary duty, unjust enrichment and conversion.

Lilly's defenses to Genentech's claims in IP-88-1463-C include estoppel, patent invalidity, patent unenforceability, statute of limitations and laches. Lilly also alleges in its defenses and cross demands that Genentech caused UC and UC researchers to breach certain agreements between UC and Lilly; that Genentech intentionally interfered with Lilly's relationship with UC and UC researchers, and intentionally interfered with Lilly's prospective economic advantage arising from that relationship; that Genentech wrongfully misappropriated trade secrets; and that Genentech wrongfully converted Lilly's property.

On February 11, 1993, Lilly moved the Court for leave to amend its reply to Genentech's answer and counterclaim in IP-87-0219-C to raise a defense of patent misuse. On that same date, Lilly moved the Court for leave to amend its answer and cross demands in IP-88-1463-C to "clarify [that] its existing unclean hands defense includes a defense of patent misuse. . . ." Lilly Mem. at 1. Lilly also sought permission to make a technical correction to its original reply in IP-88-1463-C to include in the prayer for relief an adjudication that Lilly has not converted Genentech's property. n20

n20 Lilly's request to make this correction has not been countered by Genentech, and the amendment policy of Rule 15(a), Fed. R. Civ. P., is a liberal one, as discussed infra in the text. Thus, we grant Lilly's request for leave to amend its answer in IP-88-1463-C to include in the prayer for relief an adjudication that Lilly has not converted Genentech's property.

Finally, filed concurrently with Lilly's motions for leave to amend were Lilly's motion for summary judgment as to patent unenforceability in IP-87-0219-C and motion for summary judgment for unenforceability as to all counts in IP-88-1463-C. The summary judgment motions are based on the defense of patent misuse.

Discussion I.  Lilly's Motions to Amend

Lilly has moved the Court for leave to amend its pleadings both in IP-87-0219-C and in IP-88-1463-C. Genentech opposes such motions, arguing that delay, prejudice and futility militate against such amendment. Genentech notes that the instant actions were initiated in 1987, and contends that Lilly long ago should have asserted its patent misuse defense.

Federal Rule of Civil Procedure 15(a) provides that a party may amend its pleading by leave of the court and that ". . . leave [to amend] shall be freely given when justice so requires. . . ." The Seventh Circuit has stated that delay in presenting an amendment ". . . will be a sufficient basis for denial of leave to amend only when the delay has caused the opposing party undue prejudice." *Textor v. Board of Regents of N. Ill. Univ. , 711 F.2d 1387 (7th Cir. 1983).* Thus, in deciding whether we should grant Lilly leave to amend, we must determine whether Lilly's delay in requesting leave to amend its pleadings has caused Genentech undue prejudice.

30 U.S.P.Q.2D (BNA) 1881, *; USPQ Headnotes 1881, **

Moreover, we are mindful that other courts have found leniency of particular importance when considering whether to allow a party to amend the pleadings to raise issues of patent misuse and consequent unenforceability [*1894] since " 'the possession and assertion of patent rights are 'issues of great moment to the public'.' " *Key Pharmaceuticals, Inc. v. Lowey , 373 F.Supp. 1190, 1193 [ 182 USPQ 316]* (S.D.N.Y. 1974) (quoting Precision Instrument Mfg. Co . v. *Automotive Maintenance Mach. Co. , 324 U.S. 806, 815, 89 L.Ed. 1381 [ 65 USPQ 133]* (1945) (quoting *Hazel-Atlas Glass Co. v. Hartford-Empire Co. , 322 U.S. 238, 246, 88 L.Ed. 1250 [ 61 USPQ 241]* (1944)).

Genentech claims that undue prejudice would result if the Court permitted Lilly to assert the defense of patent misuse at this belated date. n21 That prejudice, Genentech contends, would arise through the addition of new factual and legal issues, necessitating additional discovery and potentially delaying final disposition of these consolidated cases.

n21 Genentech contends that patent misuse is an affirmative defense and that Lilly's failure earlier to plead this defense in IP-88-1463-C constitutes a waiver of the defense under Rule 8(c), Fed. R. Civ. P. The Seventh Circuit has stated that a waiver analysis ". . . involves the very same equitable calculus triggered by the assessment of undue delay under Rule 15(a). . . ." *Daugherity v. Traylor Bros., 970 F.2d 348, 352 n.5 (7th Cir. 1992).* Thus, we address Genentech's claim of waiver as one of undue delay.

An examination of the parties' opposing viewpoints leads us to the conclusion that Lilly's motions to amend should be granted. While permitting Lilly to add the defense of patent misuse may prompt additional discovery, we are not persuaded that such discovery will be unduly burdensome. This position is supported by the fact that discovery in these consolidated cases currently continues.

Genentech also argues that the proposed amendment would be unduly prejudicial because of the May 9, 1992, death of Dr. Bertil Aberg (Aberg). Aberg was a founder of Kabi and one of the key negotiators of the hGH Agreement. However, Genentech does not explain why the other key negotiators of the hGH Agreement would not be able to provide the testimony referenced by Genentech. Since it appears that other witnesses are available to supply testimony regarding the hGH Agreement, we do not believe that Aberg's absence would unduly prejudice Genentech.

We turn now to the issue of delay. Even if adding the patent misuse defense would delay final disposition -- and we are not suggesting that it will -- such delay must be balanced against the public's interest in assuring that a patentee does not extend his patent beyond the statutory monopoly he has been granted. See *Key Pharmaceuticals, Inc. , 373 F.Supp. 1190.* We are convinced that any potential delay in final disposition does not rise to the level of undue prejudice to Genentech, particularly in light of the public interest that must be safeguarded.

Finally, we cannot agree with Genentech that Lilly's proposed amendments are an exercise in futility. Rather, as we explain in the following section regarding Lilly's summary judgment motions, a factual determination is necessary to evaluate the viability of Lilly's patent misuse defense. Such a determination requires that both parties have sufficient time to gather and present the pertinent facts.

Go to Headnotes [**3R] For all of these reasons, Lilly's motions to amend are granted.

II. Lilly's Motions for Summary Judgment

A summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). While facts are viewed in the light most favorable to the nonmoving party, there is an affirmative burden of production on the nonmoving party to defeat a proper summary judgment motion. *Baucher v. Eastern Ind. Prod. Credit Ass'n , 906 F.2d 332, 334 (7th Cir. 1990)* (following *Celotex Corp. v. Catrett , 477 U.S. 317, 323-24 (1986)).* Before the Court denies summary judgment, it must be determined whether there is sufficient evidence for a jury to find a verdict in favor of the nonmoving party. Id . (following *Anderson v. Liberty Lobby , Inc. , 477 U.S. 242, 249-50 (1986)).*

Lilly alleges that Genentech has included in the Insulin and hGH Agreements a provision that illegally restrains competition and impermissibly extends the statutory scope of Genentech's patent monopoly. Such inclusion constitutes

per se patent misuse and unclean hands, Lilly argues, and renders Genentech's patents in issue unenforceable. Lilly insists that such misuse not only bars Genentech's infringement claims in IP-87-0219-C, but also bars cause number IP-88-1463-C, Genenetech's action based, inter alia , on Lilly's alleged breach of the Insulin Agreement.

On the other hand, Genentech contends that the agreements containing the provisions about which Lilly complains are primarily licenses of Genentech's materials and know-how, rather than patent licenses. Genentech asserts that the provisions merely reserve for Genentech the right to terminate the agreement if the licensee is warehousing the Genentech material and know-how obtained under the agreement.  [*1895]

Additionally, Lilly argues that the 1988 Patent Misuse Reform Act (alternatively, the Act) is inapplicable to its patent misuse defense.  Conversely, Genentech contends that the Act should govern Lilly's recently added defense. We begin by addressing the issue of patent misuse.

"The grant to the inventor of the special privilege of a patent monopoly carries out a public policy adopted by the Constitution and laws of the United States, 'to promote the Progress of Science and useful Arts, by securing for limited Times to . . . Inventors the exclusive Right . . .' to their 'new and useful' inventions." *Morton Salt Co. , 314 U.S. 488, 492, 86 L.Ed. 365, 365-66 [ 52 USPQ 30]* (1944) (quoting United States Constitution, Art. I, Section 8, Cl. 8, *35 U.S.C.A. Section 31).* "But the public policy which includes inventions within the granted monopoly excludes from it all that is not embraced in the invention. It equally forbids the use of the patent to secure an exclusive right or limited monopoly not granted by the Patent Office and which it is contrary to public policy to grant." *Morton Salt Co. , 314 U.S. 488, 492, 86 L.Ed. 363, 366 [ 52 USPQ 30]* (1942).

To ensure that the patentee does not prosper from an impermissible broadening of the "physical or temporal scope" of the patent grant, the courts long have recognized the doctrine of patent misuse as an affirmative defense to a suit for patent infringement. *Windsurfing Int'l, Inc. v. AMF, Inc. , 782 F.2d 995, 1001 [ 228 USPQ 562]* (Fed. Cir. 1986) (quoting *Blonder-Tongue Labs. Inc. v. University of Ill. Found. , 402 U.S. 313, 343, 28 L.Ed.2d. 788 [ 169 USPQ 513]* (1971)). Traditionally, some forms of inappropriate action have been deemed per se patent misuse. Thus, if a patentee has used his patent as leverage to fix resale prices, see , e.g. , *Bauer & Cie. v. O'Donnell , 229 U.S. 1, 57 L.Ed. 1041 (1913),* or has tied another product to his patent (a practice referred to as a tying arrangement), see , e.g. , *Morton Salt Co. , 314 U.S. 488, 86 L.Ed. 365 [ 52 USPQ 30],* the patentee has been precluded as a matter of law from maintaining an infringement action, at least until the illegal restraint is removed.

