UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MASSACHUSETTS INSTITUTE OF TECHNOLOGY and REPLIGEN CORPORATION,<br><br>　　　　　Plaintiffs,<br><br>　　v.<br><br>IMCLONE SYSTEMS, INC.,<br><br>　　　　　Defendant. | Civil Action No. 04-10884-RGS |

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION
FOR LEAVE TO FILE ITS SECOND AMENDED ANSWER**

Nearly a year ago, ImClone stood before this Court and declared that this case would be resolved by an early summary judgment on its patent exhaustion defense. Now, one day after the close of fact discovery, and eight months after receiving the documents attached to its motion, ImClone proposes to instead inject the highly-disfavored defense of inequitable conduct[1] into this case without any factual basis. As evidenced by the bare-bones and conclusory nature of its proposed amended pleading—which accuses the inventors and "others at MIT" of just about every species of inequitable conduct in a single, seven-line sentence—ImClone's motion is a defense in search of a basis. The proposed amended answer fails basic standards of futility, particularity, and timeliness, all of which are required under the Federal Rules of Civil Procedure.

---

[1] "[T]he habit of charging inequitable conduct in almost every major patent case has become an absolute plague. Reputable lawyers seem to feel compelled to make the charge against other reputable lawyers on the slenderest of grounds … ." *Burlington Indus, Inc. v. Dayco Corp.*, 849 F.2d 1418, 1422 (Fed. Cir. 1988).

As to ImClone's claim that the inventors and others at MIT "intentionally misrepresented the correct inventorship of the claimed subject matter," the correspondence between Stanford and MIT attached as Exhibit I to ImClone's brief conclusively proves that there was *no inventorship dispute* over the `281 patent.  After being provided the opportunity to review the patent application, as well as the then-existing claims, Drs. Morrison and Oi dropped their inventorship claim.  Exactly what actions the named inventors and others owing a duty to the Patent Office should have undertaken in the face of these circumstances is not explained—or pled—by ImClone.  That is because no action or disclosure of any sort was required.

Equally futile is ImClone's assertion that the Oi reference was "intentionally with[held]" from the Patent Office.  In reality, the reference was disclosed in the `281 patent specification and, in accordance with Title 35 of the United States Code and the Patent Office regulations, cannot form the basis of an inequitable conduct charge.

As for ImClone's other allegations of inequitable conduct—wholesale and non-specific claims that unnamed persons "intentionally with[held] material prior art," "intentionally misrepresent[ed] the teachings and state of the prior art to the USPTO" or "intentionally submitt[ed] false and/or misleading declarations to the USPTO"—ImClone has not even bothered to plead them with any particularity.  These all-inclusive allegations, which are designed to permit ImClone to point to anything that happened during prosecution as "inequitable conduct," are precisely the reason why the Federal Circuit requires pleadings of this defense to satisfy the strictures of Rule 9(b).  ImClone's pleading fails completely on this score.

ImClone also fails to provide any "good cause" for its decision to wait until after the close of discovery to propose its amendment.  The file history of the `281 patent is publicly available, and was almost certainly reviewed by ImClone's counsel years ago in connection with

ImClone's deflection of Repligen's attempts to license the `281 patent in 1997. There is no reason why ImClone could not have pled its defense related to the file history with its answer or, at the very least, before the amendment deadline. Moreover, as to the inventorship claim, ImClone received the referenced correspondence between MIT and Stanford more than eight months ago. Its claim that it has taken eight months to "analyze" these documents is simply not credible. Indeed, in apparent recognition that there is no sound excuse for its delay, ImClone hurls baseless accusations regarding the scheduling of Dr. Tonegawa's deposition in an attempt to paint plaintiffs with a broad brush. However, by its own assertion that the "documents alone are sufficient to justify pleading inequitable conduct," ImClone admits that Dr. Tonegawa's deposition had nothing to do with its delay. ImClone's allegations about Dr. Tonegawa are simply a ploy to distract the Court from the real issues and the extensive amount of ImClone's brief dedicated to shouting "Tonegawa" speaks volumes as to the true nature of ImClone's motion. ImClone's motion for leave to file its second amended answer fails in all respects and should be denied.

