# EXHIBIT A

Case 1:04-cv-10884-RGS    Document 68-2    Filed 07/28/2005    Page 1 of 7

```
                                                              1
 1          UNITED STATES DISTRICT COURT
 2            DISTRICT OF MASSACHUSETTS
 3               No. 04 10884 RGS
 4
 5
 6
 7  *************************
 8  MASSACHUSETTS INSTITUTE OF
 9  TECHNOLOGY and REPLIGEN
10  CORPORATION,
11                  Plaintiffs
12          vs.
13  IMCLONE SYSTEMS, INC.,
14                  Defendant
15  *************************
16
17              VOLUME:  I
18              PAGES:   1-203
19
20
21  VIDEOTAPED DEPOSITION OF EDMUND R. PITCHER
22          WEDNESDAY, JUNE 8, 2005
23                 9:49 a.m.
24
25
```

Page 50

1  Q. Why is it important to tell the Patent
2     Office, including when you prosecuted the
3     '281 patent application, about the correct
4     inventors of the subject matter claimed in
5     the application?
6              MR. MADERA: Objection to form.
7  A. Why is it important? Could you repeat the
8     question? Why is it important to what?
9  Q. Sure.
10 A. To tell the Patent Office about the
11    correct inventors?
12 Q. Let me phrase it this way. When you were
13    prosecuting the '281 application, why did
14    you have an understanding that it was
15    important in accordance with your duty of
16    candor to tell the Patent Office who the
17    correct inventors of the claimed subject
18    matter were?
19 A. Because that's a requirement of the
20    statute for getting a valid patent.
21 Q. What statute?
22 A. 35 U.S.C.
23 Q. So in order to follow the rules of the
24    Patent Office, you have to tell the Patent
25    Office who the correct inventors of the

Page 51

1     claimed subject matter are; correct?
2  A. Yes.
3  Q. All right.
4  A. There is, as you know, I'm sure, there is
5     -- the correct inventors have to sign an
6     oath.
7  Q. Do you know whether anybody at MIT was
8     aware of any dispute over who should be
9     named inventors of the claimed subject
10    matter on the '281 patent during its
11    pendency in the Patent Office?
12 A. Yes. Do I know whether anyone? I know
13    that there was a dispute. Yes.
14 Q. When did you first become aware of that
15    dispute?
16 A. Yesterday.
17 Q. Okay. So the first time you heard about a
18    dispute over correct inventorship on the
19    '281 patent was yesterday during your
20    preparation for this deposition?
21 A. If I had known of it earlier, which I
22    don't think I did, I have long forgotten
23    it. I -- I -- it was news to me when it
24    was explained to me that there had been a
25    dispute of some kind when I learned that

Page 52

1     in my deposition preparation yesterday.
2  Q. Do you know whether Dr. Vernon Oi or
3     Dr. Sherie Morrison ever asserted to MIT
4     during the pendency of the '281 patent
5     application in the Patent Office that they
6     should be named inventors on that patent
7     application?
8  A. Everything I know about it I learned in my
9     deposition prep last night, and I --
10             MR. MADERA: To the extent that
11    it entails discussions between my law firm
12    and you, that's again within the privilege
13    and work product immunity. To the extent
14    it calls for information that you know or
15    participated as a prosecution attorney in
16    this case, you can answer the questions.
17    Do you understand the distinction?
18             THE WITNESS: I'm not sure I do.
19    I mean the things that I learned in the --
20    in the -- in the preparation for my
21    deposition, I'm not supposed to know, so I
22    say I don't know that?
23             MR. MADERA: Wait.
24             THE WITNESS: Or he asked me
25    whether I know it or not, and I don't know

Page 53

1     exactly what --
2              MR. MADERA: Counsel, I think --
3     let me just take a break. I want to be
4     certain that the witness understands the
5     distinction between privileged
6     communications and what he is to testify
7     to as a fact witness. I don't want there
8     to be any inadvertent privilege waivers.
9     We will be back in a second.
10             MR. RICHTER: If you want, I can
11    just rephrase the question, which I think
12    might be helpful. I can ask him the
13    question --
14             MR. MADERA: I actually -- I
15    would want to have a chance to make sure
16    he is clear on these instructions. I
17    don't want him to inadvertently answer one
18    of your questions, and then we are down
19    the road to an inadvertent waiver of
20    privilege.
21             THE WITNESS: Right.
22             MR. RICHTER: I am going to
23    limit my questions to what you knew while
24    you were prosecuting the patent
25    application. That's all I want to know.