In the past, courts have found per se patent misuse whenever the patentee conditioned the licensee's right to use his patent "on the licensee's agreement to purchase, use or sell, or not to purchase use or sell, another article of commerce not within the scope of his patent monopoly." *Zenith Radio Corp. v. Hazeltine Research , 395 U.S. 100, 136, 23 L.Ed.2d 129, 155 [ 161 USPQ 577]* (1969). For example, the Court in Morton Salt found per se patent misuse where the patentee permitted the licensee to use with the patented machines only salt tablets sold by the patentee. *Morton Salt , 314 U.S. 488, 86 L.Ed. 363 [ 52 USPQ 30].* And, the Court in National Lockwasher v. George K. Garrett Co . found per se patent misuse in a provision stipulating that the licensee would not manufacture any non-tangling spring washers except those covered by the licensor's patent.  *National Lockwasher , 137 F.2d 255 [ 58 USPQ 460]* (3d Cir. 1943).

Furthermore, agreements that implicitly rather than explicitly forbid the licensee from using the products or devices of a competitor also have been condemned. For example, in United Shoe Mach. Corp. v. United States , the lessor of patented shoe machinery included several restrictive provisions in his leases. *258 U.S. 451, 66 L.Ed. 708 (1922).* Among these provisions was one stipulating ". . . that if the lessee fails to use exclusively machinery of certain kinds made by the lessor, the lessor shall have the right to cancel the right to use all such machinery so leased . . ." *United Shoe , 258 U.S. 451, 456, 66 L.Ed. 708, 716-17.* The Court held that although the agreement specifically did not prohibit lessees from using the machinery of a competitor or lessor, ". . . the practical effect of these drastic provisions is to prevent such use." *Id . at 456, 66 L.Ed. at 717.* The Court determined that the restrictions and tying arrangements in the leases "must necessarily lessen competition and tend to monopoly. . . ." Id . The Court found lessor's retention of a right to cancel as effective a method of tying as express covenants could be.  *Id . at 458, 66 L.Ed. at 717.*

Lilly argues that the holdings in Morton Salt, United Shoe and National Lockwasher , among others, illustrate that a finding of per se patent misuse is appropriate in this case. Lilly alleges that provisions in two license agreements entered

by Genentech support such a finding. The provision in the Insulin Agreement that Lilly challenges as patent misuse provides:

8.12 Lilly Use Of Non-Genentech Recombinant Microorganism . Genentech may, at its option, terminate Lilly's rights hereunder with respect to one or more countries or terminate this Agreement in is entirety in the event Lilly shall sell Recombinant Insulin which is produced or derived from the product of any Recombinant Microorganism for whose use no royalty is due to Genentech hereunder, unless Lilly is obliged by circumstances essentially beyond its control to make such Insulin sales involving such other Recombinant Microorganism, [sic] Lilly shall  [*1896]  advise Genentech on each occasion on which it files for government approval for the sale of any such product and again on any such approval.

A similar provision in the hHG Agreement stipulates:

9.08 Genentech may, at its option, terminate KabiGen's rights hereunder with respect to one or more countries or terminate this Agreement in its entirety in the event KabiGen or an affiliate-licensee hereunder of KabiGen or AB Kabi shall sell for human purposes a product containing human growth hormone, and any analog thereof having substantially the same or improved efficacy, which is produced by or derived from the product of any microorganism or other non-pituitary source and for whose use no royalty is due to Genentech hereunder. KabiGen shall advise Genentech on each occasion on which it or the affiliate-licensee hereunder files for governmental approval for the sale of any such product and again upon the grant of any such approval.

Lilly's patent misuse charge focuses on Genentech's retention of a right to terminate the agreement should Lilly or Kabi sell recombinant insulin or hGH, respectively, produced or derived without using either Genentech microorganisms or Genentech patented technology. Lilly argues that this right to terminate presents a continual, inchoate threat. Specifically, if Lilly should use materials and services of others for the production of human insulin or develop its own rather than use those of Genentech, Genentech can terminate Lilly's right both to Genentech's materials and patented technology. This threat, Lilly contends, counters the public interest by stifling both competition and innovation. Thus, Lilly argues, the provisions are Genentech's attempt by means other than that of free competition to extend the bounds of its lawful monopoly such that Lilly and Kabi are forced to use solely ".  .  . Genentech patented technology and/or Genentech materials in their production of insulin and hGH, respectively." Lilly Memo. at 3.

 Were it not for the 1988 Patent Misuse Reform Act, we believe precedent would dictate a finding in Lilly's favor. Although the Insulin and hGH Agreements grant Lilly and Kabi, respectively, both unpatented materials and patented technology, we do not believe this sufficiently distinguishes the instant case from others in which per se patent misuse historically has been found. It is clear that Genentech's contractual right to terminate the agreements should the licensees sell recombinant insulin or hGH for which Genentech receives no royalty includes the right to cancel the patent license of the licensee. The retention of such a right appears to use the patent as leverage to insure that the licensee will not use the microorganisms and the technology of competitors. This type of tying arrangement previously has been condemned as per se patent misuse.

Moreover, the fact that the provisions are rights to terminate rather than explicit prohibitions on the licensees' use of competitors' products does not lessen their impact. As noted earlier in this Entry, the Supreme Court has found that such a tying method is as effective as an express covenant not to use competitor's products or technology.  See *United Shoe , 258 U.S. at 458, 66 L.Ed. at 717.*

 However, the 1988 Patent Misuse Reform Act has placed limitations on the finding of patent misuse in tying arrangements. The Act eliminates per se findings of patent misuse in such situations. When the Act governs, a finding of patent misuse is prohibited unless the patentee is shown to have market power in the relevant market for the patent involved in the tying arrangement. The relevant part of the Act stipulates:

(d) No patent owner otherwise entitled to relief for infringement or contributory infringement of a patent shall be denied relief or deemed guilty of misuse or illegal extension of the patent right by reason of his having done one or more of the following: .  .  . (5) conditioned the license of any rights to the patent or the sale of the patented product on the acquisition of a license to rights in another patent or purchase of a separate product, unless, in view of the

30 U.S.P.Q.2D (BNA) 1881, *; USPQ Headnotes 1881, **

circumstances, the patent owner has market power in the relevant market for the patent or patented product on which the license or sale is conditioned.

*35 U.S.C. Section 271*(d)(5).

Lilly argues that the Act is inapplicable to the instant actions for two reasons. First, Lilly argues that these causes were initiated before the Act's effective date. The Act specifically provides that *35 U.S.C. Section 271*(d)(5) applies only to cases filed on or after the date of its enactment -- November 19, 1988. Second, Lilly contends that the Act does not govern the instant motions because the language of the Act does not include the type of tying arrangement here in issue. We address Lilly's concerns in turn.

The cases before us were initiated in 1987, both a number of months before the effective date of the Act. However, Lilly did not move for leave to amend in either case until February 11, 1993, years after the effective date of the Act. Genentech argues that Lilly's proposed amendment to include an affirmative [*1897] defense of patent misuse does not relate back to the 1987 filing dates, but rather is governed by the 1993 filing date.

Federal Rule of Civil Procedure 15(c) provides the circumstances under which amendments relate back to the date of the original pleading. The applicable section reads:

(c) Relation Back of Amendments.  An amendment of a pleading relates back to the date of the original pleading when

. . .

(2) the claim or defense asserted in the amended pleading arose out of the conduct, transaction or occurrence set forth or attempted to be set forth in the original pleading. . . .

Fed. R. Civ. P. 15(c)(2).

An examination of Lilly's original pleadings in IP-87-0219-C and IP-88-1463-C indicate that Lilly describes no "conduct, transaction or occurrence" from which its patent misuse defense could arise. In its original pleading in IP-87-0219-C, Lilly seeks a declaratory judgment that eight of Genentech's patents ". . . are invalid and void for failure to comply with the requirements of Part II of Title 35, United States Code." Compl. at 4.

Part II of Title 25 governs the patentability of inventions and the grant of patents. Even in interpreting Part II liberally in favor of Lilly, we do not believe that a charge of invalidity based on this part of Title 35 suggests conduct, a transaction or an occurrence from which an affirmative defense of patent misuse could arise.  See 3 Moore's Federal Practice Para. 15.15 [3.-2].

Likewise in Lilly's answer and cross demands in IP-88-1463-C, we can find no facts set forth or attempted to be set forth from which a charge of patent misuse could arise. We do not believe that Lilly's defense of unclean hands can serve as notice to Genentech of a patent misuse defense. Lilly's reference to unclean hands does not suggest that Genentech misused its patents, but rather accuses Genentech of misrepresentation. Moreover, we find no other language in Lilly's original pleading that hints of patent misuse.

Consequently, we find that Lilly's amendments do not relate back to the filing date of its original pleadings, but rather are governed by the more recent filing date. Hence, relation back does not prevent the 1988 Patent Misuse Reform Act from controlling the motions under consideration.

Finally, Lilly argues that the tying arrangement involved in the instant action is not included within the language of the Act and, thus, the Act does not prevent a summary resolution of this motion. Conversely, Genentech argues that summary judgment is improper because the language of the Act includes the tying arrangement presently under consideration.

This issue is a difficult one to resolve. The difficulty arises in interpreting the relevant section of the 1988 Patent Misuse Reform Act in light of the history of the doctrine of patent misuse. Through the years, courts have found per se patent

misuse in varying forms of tying arrangements. In some cases, the patentee is conditioning the license of his patent on the licensee agreeing to use some specific unpatented product.  See, e.g., *Morton Salt , 314 U.S 488, 86 L.Ed. 363 [ 52 USPQ 30]*. In other cases, the patentee is conditioning the license of his patent on the licensee agreeing not to use the products or devices of a competitor.  See, e.g., *National Lockwasher , 137 F.2d 255 [ 58 USPQ 460]*.