## ARGUMENT

**A.    ImClone's Amended Pleading May Only Be Allowed If "Good Cause" Is Shown.**

The Court's scheduling order set a September 15, 2004 deadline for amendments to the pleadings. Because the Court's deadline has long since passed, ImClone's motion to amend its answer is not governed by the "freely given" standard of Rule 15(a). *See O'Connell v. Hyatt Hotels of Puerto Rico*, 357 F.2d 152, 154 (1st Cir. 2004). Rather, ImClone's motion must be analyzed under the more stringent "good cause" standard set forth in Rule 16(b). *Id.* A court may deny a motion for leave to amend a pleading on numerous grounds, including futility of the amendment, undue delay, undue prejudice to the opposing party, and bad faith or dilatory motive on the part of the movant. *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Acosta-Mestre v. Hilton*

3

*Int'l of Puerto Rico, Inc.*, 156 F.3d 49, 51 (1st Cir. 1998).  Here, each one of these factors supports the denial of ImClone's eleventh-hour attempt to amend its answer and add groundless charges of inequitable conduct.

**B.    The Court Should Deny ImClone's Motion to Amend Because ImClone's Allegations of Inequitable Conduct are Futile.**

Futility of an amendment, on its own, provides a sufficient basis to deny a motion for leave to amend.  *Hatch v. Dept. for Children, Youth, and Their Families*, 274 F.3d 12, 19 (1st Cir. 2001).  "Where an amendment would be futile or would serve no legitimate purpose, the district court should not needlessly prolong matters."  *Berard v. Town of Millville*, 113 F. Supp. 2d 197, 203-04 (D. Mass. 2000).

The First Circuit has set forth two standards by which futility is measured.  *Hatch*, 274 F.3d at 19.  Where a party seeks leave to amend before the close of discovery and before either party has moved for summary judgment, futility is analyzed with reference to the pleading requirements of Federal Rule of Civil Procedure 12(b)(6).  *Id.*  Alternatively, where a party seeks leave to amend after the close of discovery and after a summary judgment motion has been docketed, the proposed amendment must not only be "theoretically viable" but also must be supported by substantial evidence.  *Hatch*, 274 F.3d at 19.  The procedural posture of the instant case does not fall into either category.  Because ImClone delayed the filing of its motion for leave until the day *after* the close of discovery, it is not entitled to an analysis of its proposed amended answer under the criteria of Rule 12(b)(6).  At the same time, neither party has filed a motion for summary judgment.  Ultimately, however, it does not matter which futility standard

the Court applies.[2] ImClone's allegations of inequitable conduct are neither supported by substantial evidence nor are they even theoretically viable.

> **1.    The Correspondence Between Stanford and MIT Conclusively Shows That Dr. Morrison and Dr. Oi Are Not Inventors.**

To prevail on an inequitable conduct defense, ImClone must set forth clear, unequivocal, and convincing evidence of (1) an affirmative misrepresentation of a material fact, a failure to disclose material information, or a submission of false material information with (2) an intent to deceive the Patent Office. *Amgen Inc. v. Hoescht Marion Roussel, Inc.*, 314 F.3d 1313, 1358 (Fed. Cir. 2003). Here, there is not even a shred of evidence that supports ImClone's allegation that Dr. Tonegawa, Dr. Gillies, and unnamed "others" at MIT misrepresented the correct inventorship of the `281 patent to the Patent Office. (*See* ImClone Ex. A ¶ 46.) This is evident even from a cursory review of the correspondence between Stanford and MIT, which is attached as Exhibit I to ImClone's motion.

The Exhibit I correspondence shows that on October 25, 1984, Stanford, on behalf of Dr. Morrison and Dr. Oi, contacted MIT after learning that Dr. Tonegawa and Dr. Gillies had filed a patent application for their research on cellular enhancer technology. (ImClone Ex. I at MIT001336.) Without even seeing the patent application or the pending claims, Stanford's letter indicated that both Dr. Morrison and Dr. Oi believed they were co-inventors. (*Id.*) From the letter, it appears that this "belief" came from the fact that Drs. Morrison and Oi were listed as authors with Dr. Tonegawa and Dr. Gillies on the *Cell* article (attached as Exhibit B to the Kane Declaration) that disclosed the patented discovery.