14 (Pages 50 to 53)

Page 82

1  Exhibit 104 and tell me if you have ever
2  seen that document before.
3      (Pause.)
4      (The witness viewing Exhibit
5  No. 104.)
6  A. I have never seen this before.
7  Q. Does Exhibit 104 appear to be Ms. Ku's
8     response to Ms. Weidemier's letter that
9     was marked as Exhibit 103?
10     MR. MADERA: Objection to form.
11 A. Well, it's a photostated copy of a letter
12    that the signatory is Kathy. It says
13    Katharine Ku beneath it. And it is
14    addressed to Ms. B. Jean Weidemier, and it
15    refers to Weidemier's letter of February
16    15th, which is Exhibit 103, that you
17    showed me before the break. So I think
18    the answer is yes.
19 Q. Okay. In the middle of this letter marked
20    as Exhibit 104, there is a reference to an
21    enclosed copy of the Oi et al February
22    1983 PNAS publication. Do you see that?
23 A. Yes.
24 Q. And it refers specifically to two pages,
25    828 and 829, of the Oi article. Do you

Page 83

1  see that?
2  A. Yes.
3  Q. Do you believe that that is a reference to
4     the Oi article that we marked as
5     Exhibit 101?
6  A. I don't know. I -- is it? You tell me.
7     It is simple enough. I mean I don't know.
8     A copy of the Oi et als February 1983
9     PNAS? So 101 is a PNAS, and it is
10    February of '83. So, and it is Oi. So
11    probably yes.
12 Q. Now the -- do you know what section 102 B
13    of the patent statute recites?
14 A. Do I know what it recites?
15 Q. Yes.
16 A. I think so. Maybe it has been amended in
17    the last three years, but I used to.
18 Q. Is it fair to say that section 102 B
19    includes in its scope publications of
20    articles that occurred more than a year
21    before you filed your U. S. Patent
22    application as prior art to that
23    application?
24 A. I think 102 B is the section that -- of
25    the statute that defines all information

Page 84

1  in publications more than a year prior as
2  well as some others to constitute prior
3  art to the patent application we filed.
4  Q. When you prosecuted the '281 patent
5     application, did you understand that an
6     article published more than a year before
7     that application was filed that disclosed
8     the claimed subject matter would be
9     anticipatory prior art to that claimed
10    subject matter?
11     MR. MADERA: Objection to the
12    form of the question.
13 A. Well, your question is almost a tautology.
14    If it is an anticipation, it is an
15    anticipation. And if it is a statutory
16    bar to anticipation, then it can't be
17    removed. Does that answer your question?
18 Q. I think so. Yes. Okay.
19    So in terms of its date, without
20    getting to the substance of it, would you
21    agree that the Oi article that we marked
22    as Exhibit 101 is 102 B prior art against
23    the '281 patent?
24    MR. MADERA: Objection to form.
25 A. Well, the article says it's -- the

Page 85

1  reference in the article is Volume 80,
2  pages 825-829, February of '83. Presuming
3  it was published in February of '83, I
4  note that the '281 application was filed
5  on March 22, 1984, and I don't see any --
6  any earlier priority date claim, so I
7  think February '83 is more than a year
8  prior to March 1984. So I think the
9  timing is -- is -- that it would be a
10 reference against this application.
11 Q. That -- so you think that the Oi article
12    would be a 102 B reference against the
13    '281 patent application?
14    MR. MADERA: Objection to form.
15 A. I think the Oi et als publication, for
16    whatever it discloses, would be available
17    as a reference against the '281
18    application.
19 Q. All right. Do you know whether the Oi
20    et als article for whatever it discloses
21    was ever disclosed to the Patent Office
22    during the pendency of the '281 patent
23    application?
24 A. What time frame are you talking about?
25 Q. Okay. During your prosecution of the '281

22 (Pages 82 to 85)

86

1   patent application.
2 A. I have no idea whether it was or not at
3   that time. I don't recall whether it was.
4 Q. Sitting here today, do you know whether it
5   was ever disclosed to the Patent Office?
6 A. Yes.
7 Q. And was it?
8 A. Yes.
9 Q. Do you see --
10 A. Well, I -- I am assuming that this is the
11   same one that is disclosed in the
12   specification of the patent (pointing to
13   Exhibit No. 101), and I don't know that.
14         But with that proviso, yes, it
15   was disclosed.
16 Q. Okay. Looking at the references cited at
17   the beginning of the '281 patent, do you
18   see the Oi article anywhere there?
19 A. I think this document will speak for
20   itself. Whether I see it or not, I don't
21   know whether I see it or not. Should I
22   check it?
23 Q. Sure, please.
24 A. Do you want me to check it?
25 Q. Yes.