Courts have recognized that the two situations involve slightly different factual situations, but generally refer to both situations as tying arrangements. We cannot find an instance in which a court has indicated that the two tying arrangements should be treated differently. Some commentators, however, have referred to the former situations as "tie-ins" and the latter as "tie-outs." This is important to Lilly's argument in that Lilly insists that the above-quoted language of the Act refers only to "tie-in" arrangements. The tying arrangements challenged in the instant actions, Lilly contends, are "tie-outs" and, thus, unaffected by the Act.

This background leads us to the statutory interpretation problem. The relevant portion of the statute stipulates that a patentee who has "conditioned the license of any rights to the patent . . . on the . . .  purchase of a separate product . . ." is not ". . .  guilty of misuse or illegal extension of the patent right . . ." unless the patent owner has ". . . market power in the relevant market for the patent or patented product on which the . . . license is conditioned." The question is whether this language encompasses only those arrangements in which the patent license directly is tied to the purchase of a separate product, or if it also encompasses those instances in which the terms of the license prevents the licensee from purchasing or using a separate product.

Lilly argues that because an earlier House version n22 of the 1988 Patent Misuse Reform Act included language that more precisely described the latter type of arrangements and the final version does not include that  [*1898]  language, Congress did not intend to include both types in the Act. We, however, are not persuaded by Lilly's argument. We believe the statutory provision in issue reasonably could be read to encompass situations like the instant one, where the patentee has conditioned the license to the patent rights on the licensee's implicit agreement not to purchase certain, separate products. Because we believe that the statutory language is unclear, we turn to the legislative history for guidance.

n22 H.R. 4086, 100th Cong., 2d Sess. (1988).


 An examination of the legislative history of the Act leads us to conclude that the language of the Act is meant to encompass both types of tying situations. For example, the Congressional Record of the Senate regarding the Act indicates that Congress' intention was to deal with ". . . a small piece of the patent misuse problem -- tying arrangements -- and leaves the rest for us to address in the future." 134 Cong. Rec. S17146-02 (daily ed. Oct. 21, 1988) (statement of Sen. Deconcini). Certainly, this passage does not suggest that some tying arrangements were not included in the statutory language.  Moreover, the Congressional Record of the Senate reads: "Reform of patent misuse will ensure that the harsh misuse sanction of unenforceability is imposed only against those engaging in truly anticompetitive conduct." Id . (statement of Sen. Leahy). We are convinced that Congress would not have fashioned a "rule- of-reason type" approach for one form of tying arrangement and excluded from that approach another intimately related tying situation, especially in light of its clear purpose of permitting a misuse defense only when the patentee has acted anticompetitively. Contrary to Lilly's argument, we do not believe that Congress recognizes a difference between "tie-ins" and "tie-outs."

Go to Headnotes  [**4R]  For these reasons, we find that *35 U.S.C. Section 271*(d)(5) is applicable to the instant motion, requires a rule of reason approach to the issue of Genentech's market power, and prevents summary resolution of this action. Furthermore, since Lilly's motion for summary judgment in IP-88-1463-C was contingent upon a finding of per se patent misuse, summary resolution in that case likewise is inappropriate.

III.  Conclusion

In summary, Lilly's motions for leave to amend are granted; Lilly's motion for summary judgment in IP-87-0219-C is denied; and Lilly's motion for summary judgment in IP-88-1463-C is denied.

30 U.S.P.Q.2D (BNA) 1881, *; USPQ Headnotes 1881, **

Entry Granting Lilly and Genentech's Motions for Separate Trials on Liability and Damages Issues; Denying Lilly and Genentech's Motions for a Blanket Stay of Discovery on Damages Issues, But Granting a Stay of Discovery on the Limited Issue of Willfulness; and Granting in Part and Denying in Part UC's Motion to Compel Lilly to Respond to Document Request Numbers 5 and 21 and Interrogatory Number 34

March 2, 1994 These actions come before the Court on Lilly and Genentech's motions for separate trials on liability and damages issues; Lilly and Genentech's motions for a stay of discovery on damages issues; and UC's motion to compel Lilly to respond to document request numbers five and twenty-one and interrogatory number thirty-four.

For the following reasons, Lilly and Genentech's motions for separate trials on liability and damages issues in IP-92-0224-C, IP-90-1679-C and IP-92-0223-C are GRANTED n23 ; Lilly and Genentech's motions for a stay of discovery in IP-92-0224-C, IP-90-1679-C and IP-92-0223-C are GRANTED in part and DENIED in part; and UC's motion to compel in IP-92-0224-C is GRANTED in part and DENIED in part.

> n23 Also before the Court is Genentech's motion for a separate trial on the issue of willfulness. To the extent that we (1) find that willfulness should be heard with other damages issues; and (2) bifurcate liability and damages issues, Genentech's motion is granted.

Background These actions are three of six cases consolidated in this Court for pretrial proceedings by the Judicial Panel on Multidistrict Litigation.  See In re Recombinant DNA Technology Patent and Contract Litig. , Docket No. 912 (J.P.M.L., Feb. 19, 1992), aff'd, *In re Regents of the Univ. of Cal. , 964 F.2d 1128 [ 22 USPQ2d 1748]* (Fed. Cir. 1992). Cause number IP-92-0224-C was initiated when the University of California (UC) filed a patent infringement action on February 7, 1990, in the Northern District of California against Eli Lilly & Co. (Lilly).  UC amended its complaint April 24, 1991, and the amended complaint alleges that Lilly's production of recombinant DNA human insulin products willfully infringes three of UC's patents.

Cause number IP-90-1679-C was initiated on August 6, 1990, when Genentech filed suit against Lilly and UC in the Southern District of Indiana. Genentech amended its  [*1899]  complaint on August 27, l990, and the amended complaint seeks a declaratory judgment that one of UC's patents, the '877 patent, is invalid, noninfringed and unenforceable. The complaint also includes antitrust and pendent state law claims.

Cause number IP-92-0223-C was initiated on August 7, 1990, when UC filed a patent infringement action against Genentech in the Northern District of California. In this action UC alleges that Genentech is willfully infringing the '877 patent.

On September 18, 1991, Lilly moved the Court for a separate trial on liability and damages issues and for a stay of discovery on damages issues in IP-90-1679-C. Genentech opposed this motion. On November 10, 1993, Genentech altered its position and moved the Court for bifurcated trials and a stay of discovery in IP-92-0223-C, which action is the mirror image of IP-90-1679-C.  Genentech states that should the Court grant Genentech's request, Genentech will withdraw its opposition to Lilly's identical motion in IP-90-1679-C. UC opposes Genentech's motion. Previously, on September 4, 1991, Genentech moved for a separate trial on the issue of willfulness in IP-92-0223-C.

Similarly, on July 21, 1993, Lilly moved the Court for separate trials on liability and damages issues and for a stay of discovery on damages issues in cause number IP-92-0224-C. On September 7, 1993, UC requested this Court to compel Lilly to respond to document request numbers five and twenty-one and interrogatory number 34. This Entry addresses these motions.

Discussion Separate trials on the issues of liability and damages in patent cases is contemplated by Rule 42(b), Fed. R. Civ. P., in appropriate circumstances.  n24 Such bifurcation is " 'an effective method of simplifying factual presentation, reducing costs, and saving time.' " *Mag Instrument, Inc. v. J. Baxter Brinkmann Int'l Corp ., 123 F.R.D. 543, 544-45 [ 10 USPQ2d 1387]* (N.D. Texas 1988) (quoting *MCI Communications v. AT & T , 708 F.2d 1081, 1167* (7th Cir.) , cert. denied , *464 U.S. 891, 78 L.Ed.2d 226 (1983)).*

30 U.S.P.Q.2D (BNA) 1881, *; USPQ Headnotes 1881, **

n24 Rule 42(b) provides: n24 The court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of any claim, cross-claim, counterclaim, or third-party claim, or of any separate issue or of any number of claims, cross-claims, counterclaims, third-party claims, or issues, always preserving inviolate the right of trial by jury as declared by the Seventh Amendment to the Constitution or as given by a statute of the United States.

Go to Headnotes [**5R] The instant cases involve extremely complicated technology -- technology that creates for the parties a considerable challenge in jury presentation. Not only are the claims in the area of patent law, but also the patented technology in issue deals with genetics. Given this obviously difficult combination, we believe bifurcation of the liability and damages issues both would assist the parties in presenting their arguments to the jury and lessen jury confusion. n25 UC's argument that the damages issues are not complicated is unpersuasive. The information the jury must comprehend to determine the liability issues alone is burdensome. Admitting financial data that also is potentially time-consuming and complex could make that burden unmanageable.

n25 Genentech's opposition to Lilly's September 18, 1991, motion for bifurcation and for a stay of discovery damages was based in part on the fact that cause number IP-90-1679-C was to be tried to the Court rather than a jury. Unlike a jury trial, Genentech argued, a bench trial would not create the potential for prejudice and confusion. Thus, Genentech contended, no separate trial was warranted. However, it now should be noted that on October 22, 1993, Lilly requested that IP-90-1679-C be tried to a jury.

Furthermore, we believe that judicial economy will be promoted by bifurcation of these issues. The issues relating to damages need not be tried unless UC prevails on the issues of validity and infringement of the patents in question. n26

n26 UC states that the transferor court ruled against bifurcation in cause number IP-92-0224-C prior to the consolidation of these actions in this Court. That ruling, UC argues, has become the law of the case and makes it more difficult for this Court now to grant bifurcation. We disagree. n26 The transferee judge has the power to set aside pretrial rulings of transferor courts. In re Multi - *Piece Rim Prods. Liability Litig., 653 F.2d 671, 676 (D.C. Cir. 1981).* Furthermore, the affidavit submitted by UC to support its law of the case argument clearly indicates that the transferor judge made his decision immediately following in-court comments from the parties. Thus, the parties had inadequate time to argue their respective viewpoints and the judge afforded himself no time for deliberation of the matter. For these reasons, we are not constrained by the transferor judge's ruling.