---

[2]    Given that written discovery has concluded, Plaintiffs suggest that the heightened standard should apply.

MIT responded to Stanford's inquiry by explaining that Dr. Morrison and Dr. Oi were not co-inventors. Instead, Drs. Morrison and Oi simply provided a cell line[3] as a starting material for Dr. Tonegawa's and Dr. Gillies's research with the understanding that they would be named as authors in the publication of the discovery:

> According to Professor Tonegawa, he telephoned Morrison/Oi at Stanford to discuss his idea and request the cell line previously published by Morrison/Oi. This cell line was provided to Professor Tonegawa and Dr. Gillies with the understanding that Morrison and Oi would be named as authors in the publication of the MIT research. There was not much interaction while the research was being performed at MIT and Professor Tonegawa called Morrison/Oi when the work was completed.

(*Id.* at MIT000857.) Based on an independent review by two of MIT's outside patent attorneys, the letter states, "it was the conclusion of patent counsel that … Morrison and Oi were not co-inventors of this patent application." (*Id.*)

After more than five months had passed, Stanford sent another letter to MIT indicating that Dr. Morrison and Dr. Oi "feel that the inventorship issue is still unresolved." (*Id.* at MIT000850.) The letter also stated that Dr. Morrison and Dr. Oi "would be interested" in receiving a copy of the patent application. (*Id.*) Two weeks later, MIT responded by enclosing a copy of the patent application (without the claims) and two confidentiality agreements. (*Id.* at MIT000849.) The letter stated that once the confidentiality agreements were signed and returned, the claims would be forwarded to Stanford.[4] (*Id.*)

---

[3]  Dr. Morrison and Dr. Oi provided a mouse myeloma line, designated J558L, with which Dr. Tonegawa and Dr. Gillies conducted their research. (Kane Decl. Ex. A at 8:10-52, Ex. B at I03682.) The J558L cell line has no relation to the C225 cell line used by ImClone to manufacture Erbitux™.

[4]  In this regard, ImClone's charge that MIT "withheld the pending application's claims" to create the impression that MIT would not cooperate with Stanford is false. (*See* ImClone Br. at 9.) MIT offered to provide the claims of the `281 patent application to Dr. Morrison and Dr. Oi, subject only to the signing of a confidentiality agreement with MIT. Dr. Morrison or Dr. Oi never signed the confidentiality agreement, and thus never received the claims.

6

A month and a half later, Stanford responded to MIT's letter and stated that they had "decided not to pursue the [inventorship] issue." (*Id.* at MIT000844.) According to the letter, neither Dr. Morrison, Dr. Oi, nor their patent counsel thought it was even necessary to read the `281 patent application provided by MIT. (*Id.*) After merely discussing the "general situation," Dr. Morrison and Dr. Oi were able to conclude that "the pending patent application [was] not relevant to their work." (*Id.*)

The correspondence between Stanford and MIT conclusively shows there was never a real dispute over the inventorship of the `281 patent. At no time did Dr. Morrison or Dr. Oi have any basis to believe that they were co-inventors. Indeed, they admitted that they never even read the patent application. (*Id.*) Ultimately, even Dr. Morrison and Dr. Oi concluded that the `281 patent application was "not relevant to their work." (*Id.*)

Now, twenty years after the fact, ImClone seeks leave to contend that the conclusion reached by the alleged "co-inventors" was incorrect, and that when the actual inventors and MIT's outside patent counsel reached the same conclusion, they committed fraud on the Patent Office. This is nonsense and does not satisfy any standard of pleading. *See Bd. of Educ. v. Am. Bioscience, Inc.*, 333 F.3d 1330, 1344 (Fed. Cir. 2003) (reversing a finding of inequitable conduct for an alleged non-disclosure of co-inventors because the former colleagues were not inventors, and thus the information was "not material to any issue of patentability").[5] Accordingly, ImClone's claim of "misrepresented inventorship" is futile.