87

1 A. So it would be in "Other publications"?
2         (Pause.)
3         (The witness viewing Exhibit
4   No. 100.)
5 A. I don't see any Oi publications in the
6   list of "Other publications."
7 Q. But you believe that the Oi et al article
8   is recited in the specification of the
9   '281 patent?
10 A. I don't know whether it -- I know that
11   there is an Oi et als article cited in the
12   specification. Yes.
13 Q. Can you identify --
14 A. I don't know whether it is this one.
15 Q. Can you identify the one that you're
16   referring to?
17 A. Who can help me out here? I don't know
18   where it is exactly, so it might take me
19   some time. Could someone point me to it?
20   I mean it is there, isn't it?
21 Q. I think it is column 8, line 12.
22 A. Oi et als, Proceedings of National Academy
23   of Science, U.S.A. I see it.
24 Q. Okay. Now do you believe that is the same
25   Oi article that we marked as Exhibit 101?

88

1 A. Do I believe it? Yes.
2 Q. Okay. When you prosecuted the '281 patent
3   application, did you believe that the
4   recitation of the Oi article that now
5   appears in column 8 was an adequate
6   disclosure to the Patent Office of the Oi
7   article as prior art to the '281 patent
8   application?
9 A. I don't have any recollection of the
10   prosecution or this case -- or this
11   article. So, so I can't tell you what I
12   believed back then.
13 Q. Do you have an opinion today as to whether
14   in the time frame during which the '281
15   patent application was prosecuted reciting
16   the Oi article in the specification of
17   that patent application was a sufficient
18   disclosure of its contents as a prior art
19   reference to the Patent Office?
20         MR. MADERA: Objection to form.
21 A. Sufficient for what?
22 Q. Sufficient to disclose it to the Patent
23   Office as prior art that should be
24   considered by the examiner in considering
25   the patentability of the pending claims.

89

1 A. I think it is sufficient. I mean it is
2   right there and its relevance -- in the
3   context of its relevance as well.
4 Q. What do you mean by "in the context of its
5   relevance"?
6 A. Well, it -- we are talking about an
7   example here, and there is papers listed
8   that are relevant to what we're talking
9   about, like this says, "Plasmid pSV gamma
10   2 bVC was transfected into the mouse
11   myeloma line J558L, which has lost its
12   ability to express its endogenous heavy
13   chain gene (see Oi et al)."
14         So usually when that happens,
15   the article that is referred to is more
16   fulsome on the technology that you are
17   articulating.
18 Q. Does it say anything in column 8 with
19   respect to the Oi article about the
20   identification of enhancer elements by Oi
21   in that article?
22         MR. MADERA: Objection to form.
23 A. I have to -- I would have to read it to
24   know that. Do you want me to? I will
25   read it, if you want. In column 8?

194

1         MR. MADERA: Objection to form.
2  A.  I guess I believe it. It says -- you just
3      had me read. It says the date of receipt
4      of our paper -- which I guess is the one
5      you are talking to -- talking about here
6      -- by the publishers of Cell, May 2, '83,
7      is one piece of evidence that we were
8      fully in possession of the subject matter
9      thereof before July 1st, 1983 publication
10     of Banerji. So that -- my -- my belief is
11     based on that statement.
12 Q.  Okay. Because that statement also
13     indicates that the July '83 Cell article
14     was submitted to the publisher in May of
15     1983; correct?
16 A.  Yes. And Banerji was published when? I
17     don't know when Banerji was published. I
18     guess so.
19 Q.  Let me ask you this. Did you ever
20     consider during your prosecution of the
21     '281 patent application why Drs. Morrison
22     and Oi were named as co-authors with
23     Dr. Gillies and Tonegawa on the July '83
24     Cell article but were excluded as
25     co-inventors on the '281 patent

195

1      application directed to the same subject
2      matter?
3  A.  I don't recall.
4  Q.  Do you know whether anyone ever considered
5      that issue in connection with the
6      prosecution of the '281 patent
7      application?
8  A.  Well, from the stuff you showed me this
9      morning, Morrison and Oi questioned that
10     with MIT. That's the -- I take it is the
11     topic of the discussion between MIT and
12     Stanford.
13 Q.  But none of that discussion was ever
14     provided to you during prosecution of the
15     '281 patent application?
16 A.  Not that I can recall.
17        MR. RICHTER: I would like to
18     mark another exhibit, Exhibit 111 I think
19     it is now. It is a copy of a one-page
20     letter dated September 24, 1985, from
21     Katharine Ku to Jean Weidemier, and it has
22     a Bates number MIT 844.
23        (One-page letter dated
24          September 24, 1985, to
25          Ms. Weidemier from Ms. Ku,