In IP-92-0224-C, UC argues against bifurcation because, UC asserts, bifurcation would require that the same evidence be introduced in both trials. In explanation, as a challenge to the validity of UC's patents, [*1900] Lilly argues that the patented subject matter was obvious, in contravention of *35 U.S.C. Section 103,* and thus, no patent should have issued. One of the factors in determining obviousness is the commercial success of the product at issue. UC contends that the evidence it will introduce to illustrate commercial success is the same evidence it will offer to prove damages. This overlap of evidence in the liability and damages issues, UC asserts, militates against bifurcation. n27

n27 Genentech makes a similar argument in its opposition to Lilly's 1991 motion for bifurcation and for a stay of damages discovery in IP-90-1679-C. Genentech's primary concern was that there would be a substantial overlap in evidence needed for liability and damages issues in proving antitrust claims. However, the Federal Circuit since has held that Genentech, in its complaint, did not plead facts that if proved would constitute violation of the antitrust laws. The Court concluded that the district court correctly had dismissed Genentech's claims of antitrust violation in the licensing arrangement, pursuant to Rule 12(b)(6), Fed. R. Civ. P. *Genentech, Inc. v. Eli Lilly & Co., 998 F.2d 931, 949 [ 27 USPQ2d 1241 ]* (Fed. Cir. 1993). Thus, Genentech's evidentiary overlap argument based on the antitrust claims is no longer viable. Furthermore, Genentech's recent willingness to

30 U.S.P.Q.2D (BNA) 1881, *; USPQ Headnotes 1881, **

withdraw its opposition to Lilly's bifurcation motion in IP-90-1679-C in exchange for bifurcation in IP-92-0223-C indicates that Genentech no longer is concerned about any overlap in evidence.

We find, however, that any possible overlap in evidence will be insubstantial. As other courts have determined, "the evidence introduced to show 'commercial success' will be less extensive and of a different character from that to prove damages. The question of commercial success is not ordinarily determined by a detailed analysis of exhaustive and intricate financial data, such as is required for proof of damages, but rather by whether the claimed invention is, broadly speaking, an accepted product and a big seller." *Paine, Webber, Jackson & Curtis, Inc. v. Merrill Lynch, Pierce, Fenner & Smith , Inc. , 587 F. Supp. 1112, 1116 [ 223 USPQ 888]* (D. Del. 1984) (citations omitted). We agree with the Fifth Circuit when it stated, ". . . [W]e cannot think of an instance in a patent action where the damage issue is so interwoven with the other issues that it cannot be submitted to the jury independently of the others without confusion and uncertainty, which would amount to a denial of a fair trial." n28 *Swofford v. B & W. Inc., 336 F.2d 406, 415 [ 142 USPQ 291]* (5th Cir. 1964).

n28 UC also argues in IP-92-0223-C that the issues are so interwoven as to prevent a bifurcation of them. However, we believe the prudent, less prejudicial path is to grant bifurcation. The Court is convinced that UC's concerns satisfactorily can be resolved by methods much less drastic than burdening a jury with both liability and damages issues concurrently.

Before closing our discussion on bifurcation, we must determine whether the issue of willfulness will be heard with liability or damages. This issue is relevant to all three cases currently before us.

Guided by the factors in Rule 42(b), Fed. R. Civ. P., the Court has the discretion to determine whether evidence on willfulness n29 will be heard with liability or damages.  See *Rohm and Haas Co. v. Mobil Oil Corp. , 654 F. Supp. 82 [ 3 USPQ2d 1619]* (D. Del. 1987). In exercising our discretion, we must consider the concerns of the parties in relationship to the Rule 42(b) factors of prejudice, economy, convenience and expediency.

n29 If it is determined that a party did willfully infringe, the Court ". . . may increase the damages up to three times the amount found [by a jury] or assessed [by the court]." *35 U.S.C.A. Section 284.*

In defending a willfulness charge, a party may choose to rely on prelitigation opinion letters of counsel regarding the patents in suit. Such reliance will involve the production of documents otherwise protected by the attorney-client privilege. Lilly and Genentech are concerned that compelling them to determine their defense strategy to the willfulness charge and to produce opinion letters at this stage would prejudice the two companies in their liability defense. Specifically, Lilly argues that revealing such opinion letters could be ". . . tantamount to providing the foundation of a party's whole litigation strategy to its opponent." Lilly Br. at 14-15.

After consideration of the parties' viewpoints, we believe that the issue of willfulness should be tried as part of the damages trial.  See *Rohm , 654 F.Supp. at 86* (holding that for reasons of economy, convenience and expediency, willfulness would be heard in the damages phase). Such construction will avoid the prejudice to Lilly and Genentech that could result if they were forced to provide their opposition with a "detailed 'work product' road map" to arguments Lilly and Genentech desire to use in the liability trial. n30

n30 The discussion concerning a stay of discovery on the issue of willfulness in order to avoid this potential prejudice follows on page 9.

With this in mind, we turn to the parties' requests for blanket stays of discovery on damages in the three actions before us. We then, will address a stay of discovery on the limited issue of willfulness.  [*1901]

30 U.S.P.Q.2D (BNA) 1881, *; USPQ Headnotes 1881, **

The cases that comprise this multidistrict action long have been active; the oldest of the five was initiated on March 6, 1987. While we believe that bifurcation of the liability and damages issues is necessary to lessen jury confusion and to save judicial time, a stay of discovery only would work to protract further what already has become a very lengthy process. It is true that the Court earlier stayed discovery in other cases involved in this multidistrict action. See Eli Liily & Co. v. Genentech, Inc., Cause No. IP-87-0219-C (S.D. Ind. Jan. 28, 1992); Genentech, Inc. v. Eli Lilly & Co., Cause No. IP-88-1463-C (S.D. Ind. Jan. 28, 1992). However, those stays were entered nearly two years ago, and approximately one month before the cases were consolidated in this Court for pretrial proceedings.

 The reasons precipitating the Judicial Penal on Multidistrict Litigation's transfer were ". . . convenience of parties and witnesses and [promotion of] the just and efficient conduct of such actions." *28 U.S.C.  Section 1407*(a); *In re Regents of Univ. of Cal., 964 F.2d 1128, 1131 [ 22 USPQ2d 1748]* (Fed. Cir. 1992). We believe that granting a stay of discovery on the damages issues would create a great potential for unnecessary inconvenience to the parties and witnesses. Additionally, we are convinced that concurrent discovery of information on liability and damages issues will engender a more efficient use of Court time. For example, the Court expects that concurrent discovery on liability and damages issues -- with the exception of the willfulness issue -- will perpetuate fewer pre-trial disputes over what constitutes discoverable material. Consequently, we must deny Lilly and Genentech's requests for a blanket stay of discovery on damages issues.

This leads us finally to the issue of discovery regarding willfulness. As earlier discussed in this Entry, we believe that willfulness evidence should be heard in the damages trial. Furthermore, we believe that for purposes of judicial economy, convenience and expediency, discovery on the limited issue of willfulness should be stayed until after the trial on liability issues. As did the Rohm Court, we ". . . can foresee the need to rule on whether particular documents are discoverable or protected by the attorney- client privilege." *Rohm and Haas Co., 654 F.Supp. at 86.*

 Currently, a number of motions arising from this multidistrict litigation are sub judice.  Given that the established trial date quickly is approaching, we must minimize to the extent possible new rulings requiring valuable Court time.  Thus, while we deny the parties' requests for a blanket stay of discovery on damages issues in all three cases, we grant a stay of discovery on the limited issue of willfulness.

Finally, we turn to UC's motion to compel in IP-92-0224-C. Because we have denied Lilly's motion for a blanket stay of discovery on damages, we grant UC's motion to compel Lilly to answer document request number twenty-one, seeking to discover information with which UC can establish actual damages; and because we have determined that willfulness will be heard in the trial on damages and that a stay of discovery on the issue of willfulness is appropriate, we deny UC's motion both to compel Lilly to answer interrogatory number thirty-four, which asks if Lilly intends to rely upon opinion of counsel as a defense to willful infringement, and to compel Lilly to respond to document request number five, which seeks infringement and validity opinions concerning the patents in suit.

 Conclusion For the foregoing reasons, Lilly and Genentech's motions to bifurcate liability and damages issues in these three actions are granted; Lilly and Genentech's motions to stay discovery on damages issues other than that of willfulness in all three cases is denied; and, in IP-92-0224-C, UC's motion to compel Lilly to respond to document request number twenty-one is granted, and UC's motion to compel Lilly to respond to interrogatory number thirty-four and document request number five is denied.

Entry Granting Lilly's Motion to Transfer Cause Number IP-92-0224-C, and Denying UC's Request to Remand IP-92-0224-C to California

March 2, 1994 This cause comes before the Court on Lilly's motion to transfer cause number IP-92-0224-C to the Southern District of Indiana pursuant to *28 U.S.C. Section 1404*(a), and UC's request to remand IP-92-0224-C to California. For the following reasons, Lilly's motion to transfer is GRANTED, and UC's request to remand is DENIED.

 Background The action presently before us is one of six cases consolidated in this Court for pretrial proceedings by the Judicial Panel on Multidistrict Litigation.  See In re Recombinant DNA Technology Patent and Contract Litig. , Docket No. 912 (J.P.M.L. Feb. 19,  [*1902]  1992), aff'd, *In re Regents of the Univ. of Cal. , 964 F.2d 1128 [ 22 USPQ2d 1748]*

30 U.S.P.Q.2D (BNA) 1881, *; USPQ Headnotes 1881, **

(Fed. Cir. 1992). The consolidated cases arise out of various research arrangements between the Regents of the University of California (UC), Genentech, Inc. (Genentech), and Eli Lilly & Company (Lilly).