---

[5]   The Federal Circuit noted that "[i]n practice, patent examiners do not normally engage in determination of the respective contributions of the individual members of an inventive entity as part of making an ex parte examination; rather, it is the responsibility of the applicants and their attorneys to ensure that the inventors named in a patent application are the only true inventors. *Am. Bioscience*, 333 F.3d at 1344. This is precisely the responsible approach taken by MIT in the prosecution of the `281 patent.

### 2.     The Oi Reference Cannot Form the Basis of An Inequitable Conduct Allegation Because It Was Disclosed in the Patent Specification.

Like ImClone's claims regarding the inventorship of the `281 patent, ImClone's allegations regarding the Oi reference are baseless and futile.  ImClone alleges in its proposed amended answer that Dr. Tonegawa, Dr. Gillies, and others at MIT violated their duty of candor by intentionally withholding the Oi reference from the Patent Office.  (ImClone Ex. A ¶ 46.)  Yet, on page 10 of its brief, ImClone contradicts its own allegation by acknowledging that the Oi reference is disclosed in the `281 patent specification.  Thus, ImClone's inequitable conduct allegation is futile on its face.

Although not pled in its proposed second amended answer, it appears from ImClone's brief that its actual allegation of inequitable conduct with respect to the Oi reference is not that it was withheld from the Patent Office, but rather that it was not submitted to the Patent Office on an information disclosure form.  (*See* ImClone Br. at 10.)  This allegation, however, fails as a matter of law.  Under 35 U.S.C. § 301, the only requirement for the submission of prior art to the Patent Office is that it be "in writing."  The statute sets forth no requirement that the prior art must be listed on a particular form to be considered.  Likewise, the Manual of Patent Examining Procedure (MPEP) makes it clear than an invention disclosure statement is just one way of submitting prior art:

> While information disclosure statements are a preferred and one of the safest ways to comply with the duty of disclosure, *it is not necessary or essential to file information disclosure statements under 37 CFR 1.97-1.99 to comply with the duty of disclosure under 37 CFR 1.56*.

MPEP § 2002.03 (1984-1987) (emphasis added).[6]  Indeed, the MPEP expressly states that prior art information may be submitted in the patent specification:

> Care should be taken to see that *prior art or other information cited in a specification or in an information disclosure statement* is properly described and that the information is not incorrectly or incompletely characterized.

MPEP § 2004 (1984-87) (item 7, emphasis added).

Based on the explicit provisions in Title 35 and the MPEP set forth above, it is no surprise that ImClone has not cited a single case where a court found inequitable conduct for the alleged "non-disclosure" of a reference that is actually cited in the patent specification.  Indeed, the only caselaw uncovered by the Plaintiffs that addresses such an allegation is a non-precedential opinion from the Federal Circuit.  In that case, the Federal Circuit vacated a district court's finding that the inventor knowingly withheld prior art because "he clearly disclosed them by including them in the `281 patent's specification." *Bayer AG v. Housey*, 2005 WL 752364, at *4 (Fed. Cir. April 4, 2005).

Not only does ImClone fail to establish that the Oi reference was withheld from the Patent Office, but it also fails to explain how the Oi reference is material to patentability of the `281 patent—which is required to prove inequitable conduct.  *Specialty Composites v. Cabot Corp.*, 845 F.2d 981, 991-92 (Fed. Cir. 1988).  Information is only "material" if it is not cumulative of information already of record before the patent examiner and the examiner would have considered the information important in deciding whether to allow the application to issue as a patent.  *Id.* at 992.  To satisfy this requirement, ImClone simply concludes that the reference is "highly-material" and claims the reference anticipates the `281 patent. (ImClone Br. at 10).

---

[6] The relevant provisions from the August 1983 edition of the MPEP, which was in effect during the prosecution of the `281 patent, are attached hereto as Exhibit D to the Kane Declaration.