196

1      production number MIT000844
2      marked Exhibit No. 111 for
3      identification.)
4         MR. MADERA: I am sorry,
5  counselor. What document is that?
6         MR. RICHTER: It is MIT 844. It
7  is a --
8         MR. MADERA: Is this something
9  you gave me before?
10        MR. RICHTER: Yes. I gave it to
11 you before. I think it is one of the last
12 documents in that stack.
13        (Handing Exhibit No. 111 to the
14 witness.)
15        THE WITNESS: Okay.
16 BY MR. RICHTER:
17 Q.  Mr. Pitcher, can you read the Exhibit 111,
18     the September 24, 1985 letter, and tell me
19     if you have seen it before?
20 A.  I have already read it, and I have not
21     seen it before.
22 Q.  Do you know what is being referred to by
23     Ms. Ku in the second sentence of the
24     letter, when she states that Dr. Morrisson
25     and Oi have not read the patent

197

1      application but believe in any case,
2      quote, "that immunoglobulin enhancers in
3      immunoglobulin genes are not
4      protectable...."? Do you know what is
5      being referred to there?
6  A.  No.
7  Q.  Did you --
8  A.  Obviously they're protected, so I don't
9      know what this means.
10 Q.  When you say "obviously they're
11     protected," what do you mean by that?
12 A.  Well, there is a patent on the use of
13     enhancers that we're talking about.
14 Q.  Which patent is that?
15 A.  The one that we're talking about. What is
16     it? The '281 patent. It is on enhancers;
17     right?
18 Q.  Did you inform the Patent Office during
19     the pendency of the '281 patent
20     application that Drs. Morrison and Oi
21     believed that immunoglobulin enhancers in
22     immunoglobulin genes are not protectable?
23        MR. MADERA: Objection to form.
24 A.  No. I can't inform somebody of something
25     that I don't know, and I had no idea that

50 (Pages 194 to 197)

**198**

1  they think this.
2  Q. And the reason for that is that you never
3     received a copy of the September 24, '85
4     letter that has been marked as
5     Exhibit 111?
6        MR. MADERA: Objection to form.
7  A. I would -- if I had received a copy, I
8     would not have believed it anyway. They
9     don't know -- I don't know who these
10    people are, but I don't know where they
11    get off. I just don't know what they mean
12    by this.
13 Q. Do you know whether Drs. Morrison and Oi
14    held the view that immunoglobulin
15    enhancers in immunoglobulin genes were not
16    protectable because they believed that
17    they had already disclosed that subject
18    matter in their February '83 Oi article?
19       MR. MADERA: Objection to form.
20 A. I have no idea what or why they -- what
21    they believed nor why they believed it. I
22    have no idea.
23 Q. Okay. And did you have any idea of any of
24    those things during the time that you
25    prosecuted the '281 patent application?

**199**

1  A. I think it is obvious from my deposition
2     all day today that I did not.
3        MR. RICHTER: Why don't we take
4     a break at this time.
5        THE VIDEOGRAPHER: The time is
6     3:50, and we are off the record.
7        (Recess taken at 3:50 p.m.)
8        (Recess ended at 3:58 p.m.)
9        THE VIDEOGRAPHER: The time is
10    3:58, and we are back on the record.
11       MR. RICHTER: Mr. Pitcher, we
12    don't have any further questions. We
13    thank you for appearing. We might seek to
14    recall you pending resolution of
15    discussions we have had with the Fish firm
16    regarding documents that are now on the
17    privilege log, and if they were produced
18    or if we prevail in obtaining them or if
19    future documents were produced that
20    pertain to your testimony, we may want to
21    recall you at this time. Otherwise, we
22    thank you for appearing today.
23       THE WITNESS: Okay.
24       MR. MADERA: Thank you, Ted.
25       THE WITNESS: Free to go?

**200**

1        MR. RICHTER: Yes, you are.
2        THE VIDEOGRAPHER: The time is
3     4 p.m. The deposition has concluded.
4     This is the end of tape 4, and we are off
5     the record.
6        (Whereupon, at 4:00 p.m., the
7     deposition was adjourned.)

**201**

1        DEPONENT'S ERRATA SHEET
2        AND SIGNATURE INSTRUCTIONS
3        The original of the Errata Sheet
4  has been delivered to Gregory A. Madera,
5  Esq.
6        When the Errata Sheet has been
7  completed by the deponent and signed, a
8  copy thereof should be delivered to each
9  party of record and the ORIGINAL delivered
10 to Paul M. Ritcher, Jr., Esq., to whom the
11 original deposition transcript was
12 delivered.
13
14       INSTRUCTIONS TO DEPONENT
15
16       After reading this volume of
   your deposition, indicate any corrections
17 or changes to your testimony and the
   reasons therefor on the Errata Sheet
18 supplied to you and sign it. DO NOT make
   marks or notations on the transcript
19 volume itself.
20
21 REPLACE THIS PAGE OF THE TRANSCRIPT WITH
22 THE COMPLETED AND SIGNED ERRATA SHEET WHEN
23 RECEIVED.

VERITEXT/SPHERION DEPOSITION SERVICES
(212) 490-3430