Lilly moved the Court on October 5, 1993, to transfer cause number IP-92-0224-C to the Southern District of Indiana for trial, pursuant to *28 U.S.C. Section 1404*(a). On December 14, 1993, UC filed its opposition to Lilly's motion and requested the Court to remand the action to the Northern District of California upon close of discovery. This Entry discusses these issues.

 Discussion Transfer of an action is appropriate (1) when the action might have been brought in the transferee court; and (2) when the transfer is for the convenience of the parties and witnesses and is in the interest of justice. *28 U.S.C. Section 1404*(a); *General Food Corp. v. Carnation Co. , 411 F.2d 528, 532 [ 162 USPQ 129]* (7th Cir.), cert. denied , *396 U.S. 940, 24 L.Ed.2d 242 (1969); K & F Mfg. Co. Inc. v. Western Litho Plate & Supply Co. , 831 F.Supp. 661, 664 [ 29 USPQ2d 1155]* (N.D. Ind. 1993). The parties do not dispute that this action originally could have been brought in the Southern District of Indiana.  However, disagreements arise in their analyses of the second prong of the aforementioned test.

The Seventh Circuit has held that " [t]he 'interest of justice' is a separate component of a Section 1404(a) transfer analysis, (citations omitted), and may be determinative in a particular case, even if the convenience of the parties and witnesses might call for a different result." *Coffey v. Van Dorn Iron Works , 796 F.2d 217, 220 (7th Cir. 1986)* (citations omitted). The focus of this separate component is on the efficient functioning of the courts. *Id. at 221.*

In the instant action, the issues are very complex. The motions already decided have required a great deal of court time. Moreover, several motions sub judice will demand an equal or even greater amount of time. We believe that a transfer would better utilize judicial resources. For example, a transfer would prevent the Court in the Northern District of California from unnecessarily duplicating the judicial efforts thus far expended by this Court in gaining an understanding of the case. As we continue to decide additional discovery and substantive motions, we become more and more familiar with the action before us, as well as the other cases involved in this multidistrict litigation. Many of the issues involved in the instant suit are highly technical in nature.  Because of this Court's growing familiarity with these and other issues, a transfer would promote judicial economy in all phases of the litigation. This economy would be realized whether some, all or none of the cases involved in this litigation eventually are consolidated for trial. Certainly, judicial efficiency weighs heavily in favor of transferring IP-92-0224-C to this Court.

Furthermore, "the preferred forum is that which is the center of the accused activity." *S.C. Johnson & Son, Inc. v. Gillette Co. , 571 F.Supp. 1185, 1187-88 (N.D. Ill. 1983).* " 'The trier of fact ought to be as close as possible to the milieu of the infringing device and the hub of activity centered around its production.' " *Id. at 1188* (quoting *AMP Inc. v. Burndy of Midwest, Inc. , 340 F.Supp. 21, 24-25 [ 172 USPQ 389]* (N.D. Ill. 1971)). In the case before us, the record indicates that the only United States location in which Lilly uses the allegedly infringing process is Indianapolis. In addition, Lilly's research and production records related to this process are stored in Indianapolis. Consequently, these facts support a transfer.

UC and Lilly are in discord regarding the most convenient forum for parties and witnesses. UC argues for California, while Lilly insists that Indiana is the better choice. Each party has supported its respective position with a partial list of individuals its adversary has deposed. These lists are offered to illustrate to the Court the state in which the majority of the trial witnesses reside. We do not believe, however, that these lists are highly significant in our consideration of convenience. Although deposing an individual is an indication that a party to the litigation believes the deponent may have relevant information, yet the fact that an individual is deposed does not mean that he or she will be called to testify at trial. As Lilly points out in its reply brief, for example, several of the deponents UC has included in its list are not trial witnesses.  See Lilly Reply Br. at 12-13.

Go to Headnotes  [**6R]  In any event, we believe that in the interest of justice a transfer of this case to the Southern District of Indiana is appropriate. As earlier discussed, the element of judicial economy is afforded great weight. Thus, even were convenience of the parties and witnesses not advanced significantly, we still would be persuaded that a transfer is proper.

30 U.S.P.Q.2D (BNA) 1881, *; USPQ Headnotes 1881, **

For the foregoing reasons, Lilly's motion to transfer is granted, and UC's request for a remand is denied. [*1903] Entry Denying Genetech's Motion to Amend Its Answer and Counterclaims and Enjoining Further Prosecution of IP-92-0223-C

March 22, 1994 This cause comes before the Court on Genentech's motion to amend its answer and counterclaims. In light of the Court's sua sponte decision to enjoin further prosecution of this action, Genentech's motion is DENIED.

Background This action is one of the six cases consolidated in this Court for pretrial proceedings by the Judicial Panel on Multidistrict Litigation. See In re Recombinant DNA Technology Patent and Contract Litig. , Docket No. 912 (J.P.M.L. Feb. 19, 1992), aff'd, *In re Regents of the Univ. of Cal. , 964 F.2d 1128 [ 22 USPQ2d 1748]* (Fed. Cir. 1992); In re Recombinant DNA Technology Patent and Contract Litig. , Docket No. 912 (J.P.M.L. Oct. 1, 1993). The consolidated cases arise out of various research arrangements and license agreements among the Regents of the University of California (UC), Genentech, Inc. (Genentech), and Eli Lilly & Company (Lilly).

The instant action was initiated when UC filed a patent infringement action against Genentech in the Northern District of California on August 7, 1990. In this action, UC alleges that Genentech willfully is infringing one of UC's patents, United States Patent Number 4,363,877 (the '877 patent). The infringement allegedly occurs through Genentech's manufacture and sale of recombinantly produced human growth hormone (hGH). On March 6, 1991, Genentech filed an amended answer to UC's complaint and counterclaims against UC and Lilly.

On January 11, 1993, Genentech moved for leave to amend again its answer and counterclaims. In this motion, currently before the Court, Genentech seeks to add counterclaims charging that UC actively is inducing Lilly, counterclaim defendant, to infringe thirteen Genentech patents.

Discussion Federal Rule of Civil Procedure 15(a) provides that a party may amend its pleading by leave of the court and that ". . . leave [to amend] shall be freely given when justice so requires. . . ." Absent " 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment," a request to amend should be permitted. *Ferguson v. Roberts , 11 F.3d 696, 706 (7th Cir. 1993)* (quoting *Foman v. Davis , 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962));* see also Schlacter - *Jones v. General Tel. of Cal. , 936 F.2d 435, 443 (9th Cir. 1991).*

UC and Lilly contend that allowing Genentech to amend its answer and counterclaim unduly would prejudice them and the judicial system and, consequently, should be denied. Such amendment, Genentech's opponents claim, would inject into this action an additional thirteen patents. Currently, IP-92-0223-C encompasses the validity, infringement and enforceability of only one patent -- UC's '877 patent.

Interestingly, the thirteen patents that Genentech desires to place in issue via this amendment already are in issue in IP-87-0219-C, another of these consolidated cases. Lilly initiated IP-87-0219-C on March 6, 1987, and amended its complaint on November 9, 1987. Lilly seeks a declaratory judgment that eight of Genentech's United States patents are invalid and not infringed. Genentech counterclaims that Lilly willfully is infringing not only the patent numbers for which Lilly seeks the declaratory judgment, but also five other patents. These patents in combination constitute the thirteen patents that Genentech now proposes to include in IP-92-0223-C.

Moreover, IP-92-0223-C was filed one day after IP-90-1679-C, yet another of these consolidated cases. In early 1991, the Southern District of Indiana dismissed UC from IP-90-1679-C, leaving Lilly, the exclusive licensee of the '877 patent, as the remaining defendant. On July 1, 1993, the Federal Circuit held that dismissal of UC was improper. *Genentech, Inc. v. Eli Lilly & Co. , 998 F.2d 931, 949 [ 27 USPQ2d 1241]* (Fed. Cir. 1993). Subsequently, UC filed an answer and a counterclaim in that case. UC's counterclaim in IP-90-1679-C mirrors UC's complaint in IP-92-0223-C. Additionally, Genentech's answer to UC's complaint in IP-92-0223-C mirrors Genentech's complaint in IP-90-1679-C. Thus, it appears that resolution of IP-90-1679-C would resolve IP-92-0223-C.

Lilly suggests that permitting the prosecution of both IP-90-1679-C and IP-92-0223-C is a waste of judicial resources. We agree, and find further consideration of the propriety of allowing Genentech's requested amendment unnecessary.

30 U.S.P.Q.2D (BNA) 1881, *; USPQ Headnotes 1881, **

The Seventh Circuit has stated that " [t]wo simultaneously pending lawsuits involving identical issues and between the [*1904] same parties, the parties being transposed and each prosecuting the other independently, is certainly anything but conducive to the orderly administration of justice." *Martin v. Graybar Elec. Co.*, 266 F.2d 202, 204 (7th Cir. 1959).

Thus, given that IP-92-0223-C and IP-90-1679-C involve the same parties and the same issues, we find it improper to permit simultaneous prosecution of both.

We believe it to be important that there be a single determination of a controversy between the same litigants and, therefore, a party who first brings an issue into a court of competent jurisdiction should be free from the vexation of concurrent litigation over the same subject matter, and an injunction should issue enjoining the prosecution of the second suit to prevent the economic waste involved in duplicating litigation which would have an adverse impact on the prompt and efficient administration of justice unless unusual circumstances warrant.

*Martin*, 266 F.2d at 204 (citations omitted).

In the instant case, IP-90-1679-C was initiated in Indiana before IP-92-0223-C was initiated in California. Moreover, it finally has been determined that UC properly is a party to IP-90-1679-C -- a determination establishing that UC is within this Court's jurisdiction. Finally, we are aware of no unusual circumstances in this case warranting it appropriate for the federal courts to entertain two suits involving identical issues and parties. Therefore, we believe it proper to enjoin further prosecution of IP-92-0223-C. As we noted earlier in this Entry, resolution of the former will resolve the latter. See also In re Recombinant DNA Technology Patent and Contract Litigation , Docket No. 912, Cause Nos. IP-90-1679-C and IP-92-0223-C, Entry Granting Lilly's Motion for Leave to Amend Its Answer to Add a Counterclaim for Relief if Genentech Is Found Liable for Infringement, at 2 n.2 (S.D. Ind. March 2, 1994).