9

However, these claims ring hollow in light of the fact that ImClone has never once mentioned the Oi reference in its discovery responses. Indeed, in response to Plaintiffs' interrogatory requesting invalidity contentions (which was served in July 2004), ImClone cited several references disclosed in the `281 patent, but the Oi reference is not among them. (Kane Decl. Ex. E at 2-5.)

There is no evidence to support ImClone's allegations of inequitable conduct with respect to the Oi reference. No matter what spin ImClone puts on the evidence, the undeniable fact remains that the Oi reference was disclosed in the `281 patent specification, as expressly permitted by Title 35 and the rules of the Patent Office. Accordingly, ImClone's allegations are futile as a matter of law.

### 3. ImClone's Wholesale Allegations Violate Federal Rule of Civil Procedure 9(b).

Allegations of inequitable conduct must satisfy the specificity requirements of Rule 9(b). *Ferguson Beauregard/Logic Controls, Div. of Dover Resources, Inc. v. Mega Systems, LLC*, 350 F.3d 1327, 1344 (Fed. Cir. 2003); *Systemation, Inc. v. Engel Indus., Inc.*, 183 F.R.D. 49, 51-52 (D. Mass. 1998) (reasoning that the application of stricter pleading requirements might act as a check on the abusive practice of filing an inequitable conduct claim in nearly every patent case). To satisfy its obligations under Rule 9(b), at a minimum, ImClone must identify the time, place, and contents of any alleged inequitable conduct. *Systemation*, 183 F.R.D. at 51.

All of ImClone's allegations of inequitable conduct fail to meet the 9(b) standard to varying degrees. For example, its pleading regarding the Oi reference fails to explain how exactly the reference was withheld in view of the fact it was disclosed in the `281 patent specification. (*See* ImClone Ex. A ¶ 46.) ImClone's pleading also fails to identify the information in the Oi reference that allegedly makes it material. (*See id.*) As for the

10

inventorship claim, while ImClone's brief goes on at length about the non-existent inventorship dispute, the pleading itself is completely silent about it. ImClone proposed answer simply alleges that "Dr. Tonegawa, Dr. Gilles and others at MIT … intentionally misrepresent[ed] the correct inventorship of the claimed subject matter to the USPTO." (*Id.*)

Similarly, ImClone's other allegations of inequitable conduct variously accuse Drs. Gilles and Tonegawa and unnamed others at MIT of "intentionally withholding material prior art from the USPTO" (of which the Oi reference is simply "included"), "intentionally misrepresenting the teachings and state of the prior art to the USPTO through the prosecution of the '281 patent application," and "intentionally submitting false and/or misleading declarations to the USPTO." (*Id.*) Simply put, ImClone has "thrown the book" at the inventors and MIT. These allegations completely fail to satisfy Rule 9(b). Not a single misrepresentation, falsehood or misleading statement is identified and, other than the Oi reference, no other reference is identified.

ImClone's proposed amended answer thus fails to even meet the minimal pleading requirements of the Federal Circuit and this Court, and could not survive either a motion to dismiss or motion to strike. *See Systemation*, 183 F.R.D. at 52 (granting plaintiff's motion to dismiss claims of inequitable conduct under Rule 12(b)(6) and 9(b), or in the alternative, under Rule 12(f)); *see also Chiron Corp. v. Abbott Labs.*, 156 F.R.D. 219 (N.D. Cal. 1994) (striking bald allegations that plaintiff intentionally misled the examiner about the state of the art by filing a deceptive and misleading affidavit insufficient under Rule 9(b)); *Sun-Flex Co. v. Softview Computer Prods.*, 750 F. Supp 962, 963 (N.D. Ill. 1990) (striking an inequitable conduct pleading alleging that plaintiffs failed to disclose "material facts including prior art, prior inventions and patent application(s)" and that plaintiffs "falsified inventorship"). Accordingly, the motion to amend should be denied for failure to meet the standards of Rule 9(b).