In light of the fact that we have enjoined further prosecution of IP-92-0223-C, we must deny Genentech's motion to amend its answer and counterclaims in this action. We note that the parties have suggested two other potential outlets for Genentech's proposed counterclaims -- IP-90-1679-C and IP-87-0219-C. However, because Genentech has no motion before us requesting amendment in either of these cases, we deed not decide which, if either, would be the appropriate outlet for Genentech's additional counterclaims.

For the foregoing reasons, we enjoin further prosecution of IP-92-0223-C, and deny Genentech's motion to amend.

Entry Denying UC's Motion for Return of Inadvertently Produced Documents; Denying Genentech's Emergency Motion to Compel the Return of Inadvertently Produced Documents; and Granting in Part and Denying in Part Lilly's Motion to Compel the Return of Inadvertently Produced Privileged Documents

March 22, 1994

These causes come before the Court on UC's motion for the return of inadvertently produced privileged documents; Genentech's emergency motion to compel the return of inadvertently produced documents; and Lilly's motion to compel the return of inadvertently produced privileged documents. n31 For the following reasons, UC's motion is DENIED; Genentech's motion is DENIED; and Lilly's motion is GRANTED in part and DENIED in part.

    n31 The Court grants all the motions of the parties for leave to file supplemental memorandums concerning the motions currently before us. The supplemental materials, thus, have been considered for purposes of this Entry. n31 Moreover, the Court grants Lilly's motion for leave to file a reply memorandum in excess of the page limitation imposed by Local Rule 7.1. Lilly's memorandum both supports its motion to compel the return of inadvertently produced privileged documents and opposes Genentech's motion regarding Lilly's assertion of the attorney- client privilege. Lilly's brief exceeds the page limit by only one page. We do note, however, that this memorandum is Lilly's second memorandum to include an opposition to Genentech's motion for appropriate relief regarding the attorney- client privilege. The first opposition was included in Lilly's Combined Memorandum Supporting Its Motion to Compel Return of Inadvertently Produced Privileged Documents and Opposing Genentech's Motion for Appropriate Relief Regarding the Attorney-Client Privilege, filed on January 25, 1994. Thus, the Court grants Genentech 10 days in which to reply to Lilly's most recent opposition.

30 U.S.P.Q.2D (BNA) 1881, *; USPQ Headnotes 1881, **

## I. Background

Presently before the Court are discovery disputes that relate to the six lawsuits involving the Regents of the University of California (UC), Genentech, Inc. (Genentech), and Eli Lilly & Company (Lilly). Five of these cases were consolidated in this Court for pretrial proceedings by the Judicial Panel on Multidistrict Litigation on February 19, 1992.  See In re Recombinant DNA Technology Patent and Contract Litig. , Docket No.  [*1905]  912 (J.P.M.L. Feb. 19 1992), aff'd , *In re Regents of the Univ. of Cal.* , 964 F.2d 1128 [ 22 USPQ2d 1748] (Fed. Cir. 1992). More recently, on October 1, 1993, the Judicial Panel consolidated a sixth case in this Court for pretrial proceedings.  See In re Recombinant DNA Technology Patent and Contract Litig. , Docket No. 912 (J.P.M.L. Oct. 1, 1993).

Each party to this multidistrict litigation has moved the Court for the return of inadvertently produced documents. We begin by providing background information relevant to the respective motions.

## A. Background to UC's Motion

In conjunction with its present motion, UC provided the Court with the following information concerning its process for the screening of privileged documents. On January 17, 1991, Genentech served a request for production of documents on UC in IP-92-0223-C. UC explains that a master set of documents was received by its counsel, Townsend and Townsend, from co-counsel on March 1, 1991. Thereafter, between March 11, and April 16, 1991, two attorneys, a law clerk, and four paralegals reviewed the master set of documents for responsiveness, attorney-client privilege and work product privilege.

According to the affidavits of Townsend and Townsend's staff, the documents first were reviewed by the attorneys for responsiveness. Once separated, the responsive documents then were examined by the paralegals, who reportedly had been trained in the law of privilege. The documents the paralegals thought were privileged then were reviewed by the attorneys to ensure that they indeed were privileged. On April 16, 1991, the documents were produced to Genentech. At the time of this production, Lilly was not a party to IP-92-0223-C. Subsequent to UC's production, Genentech amended its answer to add Lilly as a counter-defendant.

Prior to involvement in IP-92-0223-C, but in connection with other of these now-consolidated actions, on May 16, 1991, Lilly served UC with a subpoena, issued by the Northern District of California, for these same documents. Upon becoming a party to IP-92-0223-C, but prior to the return date of the aforementioned subpoena, Lilly again requested that UC provide Lilly with copies of the documents produced to Genentech in IP-92-0223-C. n32

> n32 The use of subpoenas and document requests to obtain access to the same documents in each related case was necessary because of the protective orders entered in the cases.

UC complied and produced the documents to Lilly on May 21, 1991. Later, when Lilly requested the same documents in IP-92-0224-C, yet another of these consolidated actions, UC informed Lilly that Lilly could use the documents previously produced. Thereafter, UC provided privilege logs to Genentech and Lilly.

On September 10, 1991, UC suspected during the deposition of Bertram Rowland (Rowland), a former UC attorney, that some of its privileged documents inadvertently had been produced. Apparently, UC made no objection to use of the documents at that time. Rather, following the deposition, UC counsel investigated the production of the privileged documents.  n33 On September 25, 1991, UC sent letters to Lilly and Genentech requesting return of the documents. Further investigation revealed that UC had disclosed additional privileged documents. UC sent a second request to Lilly and Genentech for return of the inadvertently produced documents. Neither Lilly nor Genentech complied with UC's request.

30 U.S.P.Q.2D (BNA) 1881, *; USPQ Headnotes 1881, **

n33 UC argues that at the September 10 deposition UC counsel thought that the documents may have been produced to Lilly in response to a 1989 subpoena arising from suits in this consolidated action that originated in Indiana, or that Lilly had obtained them because of some commonality of interest in other pending suits.

UC continues to seek the return of these privileged documents. Apparently, Lilly is in possession of all of the documents UC desires returned. Genentech claims to be in possession of 72 pages of the materials UC originally had classified as privileged.  n34 However, UC informs the Court that it no longer seeks return of most of the documents produced to Genentech. UC explains that conversations between UC and Genentech have disclosed "that Genentech did not have many of the documents that UC believed had been inadvertently disclosed to Genentech." However, UC does seek return of the documents provided to Genentech on October 9, 1991, which were produced to Genentech for the sole purpose of permitting Genentech to evaluate its position regarding UC's request for return of the inadvertently produced documents.

n34 Apparently, UC initially claimed privilege in approximately 316 pages of documents. Subsequently, UC re-examined these pages and now requests the return of approximately 250 pages.

B.  Background to Genentech's Motion

On November 8, 1993, Genentech produced to Lilly and UC nineteen boxes of documents containing approximately 50,000 pages. Accompanying this production was a  [*1906]  letter from Shea and Gould, Genentech's counsel, stating that " [e]nclosed are documents which may be responsive to certain of your requests, and which previously had been withheld as work product or attorney- client privilege." Lilly Ex. D.

In issue in Genentech's motion are eight of these boxes containing approximately 21,000 pages of documents. These documents apparently originated with Genentech, and they, along with the others produced on November 8, allegedly had been reviewed twice for privilege by attorneys at Weil, Gotshal & Manges, Genentech's former lead trial counsel.

The record reveals that during the first review those documents deemed privileged were separated from the others. Likewise, a second review of the documents later was conducted, and additional privileged items were culled.  During the time frame in which this second review was performed, Shea & Gould replaced Weil, Gotshal & Manges as Genentech's lead trial counsel.  n35 The documents were transferred to Shea & Gould. At the time of the transfer, the documents currently in issue had not been removed from the original boxes as privileged documents.

n35 Weil, Gotshal & Manges remains of counsel to Genentech.

When representatives from Weil, Gotshal & Manges and Shea & Gould met to discuss the transfer, the boxes containing documents that had been segregated as privileged were identified as such. However, although the Weil, Gotshal & Manges representative knew that the other boxes were not yet ready for production, he failed to communicate this information to the Shea & Gould representatives, who departed under the assumption that these boxes held nonprivileged, responsive documents.

Furthermore, during this meeting the representative from Weil, Gotshal & Manges reportedly indicated a lack of confidence in Weil, Gotshal & Manges' privilege screening process and suggested that Shea & Gould conduct another review before producing them. Following the arrival of the documents at Shea & Gould, a Shea & Gould representative reportedly suggested to Dr. Chris Rudman (Rudman), head of litigation at Genentech and in charge of this project within Genentech, that another review be conducted. He communicated the concern of the Weil, Gotshal & Manges representative concerning the screening process and suggested a de novo review. Nonetheless, Rudman permitted only a cursory review of the boxes previously not represented as privileged. This brief review revealed no privileged documents despite the fact that Genentech now claims privilege in 12,000 of the 21,000 pages of documents.  n36 Consequently, the documents were produced to Lilly and UC.

n36 Originally, Genentech claimed that all 21,000 pages of these documents were privileged. A later review of the documents, however, led Genentech to conclude that it does not claim privilege in over 8,000 pages of the November 8, 1993 production. Thus, Genentech currently seeks the return of more than 12,000 pages of documents.