**C.     ImClone's Motion Should Be Denied Because It Fails to Provide a Valid Reason for Its Undue Delay.**

The "good cause" standard of Rule 16(b) "emphasizes the diligence of a party seeking amendment." *O'Connell*, 357 F.3d at 155.  In recognition of this, courts have repeatedly held that a motion to amend may be denied solely because of a lack of diligence or undue delay. *E.g.*, *Quaker State Oil Refining Corp. v. Garrity Oil Co.*, 884 F.2d 1510, 1517–18 (1st Cir. 2002) (affirming refusal to allow leave to amend where, among other things, the facts were known to defendant all along, a great deal of discovery had taken place, and defendant never proffered a satisfactory explanation for its delay); *Acosta-Mestre*, 156 F.3d at 53 (denying "eleventh hour" motion for leave to amend).  Whenever a considerable amount of time has elapsed between the filing of a responsive pleading and a motion for leave to amend, the movant has the burden to "show some valid reason for the neglect and delay." *Hayes v. New England Millwork*, 602 F.3d 15, 19–20 (1st Cir. 1979).

Here, ImClone fails to show any diligence or provide a valid reason for the undue delay in seeking its amendment.  In the very first sentence of its brief, ImClone claims that its inequitable conduct allegations are "based on evidence recently uncovered in discovery and not reasonably available earlier." (ImClone Br. at 1.)  This statement has no basis in fact whatsoever.  By its own admission, ImClone received the MIT/Stanford correspondence on October 15, 2004—nearly eight months before the close of fact discovery. (*Id.* at 3.)  This correspondence was among the first 1332 documents in MIT's production. (ImClone Ex. B.)  Furthermore, ImClone does not even bother to say when it first had obtained the `281 file history and the references cited therein.  However, it is likely the file history was in ImClone's possession years ago, and certainly before ImClone answered the complaint on July 1, 2004.  There is no valid justification for ImClone's decision to wait until the day after the close of

12

discovery to file its motion for leave to amend its answer.  ImClone's claim that it took eight months to "analyze" the file history and a series of five letters is not credible and does not provide the showing of diligence necessary to establish good cause.  *See Slip Track Sys., Inc. v. Metal-Lite, Inc.*, 304 F.3d 1256, 1269–70 (Fed. Cir. 2002) (affirming denial of motion for leave to add an inequitable conduct charge for lack of good cause where defendant knew the key facts early in the case but did not pursue them in a timely manner).

Because it cannot justify its undue delay in moving for leave to amend, ImClone wrongly attempts to blame Plaintiffs' counsel for its failures.  ImClone devotes nearly a quarter of its brief to baseless allegations regarding the scheduling of Dr. Tonegawa's deposition.  However, by its own assertion that the "documents alone are sufficient to justify pleading inequitable conduct," ImClone admits that Dr. Tonegawa's deposition had nothing to do with its undue delay.  (*See* ImClone Br. at 4.)  Indeed, the only reason identified by ImClone for taking Dr. Tonegawa's deposition before amending its pleading was "to give him an opportunity to explain his activities set forth in the documents." (*Id.* at 5.)  If inequitable conduct is clear from the documents as ImClone claims, then it is hard to imagine how Dr. Tonegawa's "opportunity" to explain his activities could provide ImClone any more reason to seek leave to amend.

Moreover, if ImClone was truly as concerned about Dr. Tonegawa's deposition as it would like the Court to think, it would have served Plaintiffs with a deposition notice.  As of the filing of this opposition, Plaintiffs still have yet to receive a deposition notice for Dr. Tonegawa.  Likewise, if ImClone was seriously interested in pursuing its inequitable conduct allegations, it would have deposed Dr. Gillies—the other inventor on the `281 patent—who was available for deposition long ago.  ImClone would have also been diligent in its efforts to depose the prosecuting attorney, which it did not do until two weeks ago.  The only reason for ImClone's

13

focus on Dr. Tonegawa is due to his current unavailability and not any urgent desire to depose him.

Nonetheless, Plaintiffs' counsel worked diligently to obtain a date for the deposition of Dr. Tonegawa as set forth in paragraphs 7 and 8 of the Kane Declaration filed herewith. As explained in that declaration, there is no support for ImClone's assertion that it would have deposed Dr. Tonegawa at an earlier date had it dealt directly with Dr. Tonegawa's personal lawyer. Thus, not only are ImClone's allegations relating to Dr. Tonegawa's deposition illogical and irrelevant, but they are also baseless.