C. Background to Lilly's Motion

Lilly has 97 documents listed on its inadvertently produced privileged document log. Of these 97 documents, Genentech claims that it has received 37. Additionally, since Genentech apparently did not receive the privileged portion of one of these 37 documents, it appears that Genentech is in possession of only 36 of the 97 documents on Lilly's privileged document log.

Genentech has conceded that Lilly's production of the documents in issue was inadvertent. Thus, we need not elaborate on the privilege screening process Lilly employed. We briefly note that we agree with Genentech ". . . that the facts presented by Lilly are legally sufficient under present case law to support a claim of inadvertent production." Genentech Resp. at 1.

Genentech, however, contends first that Lilly has waived any privilege in those documents on Lilly's privilege log that Genentech did not receive and that facially do not disclose a confidential attorney-client communication. Second, Genentech argues that retention of the documents it did receive from Lilly is proper because none of those documents are shielded by a valid claim of privilege.

II. Discussion

The issue of inadvertency must be addressed in both UC's and Genentech's motions for return of inadvertently produced documents. Consequently, we turn to appropriate case law.

There are three general approaches that courts have followed in determining whether the inadvertent disclosure of documents waives otherwise valid privileges. *Golden Valley Microwave Foods v. Weaver Popcorn , 132 F.R.D. 204, 208 [ 13 USPQ2d 2054]* (N.D. Ind. 1990). Some courts adhere to a strict accountability test whereby any disclosure constitutes a waiver. See, e.g., *In re Sealed Case , 877 F.2d 976 (D.C. Cir.* [*1907] *1989); International Digital Sys. Corp. v. Digital Equip. Corp. , 120 F.R.D. 445 (D. Mass. 1988); Underwater Storage, Inc. v. United States Rubber Co. , 314 F. Supp. 546, 548-49 [ 165 USPQ 97]* (D.D.C. 1970). The rationale in this approach is that even if the production was inadvertent, the disclosure breaches the confidentiality of the document and destroys the purpose for the privilege.

Other courts hold that unintentional disclosure is never a waiver because in order for disclosure to constitute a wavier, the disclosing party must have intentionally given up the protection. See , e.g., *Helman v. Murry's Steaks, Inc. , 728 F. Supp. 1099 (D. Del. 1990); Kansas-Nebraska Natural Gas v. Marathon Oil Co. , 109 F.R.D. 12 (D. Neb. 1983)*. Finally, some courts have chosen to use a case-by-case analysis in deciding the issue of privilege in inadvertently produced documents. Through this approach, the court surveys the precautions a party has taken to ensure that protected material is not produced and examines the circumstances under which the documents were produced. See , e.g., *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co. , 104 F.R.D. 103 (S.D.N.Y. 1985).*

The Seventh Circuit apparently has not had to determine which of the approaches it would apply in such a discovery dispute. However, Magistrate Judge John Godich in one of the cases now before this Court earlier determined that the case-by- case analysis is most appropriate. Eli Lilly & Co. v. Genentech, Inc. Cause No. IP-87-0219-C (S.D. Ind. Oct. 19, 1988). We agree with this determination.

Courts relying on the case-by-case approach generally consider five factors to determine whether a privilege has been waived: (1) the reasonableness of the precautions taken to prevent inadvertent disclosure; (2) the time taken to rectify the error; (3) the number of inadvertent disclosures; (4) the extent of the disclosure; and (5) the overriding issue of

30 U.S.P.Q.2D (BNA) 1881, *; USPQ Headnotes 1881, **

fairness. *Lois Sportswear , 104 F.R.D. at 105;* Bud Antle, Inc. v. Grow - *Tech, Inc. , 131 F.R.D. 179, 183 [ 16 USPQ2d 1948]* (N.D. Cal. 1990).

A.  UC's Motion for Return of Inadvertently Produced Documents

UC contends that its inadvertent disclosure of the documents in issue waives neither its attorney-client privilege nor its work product privilege.  Conversely, Lilly and Genentech insist that any privilege UC previously may have had in the documents clearly has been waived by the conduct of UC and its counsel.

We turn to the first factor for consideration. UC argues that the precautions it took to ensure that such inadvertent disclosure would not occur were reasonable.  n37 The Court finds that the precautionary measures UC outlines in its brief were not insignificant. These measures were those taken during UC's initial document production to Genentech -- a production that later apparently was photocopied to Lilly. The competing concern, however, is UC's eventual recognition that these precautions likely are not relevant to the instant inadvertent disclosure. Although UC originally believed the inadvertent disclosure occurred with UC's initial document production to Genentech, UC later determined that this theory was incorrect. UC made this determination upon learning that Genentech does not have the inadvertently disclosed documents UC desires returned; only Lilly is in possession of the documents.  Thus, while the screening system UC describes perhaps could be considered a reasonable one, its reasonableness becomes irrelevant upon learning that this system was not that through which the inadvertent document production occurred.  See Decl. of Gerald P. Dodson, Paragraphs 9, 12.

n37 These precautions are outlined supra in the background information.

 Second, UC contends that return is appropriate because it acted promptly in its request for return of these documents after learning that the inadvertent production had occurred. Standing alone, the two-week reaction period between UC's discovery of its production error and UC's request for return of the documents is not decisive. But, when the extent of the disclosure is added to the two-week period, the scale tips in favor of waiver. Several of the documents in question were marked as deposition exhibits and used extensively during the testimony of at least one witness, Bertram Rowland, former UC counsel.  n38 No objection was made to such use despite the fact that the materials were obviously of a privileged nature. UC's counsel asked his opponent about the source of one of the documents in issue and then permitted Rowland to be questioned at length about the privileged subject matter. UC's attorney's only concern was that the documents be handled in accordance with the  [*1908]  protective order earlier entered in the case.  n39 When an objection trails by two weeks extensive use of obviously privileged documents, the delay becomes more significant.

n38 Genentech, in its opposition to UC's motion, states that the documents in issue in this category also were used in the May 20, 1991, deposition of UC- in-house counsel, John Lundberg.

n39 This protective order pertains to the designation and disclosure of confidential materials exchanged by the parties.  See The Regents of the Univ. of Cal. v. Genentech, Inc., Civil Action No. C-90-2232-RFP (N.D. Cal. Feb. 7, 1992) (The preceding cause number is that number assigned to IP-92-0223-C before it was transferred to the Southern District of Indiana.); Genentech, Inc. v. Eli Lilly & Co., Cause No. IP-88-1463-C (S.D. Ind. April 3, 1989); Eli Lilly & Co. v. Genentech, Inc., IP-87-0219-C (S.D. Ind. April 3, 1989).

Furthermore, while the scope of discovery here involved was not insignificant, it was not unmanageable. Although approximately 50,000 pages of documents were reviewed and about 12,000 pages produced, UC does not suggest that it was under any pressure in responding to the production request. This case is not comparable to Transamerica Computer v. International Business Machs. , in which the defendant under court order had only three months during which to inspect approximately 17 million pages of documents. *573 F.2d 646, 648 (9th Cir. 1978).* Moreover, the scope of discovery here does not approach that involved in Eli Lilly & Co. v. Genentech. Inc. , where a total of 350,000 documents were reviewed and 140,000 items were forwarded to the defendant. Cause Number IP-87-0219-C (S.D. Ind. Oct. 19, 1988).

30 U.S.P.Q.2D (BNA) 1881, *; USPQ Headnotes 1881, **

Finally, we find that fairness dictates that any privilege in these documents be deemed waived. UC had the opportunity to object during the deposition in which certain of these documents were used, yet no objection was made. Furthermore, as stated previously, UC's objection lagged two weeks behind the Rowland deposition in which UC suggests its representatives became aware of the possible inadvertent production. This gave Lilly two weeks in which to read, analyze and rely on the deposition and its exhibits, as well as the other inadvertently produced documents.

Go to Headnotes  [**7R]  The preceding analysis leads us to the conclusion that UC has waived any privilege it may have had in its inadvertently produced documents. "Under the circumstances, the bell has already been rung, and the court cannot now unring it by . . ." returning the documents to UC.  *Bud Antle , 131 F.R.D. at 183.* However, we note that the waiver properly is limited to the documents UC actually has disclosed.  See , e.g., *Prudential Ins. Co. v. Turner & Newall PLC , 137 F.R.D. 178, 182-83 (D. Mass. 1991); Parkway Gallery v. Kittinger/Pennsylvania House Group, Inc ., 116 F.R.D. 46, 52 (M.D.N.C. 1987).*

There is additional support for denying UC the return of one inadvertently produced document in particular -- a 61-page evaluation by the law firm Irons and Sears (the Irons opinion).  n40 Lilly argues that UC lost any privilege in the Irons opinion because UC previously voluntarily produced a letter authored by Lorance Greenlee (the Greenlee letter), a counterpart to the Irons opinion.  n41 Lilly urges that the two documents are related subject matter and, therefore, since privilege has been waived in the Greenlee letter, it must be deemed waived in the Irons opinion.

> n40 This evaluation is entitled "Evaluation of the United States Patent Position of the University of California With Respect to DNA Recombinant Technology."
>
> n41 Lilly also contends that UC's failure to divulge some of the information contained in the Irons opinion to the U.S. Patent and Trademark Office (PTO) suggests that UC was perpetrating a fraud on the PTO in the procurement of a patent. Thus, Lilly argues, the crime-fraud exception should be invoked to destroy UC's privilege in the document. n41 UC counters that the crime-fraud exception is not available to Lilly to terminate UC's privilege because Lilly has failed to establish a prima facie case of fraud. Because our decision that UC has waived any privilege it may have had in the documents in question rests on other grounds, we need not address the issue of fraud.

UC asserts that its production of the Greenlee letter in 1989 was not voluntary, but rather inadvertent. Thus, UC argues, such production does not assist Lilly in its attempt to retain the Irons opinion. Additionally, UC claims that it has not waived privilege in the Irons opinion because the opinion and the Greenlee letter relate to different subject matter. Therefore, UC contends, Lilly's reliance on a subject matter waiver is ineffective.