ImClone fails to demonstrate any diligence in pursuing its inequitable conduct allegations and fails to provide a valid reason for waiting until the day after the close of discovery to move for leave to amend its answer. ImClone has failed to show good cause and its motion should be denied.

**D.    ImClone's Untimely Addition of an Inequitable Conduct Defense Will Unduly Prejudice Plaintiffs.**

From the very beginning of this case, ImClone's strategy has been one of delay. ImClone has refused to produce documents responsive to Plaintiffs' requests for production and has refused to answer interrogatories in a manner required by the Local Rules. These refusals have necessitated no fewer than three motions to compel (as of the filing of this opposition) for Plaintiffs to get basic discovery materials from ImClone. (Docket Nos. 27, 29, & 39.)

But even three weeks after the Court granted Plaintiffs' motions to compel complete answers to Plaintiffs' interrogatories regarding ImClone's defenses of invalidity, laches, and estoppel, ImClone still has not provided the supplemental answers required to comply with the Court's Order. Likewise, ImClone has yet to produce the vast majority of documents responsive to the document requests that the Court ordered ImClone to produce on June 3.

Based on ImClone's track record, it is no surprise that it held back its inequitable conduct claims until after the close of fact discovery. ImClone's hope is to create a "satellite" litigation that will force Plaintiffs to divert valuable resources from the real issues and delay the resolution of this case. The substantial prejudice to Plaintiffs that would result from a grant to amend is alone a sufficient basis to deny ImClone's motion. *See Acosta-Mestre*, 156 F.3d at 52 (finding prejudice to be a sufficient alternative basis—apart from delay—for denial of motion to amend because of the additional cost, delay, and change of strategy and tactics that granting the motion would cause opponent to suffer); *Exxon Mobile Corp. v. New West Petroleum L.P.*, 2005 WL 1366482, at *4–6 (E.D. Cal. June 6, 2005) (denying defendants' motion for leave to amend answer to add affirmative defense of fraud because of the prejudice that would result).

ImClone's allegations of inequitable conduct are so lacking in substance that any additional discovery required by Plaintiffs would be a complete waste of time. Accordingly, ImClone has failed to show good cause and has shown evidence of bad faith and/or dilatory motive. Its motion should be denied.

## CONCLUSION

For the foregoing reasons, ImClone fails to satisfy the requirements of Rule 15(a) and show "good cause" as required by Rule 16(b). Accordingly, the Court should deny ImClone's motion for leave to file its second amended answer.

## REQUEST FOR ORAL ARGUMENT

Plaintiffs Massachusetts Institute of Technology and Repligen Corporation hereby request oral argument.

| | |
|---|---|
| Dated:  June 22, 2005 | /s/  Michael J. Kane<br>Michael J. Kane (*pro hac vice*)<br>3300 Dain Rauscher Plaza<br>60 South Sixth Street<br>Minneapolis, MN 55402<br>Telephone:  (612) 335-5070<br>Facsimile:  (612) 288-9696 |

*Of Counsel*:

| | | |
|---|---|---|
| Gregory A. Madera<br>FISH & RICHARDSON P.C.<br>225 Franklin Street<br>Boston, MA 02110-2804<br>Telephone:  (617) 542-5070<br>Facsimile:  (617) 542-8906 | Jonathan E. Singer<br>John C. Adkisson<br>Chad A. Hanson<br>William R. Woodford<br>FISH & RICHARDSON P.C., P.A.<br>3300 Dain Rauscher Plaza<br>60 South Sixth Street<br>Minneapolis, Minnesota 55402<br>Telephone:  (612) 335-5070<br>Facsimile:  (612) 288-9696 | Juanita Brooks<br>FISH & RICHARDSON P.C.<br>12390 El Camino Real<br>San Diego, CA 92130<br>Telephone:  (858) 678-5070 |

*Attorneys for PlaintiffsMassachusetts Institute of Technology &Repligen Corporation*

60299676.doc