We are unpersuaded by UC's latter contention that the two documents are unrelated. The Greenlee letter and the Irons opinion obviously are two attorneys' comments on the same subject. A UC representative had authorized Greenlee "to conduct a study of the University's patent position with respect to recombinant DNA. . . ." when Greenlee was associated with Irons and Sears. Greenlee explains in the December 7, 1979, letter to Roger Ditzel, patent administrator for University of California, that he and Edward S. Irons (Irons) of Irons and Sears had begun the study while Greenlee was affiliated with Irons and Sears. Greenlee left Irons and Sears before the study was completed. In his letter, Greenlee acknowledges  [*1909]  that Irons was continuing the study, but noted that he, Greenlee, felt it necessary "to present the University with an independent analysis, focusing on the most significant aspects of the situation."

The language of the Greenlee letter makes it clear that it and the Irons opinion arose from the same university assignment. Additionally, the language in the two documents illustrates that both authors were addressing the university's position with respect to recombinant DNA technology. Certainly, the fact that the Irons opinion is a more thorough analysis does not prevent the two documents from covering the same subject matter. Accordingly, we find that the two documents are related.

UC insists that production of the Greenlee letter was inadvertent and not voluntary. Therefore, UC asserts, any waiver the Court finds should be narrowly construed and should not encompass the Irons opinion. Significantly, UC never

30 U.S.P.Q.2D (BNA) 1881, *; USPQ Headnotes 1881, **

attempted to rectify its error -- if it was an error -- in producing the Greenlee letter. In fact, during a July 13, 1991, deposition Greenlee was permitted to answer questions regarding his letter without objection. Later, at the deposition of Kevin L. Bastian on January 22, 1992, Gerald Dodson, UC counsel, stated that the Greenlee letter was a "potential inadvertent disclosure by the university a number of years ago. . . . I'm saying after two years time, it's a waiver." Thus, UC apparently never tried to regain possession of the Greenlee letter. Furthermore, it appears that UC did not request the return of the Irons opinion until at least late September 1991, most likely leaving that document in Lilly's hands for several months before any return request was made.

Moreover, we note that holdings in the cases UC cites to support its limited waiver argument are not contrary to our finding today. In those cases, the courts found that while there was no subject matter waiver of documents not yet produced, privilege had been lost in those documents actually produced -- even though produced inadvertently. *Prudential Ins. Co. v . Turner & Newall, PLC , 137 F.R.D. 178 (D. Mass. 1991); Parkway Gallery Furniture, Inc. v. Kittinger/Pennsylvania House Group, Inc., 116 F.R.D. 46 (M.D.N.C. 1987).* In the instant case, both the Greenlee letter and the Irons opinion actually have been produced. Such actual production weighs in favor of a waiver of privilege.

Finally, an examination of the issue of fairness further supports a finding of waiver of privilege in the Irons opinion. Lilly, whether inadvertently or not, had been given the Greenlee letter -- one portion of a study conducted by two attorneys on the same subject matter. Lilly had been permitted to read and analyze that portion. Subsequently, UC "inadvertently" produced the other portion of this study -- the Irons opinion. UC seeks to regain possession only of the later-produced portion. Lilly suggests that UC's desire to regain only the Irons opinion is fueled by the fact that the Irons opinion offers an unfavorable report of UC's patent position, while the Greenlee letter presents a more favorable position.

In any event, fairness dictates that if UC was willing to permit Lilly to rely on the Greenlee portion of this study without objection (or to use this portion of the study for its own purposes), the remainder or counterpart of the study, likewise should remain in the mix. Consequently, the Court denies UC's motion for return of its inadvertently produced documents.

B. Genentech's Motion for Return of Inadvertently Produced Documents

As was UC's, Genentech's production of privileged documents must be analyzed under the Lois Sportswear factors to determine if Genentech has waived any privilege it had in those documents. *104 F.R.D. at 105.* Application of these factors to the relevant facts leads us to conclude that, indeed, a waiver has occurred.

The unreasonableness of the screening procedures Genentech employed is readily apparent and requires little discussion. The fact that 21,000 pages of documents thought to be privileged "slipped through" these procedures is telling evidence of the quality of the established precautions. Although an investigation following the production in issue reduced the number of documents Genentech seeks returned, yet Genentech still asks this Court to return to it more than 12,000 pages -- approximately 25 percent of the entire November 8, 1993, production.

The unreasonableness of Genentech's conduct further is illustrated by the warnings it received and ignored regarding the documents in issue. Rudman, himself, was cautioned about the screening procedures employed at Weil, Gotshal & Manges but, nevertheless, would permit only a cursory review of the documents. This cursory review apparently uncovered no privileged materials and, thus, the documents were produced to Genentech's opposition.

The great number of inadvertent disclosures in this case also supports a finding of waiver. As previously discussed, Genentech seeks 12,000 pages returned, and these 12,000 pages all were produced in the same time frame. Genentech asserts that these [*1910] disclosures equal less than one-half of one percent of Genentech's total number of pages produced, and that this should weigh in favor of returning the documents. However, in this case the overall percentage rate of Genentech's "inadvertent" disclosures is not as significant as Genentech contends. Given the volume of privileged documents that slipped through Genentech's screening process employed on the disclosures in question, we do not find it appropriate to assess these disclosures by reference to the procedures used for other Genentech productions.

30 U.S.P.Q.2D (BNA) 1881, *; USPQ Headnotes 1881, **

Genentech argues that fairness dictates a return of its documents. Specifically, Genentech contends that the Court should guard the attorney-client privilege for the client when counsel unintentionally has produced privileged matter. In other situations, this argument might be more persuasive. In this case, however, Genentech itself, through its in-house representative, denied an opportunity to prevent these very disclosures from occurring. Thus, we find Genentech's argument unavailing.

Moreover, in fairness to all involved in the litigation, there is a certain point past which the Court should not intervene to rectify the mistakes of a party or that party's counsel. Otherwise, any unintentional production would require that the Court order the return of the documents. This Court already has established that it does not adhere to the intentional-unintentional approach in determining the inadvertency of a disclosure. See , infra , at 5.

In summation, when such inadequate screening procedures are coupled with an informed determination to forego a thorough review of the documents, the Court cannot be used as a safety net. Certainly, the parties are acutely aware of the significance of this litigation and must conduct themselves accordingly. In fairness to other parties, failure to do so can result only in living with the consequences. Therefore, we must deny Genentech's motion for return of inadvertently produced documents. However, as with UC's production, we do not find a subject matter waiver; the waiver applies only to the documents actually produced.

C. Lilly's Motion for Return of Inadvertently Produced Documents

Contrary to UC's and Genentech's motions, the issue of inadvertency is not determinative in Lilly's motion to compel the return of inadvertently produced privileged documents. As stated earlier in this Entry, Genentech has conceded that Lilly's production, indeed, was inadvertent. Rather, Genentech bases its opposition to Lilly's motion on two other grounds, which we will address consecutively.

First, we briefly will discuss those documents on Lilly's privileged log that Genentech did not receive. Lilly's log contained 97 documents; Genentech received 37 of them. n42 Genentech contends that Lilly has waived any privilege it may have had in the documents that (1) were not produced, and (2) are not patently privileged.

n42 However, as to Lilly Document No. 87, Genentech reports that it did not receive the privileged portion of that document. Thus, Document No. 87 is one of those documents Genentech did not receive but is, nevertheless, on Lilly's privileged log.

Genentech provides no support for this seemingly novel approach, and we do not believe such an approach is meritorious. If Lilly never produced these documents, we cannot discern any basis for finding a waiver of privilege. Furthermore, if Genentech received but lost or misplaced the documents, we do not believe that ordering a reproduction of them would be the proper course. Rather, should Genentech locate such documents, a determination of their privileged status then would be appropriate.

Next, we turn to those documents in issue that Lilly actually inadvertently produced to Genentech. First, we note that Genentech has conceded the privileged nature of nine of these documents. n43 Thus, these documents shall be returned to Lilly. Second, in Lilly's reply to its motion to compel the return of inadvertently produced documents, Lilly masked and reproduced six of the documents Genentech challenges as nonprivileged. n44 The Court approves of Lilly's masking and reproduction. Consequently, these documents are no longer in issue.

n43 These are Lilly Document Nos. 3, 9, 14, 35, 64, 68, 69, 72, and 83.

n44 These are Lilly Document Nos. 45, 55, 61, 63, 73 and 85.

Finally, we consider the last category of documents in issue. As to these documents, Genentech claims that Lilly has no valid privilege. Conversely, Lilly contends that the documents clearly are privileged and should be returned.

30 U.S.P.Q.2D (BNA) 1881, *; USPQ Headnotes 1881, **

Following a thorough examination of the documents, the affidavits submitted by Lilly, and the contentions of the opposing parties, we have reached the following conclusions. With the exception of Lilly Document No. 7, we find that the documents are privileged and must be returned to Lilly.  n45 However, we find no privilege in Lilly Document No. 7,  [*1911]  which contains minutes of a research and development expression group meeting.  Therefore, Genentech need not return this document to Lilly.

      n45 These are Lilly Document Nos. 8, 10, 11, 13, 27, 28, 29, 30, 39, 41, 46, 51, 52, 53, 54, 56, 58, 64, 67, 75 and 81.

III.  Summary

To summarize, UC's motion for the return of inadvertently produced privileged documents is denied; Genentech's emergency motion for the return of inadvertently produced documents is denied; and Lilly's motion to compel the return of inadvertently produced privileged documents is granted to the extent that the privileged documents are unchallenged, granted to the extent that the Court's in camera review has determined return is appropriate, denied as to Lilly Document No. 7, and denied as to those documents that Lilly has entered on its privileged log but which Genentech apparently does not have in its possession or has misplaced. The privileged status of these latter documents will be determined if and when Genentech locates and wishes to use them.