iii.    Claims 10, 12, 13, 15 and 17 are directed to enhancer elements that enhance expression of any proteinaceous substances, yet the specification only discusses one proteinaceous element. Accordingly, one of ordinary skill in the art is not provided with sufficient information to practice the full scope of these claims without undue experimentation.

iv.    Claim 11 limits the expressed proteinaceous substance to four different classes of protein, yet the specification only discusses one protein. Accordingly, one of ordinary skill in the art is not provided with sufficient information to practice the full scope of this claim without undue experimentation.

v.    Claims 10-13, 15 and 17 all claim all enhancer elements, regardless of their actual nucleotide sequence. No information regarding the enhancer element is provided other than its functional characteristics. Accordingly, one of ordinary skill in the art is not provided with sufficient information to practice the full scope of these claims without undue experimentation.

vi.    Claim 17 is directed to all enhancer elements which happen to contain any "portion of the nucleotide sequences" in Figure 10. Figure 10 is stated in the patent specification to possibly contain an enhancer element, but it is not identified where in the 997-nucleotide long sequence the enhancer element is located. Accordingly, one of ordinary skill in the art is not provided with sufficient information to practice the full scope of this claim without undue experimentation.

vii.    Claim 12 is directed to all genes encoding for selectable markers, however the specification only discusses two selectable marker genes. Accordingly, one of

ordinary skill in the art is not provided with sufficient information to practice the full scope of this claim without undue experimentation.

viii.    Claim 13 is directed to all vectors which are plasmids or viruses. However, the specification only discusses two vectors, both of which are plasmid vectors (pSV2gpt and pSER). Accordingly, one of ordinary skill in the art is not provided with sufficient information to practice the full scope of this claim without undue experimentation.

ix.    Claim 15 is directed to all enhancers which are "operative naturally to enhance production of immunoglobulin", however the specification only discusses one enhancer which functions to only produce one particular heavy chain immunoglobulin. Accordingly, one of ordinary skill in the art is not provided with sufficient information to practice the full scope of this claim without undue experimentation.

x.    Claims 18-22 all require a "tissue specific mammalian cellular enhancer element". The specification only discusses one such element, yet the claim is directed to all tissue specific mammalian cellular elements. Accordingly, one of ordinary skill in the art is not provided with sufficient information to practice the full scope of these claims without undue experimentation. Additionally, claims 18, 19, 21, and 22 are directed to all tissue types, despite the fact that the specification only discusses an enhancer element for one tissue type. Accordingly, one of ordinary skill in the art is not provided with sufficient information to practice the full scope of these claims without undue experimentation. Moreover, claims 18 and 20-22 are directed to enhancer elements that enhance expression of any proteinaceous substances, yet the specification only discusses one proteinaceous element. Accordingly, one of ordinary skill in the art is not provided

with sufficient information to practice the full scope of these claims without undue experimentation.

xi.    Claim 19 limits the expressed proteinaceous substance to four different classes of protein, yet the specification only discusses one protein. Accordingly, one of ordinary skill in the art is not provided with sufficient information to practice the full scope of this claim without undue experimentation.

xii.    Claims 18-22 all claim all enhancer elements, regardless of their actual nucleotide sequence.  No information regarding the enhancer element is provided other than its functional characteristics. Accordingly, one of ordinary skill in the art is not provided with sufficient information to practice the full scope of these claims without undue experimentation.

xiii.    Claim 22 is directed to all enhancer elements which happen to contain any "portion of the nucleotide sequences" in Figure 10.  Figure 10 is stated in the patent specification to possibly contain an enhancer element, but it is not identified where in the 997-nucleotide long sequence the enhancer element is located. Accordingly, one of ordinary skill in the art is not provided with sufficient information to practice the full scope of this claim without undue experimentation.

ixx.    Claim 20 is directed to all enhancers which are "operative naturally to enhance production of immunoglobulin", however the specification only discusses one enhancer which functions to only produce one particular heavy chain immunoglobulin. Accordingly, one of ordinary skill in the art is not provided with sufficient information to practice the full scope of this claim without undue experimentation.

Claims 10-13, 15, and 17-22 are invalid for failure to meet the requirements of 35 U.S.C. § 112, second paragraph. The claims fail to particularly point out and distinctly define the metes and bounds of the subject matter claims. More specifically, for example:

Claims 10-13, 15 and 17-22 all require that an "enhancer element" be sufficiently close to a "transcription unit". The specification provides no information regarding how close it needs to be to be "sufficiently close", nor does it provide any guidance on any minimum or maximum distance. Further, the claims all state that the "enhancer element" enhances "independent" of its position, which is directly contrary to the recited need to be "sufficiently close."

Additionally the asserted claims of the '281 Patent are invalid for violations of 35 U.S.C. § 115 for including a false oath since the named inventors were not the true sole inventors of the claimed subject matter for the reasons noted above. It is also invalid for violating 35 U.S.C. § 116 because the claimed subject matter was at least also invented by Drs. Morrison and Oi, but the application for the patent not made jointly with them. Additionally, the '281 patent is invalid for failing to meet the requirements of § 118 for the filing of an application without the consent of an inventor (instead omitting the additional and true inventors from the application). Additionally, the claims are invalid under 35 U.S.C. § 102(f) for these same reasons.

The '281 patent further is invalid for failing to meet the requirements of 35 U.S.C. § 255 and 256, which lay out the provisions for corrections of mistakes in the patent and the naming of the inventor. Despite these provisions, no efforts were ever undertaken to correct the mischaracterization of references in the patent specification related to the

work of Drs. Morrison and Oi or to correct the failure to name Drs. Morrison and Oi as

inventors.

## INTERROGATORY NO. 3

State the basis for your contention that Plaintiffs' claims are barred by the doctrine
of laches.

## RESPONSE TO INTERROGATORY NO. 3

ImClone objects to the Interrogatory to the extent that it seeks information

protected by the attorney client privilege and/or work product doctrine. ImClone further

objects to this Interrogatory to the extent it calls for legal conclusions and legal

contentions. Subject to and without waiving these objections, ImClone answers as

follows: As shown in the Complaint, since at least as early as 1994, plaintiffs were aware

that ImClone was testing C225 antibody in human clinical trials. Moreover, plaintiffs

were aware or should have been aware that ImClone was using C225. Also, at least as

early as August 1997, Repligen accused ImClone of infringing the '281 patent based on

Repligen's belief that ImClone was conducting commercial activities with respect to the

C225 antibody. Also, at least as early as September 1997, Repligen offered ImClone a

license under the '281 patent based on ImClone's alleged infringement. As Repligen is

aware, ImClone did not accept Repligen's license offer. Thereafter, Repligen was silent

and made no further claims that ImClone was infringing the '281 patent until it brought

this suit. Thereafter, plaintiffs were aware or should have been aware from the publicity

surrounding ImClone's Erbitux product that ImClone was preparing to market Erbitux

pending fast-track FDA approval in December 2001 and again in early 2004. Despite

plaintiffs' awareness of ImClone's activities with respect to the Erbitux product, plaintiffs

delayed bringing this action for more than six years after Repligen first accused ImClone

of infringement.  In fact, plaintiffs did not initiate this action until the penultimate day of

the life of the '281 patent, after ImClone had been selling Erbitux for several months, and

after ImClone had manufactured sufficient quantities of Erbitux to satisfy the immediate

demand for the product.  Plaintiffs' delay in bringing this action was unreasonable and

inexcusable and has materially prejudiced ImClone.

## SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 3

ImClone objects to the Interrogatory to the extent that it seeks information

protected by the attorney client privilege and/or work product doctrine.  ImClone further

objects to this Interrogatory to the extent it calls for legal conclusions and legal

contentions. Subject to and without waiving these objections, ImClone answers as

follows: As shown in the Complaint, since at least as early 1994, plaintiffs were aware

that ImClone was testing C225 antibody in human clinical trials.  Moreover, plaintiffs

were aware or should have been aware that ImClone was using C225.  Also, at least as

early as August 1997, Repligen accused ImClone of infringing the '281 patent based on

Repligen's belief that ImClone was conducting commercial activities with respect to the

C225 antibody. Also, at least as early as September 1997, Repligen offered ImClone a

license under the '281 patent based on ImClone's alleged infringement.  As Repligen is

aware, ImClone did not accept Repligen's license offer.  Thereafter, Repligen was silent

and made no further claims that ImClone was infringing the '281 patent until it brought

this suit.  Thereafter, plaintiffs were aware or should have been aware from the publicity

surrounding ImClone's Erbitux product that ImClone was preparing to market Erbitux

pending fast-track FDA approval in December 2001 and again in early 2004. Despite

plaintiffs' awareness of ImClone's activities with respect to the Erbitux product, plaintiffs

delayed bringing this action for more than six years after Repligen first accused ImClone

of infringement. In fact, plaintiffs did not initiate this action until the penultimate day of

the life of the '281 patent, after ImClone had been selling Erbitux for several months, and

after ImClone had manufactured sufficient quantities of Erbitux to satisfy the immediate

demand for the product. Plaintiffs' delay in bringing this action was unreasonable and

inexcusable and has materially prejudiced ImClone. Documents which support our

conclusions include documents I02579-I02580, I02586-I02589, I02592-I02593, I02610-

I02612, I02627-I02628, I02635, I02828-I02831, I04239, I04255-I04256, I05137,

REP0511, REP0512-REP0515, REP0516-REP0531, and REP0532-REP0533.

## SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 3

In addition to the earlier responses, ImClone further responds: Since at least as

early as 1993 it was publicly known that ImClone was in possession of C225, and

plaintiffs either did or should have known of this. (I00077, I00080, I04452-53, I09009-

11). At least as early as 1996 plaintiffs demonstrably were aware of ImClone's

possession of C225. (Complaint at ¶ 23). Plaintiffs have testified in response to

interrogatories that:

> "Plaintiff Repligen first learned of ImClone's use of the C225 cell line
> sometime during the first half of 1996 from Toby Hecht of the National
> Cancer Center, who called Dan Witt of Repligen seeking the sequence of
> the C225 cell line from Dr. Witt on behalf of ImClone, which had already
> begun the process of seeking FDA approval for C225. (Lita Nelsen of
> Plaintiff MIT first learned of this use sometime after from Dr Witt, but no
> later than June of 1997.) After Dr. Hecht's phone call, Dr. Witt contacted
> ImClone to discuss the matter and he and individuals at ImClone,
> including John Gilly and John Landes, had a number of telephone
> discussions regarding ImClone's use of the cell line. As part of these

discussions, Repligen offered ImClone a license to the patent-in-suit in 1997. ImClone declined this license."
(Response to Interrogatory No. 7.)

Also, at least as early as August 1997, Repligen accused ImClone of infringing the '281 patent based on Repligen's belief that ImClone was conducting commercial activities with respect to the C225 antibody. Individuals involved in these accusations include at least Daniel P. Witt, Ph.D., Repligen's Vice President, Business Development, Lita Nelson, Director of the Technology Licensing Office at MIT, and Larry Wittenberg at MIT.

Also, at least as early as September 1997, Repligen offered ImClone a license under the '281 patent based on ImClone's alleged infringement. This license was offered by Dr. Witt, and people with knowledge of this license would include at least Dr. Witt and those at Repligen and/or MIT that he communicated or discussed the offer of this license and its terms.

As Repligen is aware, ImClone did not accept Repligen's license offer. At least Dr. Witt is aware of the fact that ImClone did not accept Repligen's license offer. Plaintiffs have produced no evidence indicating that any Repligen or MIT employee has any knowledge of ImClone actually accepting Repligen's offer of a license. Thereafter, plaintiffs were silent and made no further claims that ImClone was infringing the '281 patent until it brought this suit. Yet, plaintiffs were aware or should have been aware from the publicity surrounding ImClone's Erbitux product that ImClone was preparing to market Erbitux pending fast-track FDA approval in December 2001 and again in early 2004.

Despite plaintiffs' awareness of ImClone's activities with respect to the Erbitux product, plaintiffs delayed bringing this action for more than six years after Repligen first accused ImClone of infringement. In fact, plaintiffs did not initiate this action until the penultimate day of the life of the '281 patent, after ImClone had been selling Erbitux for several months, and after ImClone had manufactured sufficient quantities of Erbitux to satisfy the immediate demand for the product.

Plaintiffs' delay in bringing this action was unreasonable and inexcusable and has materially prejudiced ImClone. Documents which support ImClone's conclusions include documents in the following bates ranges I02579-I02580, I02586-I02589, I02592-I02593, I02610-I02612, I02627-I02628, I02635, I02828-I02831, I04239, I04255-I04256, I05137, REP0511-542. The identities of other individuals with knowledge of the above contentions are apparent from these documents and this information can be derived by plaintiffs as easily as it can by ImClone.

## INTERROGATORY NO. 4:

State the basis for your contention that Plaintiffs' claims are barred by the doctrine of estoppel including equitable estoppel.

## RESPONSE TO INTERROGATORY NO. 4:

ImClone objects to the Interrogatory to the extent that it seeks information protected by the attorney client privilege and/or work product doctrine. ImClone further objects to this Interrogatory to the extent it calls for legal conclusions and legal contentions. Subject to and without waiving these objections, ImClone answers as follows: As shown in the Complaint, since at least as early as 1994, plaintiffs were aware

that ImClone was testing C225 antibody in human clinical trials. Moreover, plaintiffs

were aware or should have been aware that ImClone was using C225. Also, at least as

early as August 1997, Repligen accused ImClone of infringing the '281 patent based on

Repligen's belief that ImClone was conducting commercial activities with respect to the

C225 antibody. Also, at least as early as September 1997, Repligen offered ImClone a

license under the '281 patent based on ImClone's alleged infringement. As Repligen is

aware, ImClone did not accept Repligen's license offer. Thereafter, Repligen was silent

and made no further claims that ImClone was infringing the '281 patent until it brought

this suit. Thereafter, plaintiffs were aware or should have been aware from the publicity

surrounding ImClone's Erbitux product that ImClone was preparing to market Erbitux

pending fast-track FDA approval in December 2001 and again in early 2004. Despite

plaintiffs' awareness of ImClone's activities with respect to the Erbitux product, plaintiffs

delayed bringing this action for more than six years after Repligen first accused ImClone

of infringement. In fact, plaintiffs did not initiate this action until the penultimate day of

the life of the '281 patent, after ImClone had been selling Erbitux for several months, and

after ImClone had manufactured sufficient quantities of Erbitux to satisfy the immediate

demand for the product. Plaintiffs' years of silence and delay in bringing this action led

ImClone to infer that plaintiffs had abandoned its claim against ImClone. ImClone relied

on plaintiffs' silence in proceeding to market and sell Erbitux, and ImClone will be

materially prejudiced if plaintiffs are allowed to proceed with this infringement claim.

## SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 4

ImClone objects to the Interrogatory to the extent that it seeks information protected by the attorney client privilege and/or work product doctrine. ImClone further objects to this Interrogatory to the extent it calls for legal conclusions and legal contentions. Subject to and without waiving these objections, ImClone answers as follows: As shown in the Complaint, since at least as early as 1994, plaintiffs were aware that ImClone was testing C225 antibody in human clinical trials. Moreover, plaintiffs were aware or should have been aware that ImClone was using C225. Also, at least as early as August 1997, Repligen accused ImClone of infringing the '281 patent based on Repligen's belief that ImClone was conducting commercial activities with respect to the C225 antibody. Also, at least as early as September 1997, Repligen offered ImClone a license under the '281 patent based on ImClone's alleged infringement. As Repligen is aware, ImClone did not accept Repligen's license offer. Thereafter, Repligen was silent and made no further claims that ImClone was infringing the '281 patent until it brought this suit. Thereafter, plaintiffs were aware or should have been aware from the publicity surrounding ImClone's Erbitux product that ImClone was preparing to market Erbitux pending fast-track FDA approval in December 2001 and again in early 2004. Despite plaintiffs' awareness of ImClone's activities with respect to the Erbitux product, plaintiffs delayed bringing this action for more than six years after Repligen first accused ImClone of infringement. In fact, plaintiffs did not initiate this action until the penultimate day of the life of the '281 patent, after ImClone had been selling Erbitux for several months, and after ImClone had manufactured sufficient quantities of Erbitux to satisfy the immediate

demand for the product. Plaintiffs' years of silence and delay in bringing this action led

ImClone to infer that plaintiffs had abandoned its claim against ImClone. ImClone relied

on plaintiffs' silence in proceeding to market and sell Erbitux, and ImClone will be

materially prejudiced if plaintiffs are allowed to proceed with this infringement claim.

Documents which support our conclusions include documents I02579-I02580, I02586-

I02589, I02592-I02593, I02610-I02612, I02627-I02628, I02635, I02828-IO2831, I04239,

I04255-I04256, I05137, I05210, REP0511, REP0512-REP0515, REP0516-REP0531,

REP0532-REP0533, MIT0812, REP0466, REP0467-REP0468, REP0534-REP0536,

REP0537, REP0538-REP0539, REP0540-REP0541, and REP0542.

## SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 4

In addition to the earlier responses, ImClone further responds: Since at least as

early as 1993 it was publicly known that ImClone was in possession of C225, and

plaintiffs either did or should have known of this. (I00077, I00080, I04452-53, I09009-

11). At least as early as 1996 plaintiffs demonstrably were aware of ImClone's

possession of C225. (Complaint at ¶ 23). Plaintiffs have testified in response to

interrogatories that:

> "Plaintiff Repligen first learned of ImClone's use of the C225 cell line
> sometime during the first half of 1996 from Toby Hecht of the National
> Cancer Center, who called Dan Witt of Repligen seeking the sequence of
> the C225 cell line from Dr. Witt on behalf of ImClone, which had already
> begun the process of seeking FDA approval for C225. (Lita Nelsen of
> Plaintiff MIT first learned of this use sometime after from Dr Witt, but no
> later than June of 1997.) After Dr. Hecht's phone call, Dr. Witt contacted
> ImClone to discuss the matter and he and individuals at ImClone,
> including John Gilly and John Landes, had a number of telephone
> discussions regarding ImClone's use of the cell line. As part of these
> discussions, Repligen offered ImClone a license to the patent-in-suit in
> 1997. ImClone declined this license."
> (Response to Interrogatory No. 7.)

Also, at least as early as August 1997, Repligen accused ImClone of infringing the '281 patent based on Repligen's belief that ImClone was conducting commercial activities with respect to the C225 antibody. Individuals involved in these accusations include at least Daniel P. Witt, Ph.D., Repligen's Vice President, Business Development, Lita Nelson, Director of the Technology Licensing Office at MIT, and Larry Wittenberg at MIT.

Also, at least as early as September 1997, Repligen offered ImClone a license under the '281 patent based on ImClone's alleged infringement. This license was offered by Dr. Witt, and people with knowledge of this license would include at least Dr. Witt and those at Repligen and/or MIT that he communicated or discussed the offer of this license and its terms.

As Repligen is aware, ImClone did not accept Repligen's license offer. At least Dr. Witt is aware of the fact that ImClone did not accept Repligen's license offer. Plaintiffs have produced no evidence indicating that any Repligen or MIT employee has any knowledge of ImClone actually accepting Repligen's offer of a license. Thereafter, plaintiffs were silent and made no further claims that ImClone was infringing the '281 patent until it brought this suit. Yet, plaintiffs were aware or should have been aware from the publicity surrounding ImClone's Erbitux product that ImClone was preparing to market Erbitux pending fast-track FDA approval in December 2001 and again in early 2004.

Despite plaintiffs' awareness of ImClone's activities with respect to the Erbitux product, plaintiffs delayed bringing this action for more than six years after Repligen first accused ImClone of infringement. In fact, plaintiffs did not initiate this action until the

penultimate day of the life of the '281 patent, after ImClone had been selling Erbitux for several months, and after ImClone had manufactured sufficient quantities of Erbitux to satisfy the immediate demand for the product.

Plaintiffs' years of silence and delay in bringing this action led ImClone to infer that plaintiffs had abandoned its claim against ImClone. ImClone relied on plaintiffs' silence in proceeding to market and sell Erbitux, and ImClone will be materially prejudiced if plaintiffs are allowed to proceed with this infringement claim. Documents which support ImClone's conclusions include documents I02579-I02580, I02586-I02589, I02592-I02593, I02610-I02612, I02627-I02628, I02635, I02828-IO2831, I04239, I04255-I04256, I05137, I05210, REP0511, REP0512-REP0515, REP0516-REP0531, REP0532-REP0533, MIT0812, REP0466, REP0467-REP0468, REP0534-REP0536, REP0537, REP0538-REP0539, REP0540-REP0541, and REP0542. The identities of other individuals with knowledge of the above contentions are apparent from these documents and this information can be derived by plaintiffs as easily as it can by ImClone.

## INTERROGATORY NO. 5:

State the basis for your contention that Plaintiffs' claims are barred by the doctrine of patent exhaustion including in your answer the basis for your contention that all patent rights under the `281 patent to the C225 cell line and C225 antibody supplied by Damon Biotech (predecessor of Repligen) to NCI under contract with the federal government were exhausted upon the delivery of those materials to NCI.

## RESPONSE TO INTERROGATORY NO. 5:

ImClone objects to the Interrogatory to the extent that it seeks information

protected by the attorney client privilege and/or work product doctrine. ImClone further

objects to this Interrogatory to the extent it calls for legal conclusions and legal

contentions. ImClone further objects to this Interrogatory as premature in that many of

the underlying documents that ImClone intends to rely on in support of its patent

exhaustion defense are in the possession of plaintiffs and have not yet been produced.

ImClone may therefore supplement this response after plaintiff have provided the

discovery ImClone has requested. Subject to and without waiving these objections,

ImClone answers as follows:  Repligen's predecessor Damon produced the C225 cell line

that plaintiffs rely upon as the basis for their infringement charge under National Cancer

Institute Contract N01-CM-87253-01 ("NCI/Damon contract").  Under the terms of the

NCI/Damon contract, Damon made the C225 cell line and C225 antibody from the M225

cell line that NCI had received from the University of California under a Material

Transfer Agreement, and that NCI provided to Damon under the NCI/Damon contract.

The NCI/Damon contract contained no restrictions on how NCI may use or distribute the

C225 cell line or C225 antibody. Under the NCI/Damon contract, Damon was paid for

the production and delivery of the C225 antibody and C225 cell line to NCI without any

restriction on NCI's right to provide the C225 cell line or C225 antibody to others,

including ImClone. Consequently, to the extent that plaintiffs argue that the C225 cell

line is covered by a claim of any valid U.S. patent, such a patent right was exhausted

upon Damon's delivery of the C225 cell line to NCI without restriction.

## SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 5:

ImClone objects to the Interrogatory to the extent that it seeks information

protected by the attorney client privilege and/or work product doctrine. ImClone further

objects to this Interrogatory to the extent it calls for legal conclusions and legal

contentions. ImClone further objects to this Interrogatory as premature in that many of

the underlying documents that ImClone intends to rely on in support of its patent

exhaustion defense are in the possession of plaintiffs and have not yet been produced.

ImClone may therefore supplement this response after plaintiff have provided the

discovery ImClone has requested. Subject to and without waiving these objections,

ImClone answers as follows:  Repligen's predecessor Damon produced the C225 cell line

that plaintiffs rely upon as the basis for their infringement charge under National Cancer

Institute Contract N01-CM-87253-01 ("NCI/Damon contract").  Under the terms of the

NCI/Damon contract, Damon made the C225 cell line and C225 antibody from the M225

cell line that NCI had received from the University of California under a Material

Transfer Agreement, and that NCI provided to Damon under the NCI/Damon contract.

The NCI/Damon contract contained no restrictions on how NCI may use or distribute the

C225 cell line or C225 antibody. Under the NCI/Damon contract, Damon was paid for

the production and delivery of the C225 antibody and C225 cell line to NCI without any

restriction on NCI's right to provide the C225 cell line or C225 antibody to others,

including ImClone.  Consequently, to the extent that plaintiffs argue that the C225 cell

line is covered by a claim of any valid U.S. patent, such a patent right was exhausted

upon Damon's delivery of the C225 cell line to NCI without restriction. Documents

which support our conclusions include documents REP0105-REP0124, REP0125-

REP0140, REP0234-REP0312, REP0313-REP0380, I04232-I04238, I04271-I04274, I04276-I04295, I04392-I04409, I05063-I05082, I05112-I05122, I05139-I05145, I05160-I05162, and I05299-I05315.

## SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY 5

In addition to the bases of exhaustion discussed above, any '281 patent rights that MIT or any of its licensees (including Repligen) had in the C225 cell line were also separately exhausted when the NCI (which had since 1984 a written license from MIT that included the right to sell anything covered by the '281 patent) then sold the C225 cell line to ImClone around 1993 pursuant to a written clinical trials agreement.

## INTERROGATORY NO. 7:

State the basis for your contention that Plaintiffs' claims are unenforceable due to the doctrines of patent exhaustion, implied license, laches, estoppel, unclean hands, or any other equitable doctrine.

## RESPONSE TO INTERROGATORY NO. 7:

See responses to Interrogatories 4, 5 and 6 above.

## SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 7.

In addition to the bases provided in our responses to Interrogatories 3, 4, 5, and 6, the '281 patent is additionally unenforceable due to the inequitable conduct and fraud on the patent office which occurred during the prosecution of the patent. The '281 patent is unenforceable due to inequitable conduct committed by each of Dr. Susumu Tonegawa and Dr. Stephen D. Gillies (the named inventors on the '281 patent), as well as by others

employed by MIT or acting on its behalf who were involved in the prosecution of the application that led to that patent (together, "others at MIT") before the U.S. Patent and Trademark Office ("the USPTO"). Dr. Tonegawa, Dr. Gillies and others at MIT had a duty of candor to the USPTO during the prosecution of the '281 patent application in the USPTO, including the duty to disclose to the USPTO all material information of which they were aware relating to the claimed subject matter in that application. Dr. Tonegawa, Dr. Gillies and others at MIT violated that duty of candor they owed to the USPTO by, *inter alia*, intentionally withholding material prior art from the USPTO (including a publication of Oi et al., PNAS, vol. 80, pp. 825-829 (1983)), intentionally misrepresenting the teachings and state of the prior art to the USPTO throughout the prosecution of the '281 patent application, intentionally submitting false and/or misleading declarations to the USPTO, and intentionally misrepresenting the correct inventorship of the claimed subject matter to the USPTO (as well as failing to inform the USPTO of the existence of a dispute as to inventorship). Each of the foregoing acts was committed by Dr. Tonegawa, Dr. Gillies and others at MIT with the deliberate intention to deceive the USPTO, and each of those acts on its own renders the '281 patent unenforceable for inequitable conduct.

More specifically with respect to this issue of inequitable conduct related to the inventorship issues, a U.S. patent must be applied for in the name of the true inventors of the claimed subject matter. 35 U.S.C. §§ 102(f), 115. As such, inventorship is material to patentability as a matter of law. *Perseptive Biosystems, Inc. v. Pharmacia Biotech, Inc.*, 225 F.3d 1315, 1321 (Fed. Cir. 2000) ("As a critical requirement for obtaining a patent, inventorship is material."); *Frank's Casing Crew & Rental Tools, Inc.* v. *PMR*

*Techs., Ltd.*, 292 F.3d 1363 (Fed. Cir. 2002) (affirming district court's finding of

inequitable conduct based on the applicants' deliberate concealment of involvement of

unnamed inventor); *Union Carbide v. Dow Chemical Co.*, 619 F. Supp. 1036, 1054 (D.

Del. 1985). (misrepresentation concerning inventorship material); *see also* MPEP

2001.04 (1980) (inventorship disputes are material).  Thus, since at least Dr. Tonegawa

and the inventors agents at MIT were aware that there was a dispute as to the true

inventorship of the subject matter of that patent, they had a duty to inform the patent

office of this material information, and failure to do so <u>is</u> inequitable conduct.

The patent application which led to the '281 patent was pending from March 22,

1984 (its filing date) through its issuance on May 5, 1987.  During prosecution of the

'281 patent, MIT, particularly Dr. Tonegawa, withheld material information from the

PTO regarding the fact that Dr. Vernon Oi and Dr. Sherie Morrison of Stanford

University should have been named inventors on that patent application.  On October 25,

1984, MIT and Dr. Tonegawa were unambiguously informed that there was a dispute as

to inventorship due to the failure to identify Drs. Morrison and Oi as inventors.

(MIT001336).  From October 25, 1984 through September 24, 1985 there was lengthy

correspondence and communications between Stanford University, MIT, Drs. Morrison

and Oi, Dr. Tonegawa and MIT's outside counsel.  (MIT000844, 849-851, 857-860).

Neither Dr. Tonegawa nor counsel involved in the prosecution of the patent ever

informed the PTO of this dispute.  Moreover, when MIT sent the pending application to

Stanford for its review, they withheld  the pending application's claims, which are at the

very core of any inventorship inquiry, which is evidence of their intent.  (MIT000849).

Proof of Drs. Morrison and Oi's status as the true inventors (or at least co-inventors) of the claimed subject matter of the '281 patent is their prior publication, Oi et al., *PNAS*, vol. 80, pp.825-829 (1983), which discloses some of the very same subject matter that MIT and Dr. Tonegawa later claimed as their invention in the '281 patent. MIT, Dr. Tonegawa and Dr. Gilles were aware of this prior work and article by Drs. Morrison and Oi, as is evidenced by their above correspondence with Stanford during the prosecution of the application that led to the '281 patent. The true nature of the Oi reference and its nexus with the claimed invention was never disclosed to the PTO by Dr. Tonegawa or anyone else at MIT, despite their undeniable duty to do so.

Despite the high materiality of the above information, the PTO was <u>never</u> informed of the charge of incorrect inventorship and invalidity of the "invention" itself. The knowledge of MIT and Dr. Tonegawa of the importance of these allegations, coupled with the fact that this information was not provided to the PTO leads to a clear inference that the withholding of this information was intentional. Because direct evidence of intent is rarely available, the "existence of fraudulent intent may be presumed upon proof of a knowing misrepresentation of a material fact," which is precisely the case here. *See Union Carbide*, 619 F. Supp. at 1052 (D. Del. 1985); *see also Molins PLC v. Textron Inc.*, 821 F. Supp. 1551, 1564 (D. Del. 1992) ("Because direct evidence of an intent to deceive rarely exists, the Court may rely on circumstantial evidence leading to an inference of intent to mislead as the basis for a finding of inequitable conduct."), *affd in part*, 48 F.3d 1172 (Fed. Cir. 1995). This alone is sufficient for a finding of inequitable conduct.

Even further compounding their inequitable conduct, MIT and Dr. Tonegawa never disclosed the highly-material Oi reference to the PTO under the procedures of the PTO governing such disclosures.   Although the specification of the patent mentions (while mischaracterizing) the Oi reference as the source of their starting materials, there is no indication that the PTO ever reviewed the Oi reference with respect to the patentability of the '281 patent claims.  That is not surprising since MIT never filed the disclosure forms with the PTO that would have required the PTO to carry out such an examination with regard to the Oi reference.  Such evidence further supports a finding of fraudulent, or inequitable conduct by MIT before the PTO, which renders the '281 patent unenforceable.

Indeed, by ignoring the teachings of the Oi reference, MIT repeatedly misrepresented the state of the prior art to the PTO in arguing for the patentability of its claims during prosecution.  These misrepresentations culminated in the submission of a false and misleading affidavit to the PTO by Dr. Tonegawa, in which he averred that he invented the claimed subject matter before it was published by others in the literature. That statement was made by Dr. Tonegawa to the PTO with the full knowledge that Drs. Morrison and Oi had carried out work well prior to his that anticipated the subject matter he was attempting to claim in the PTO (and, ultimately, did so successfully), which prior work MIT and Dr. Tonegawa together intentionally withheld from the PTO in order to obtain allowance of the '281 patent.

**INTERROGATORY NO. 9:**

State the basis for your contention ImClone has not willfully infringed any claim of the '281 patent including in the answer (a) the manner in which ImClone became

aware of the `281 patent, (b) the dates on which ImClone first became aware of the `281 patent, (c) the persons at ImClone who first became aware of the `281 patent, (d) an identification of any opinion, oral or written, received by ImClone concerning the `281 patent, (e) the author(s) of any such opinion, (f) the date any such opinion was requested, (g) the date any such opinion was received, (h) the recipient(s) of any such opinion, and (i) whether ImClone intends to rely on any such opinion as a defense to willful infringement.

## RESPONSE TO INTERROGATORY NO. 9:

ImClone objects to this Interrogatory to the extent that it calls for information that is protected by the attorney client privilege and/or work product doctrine. ImClone further objects to this Interrogatory as premature in that the Court, in its August 10th Order, has required, *inter alia,* plaintiffs to identify the patent claims it asserted against ImClone; to identify where each element of the claim is found in ImClone's product; to provide a description of the information on which plaintiffs relied on in each infringement contention, and to rank the infringement claims in their order of importance. ImClone will supplement this response after plaintiffs have complied with the Court's August 10th Order.   In addition, ImClone will schedule privileged documents responsive to this request from which most of the requested information will be provided.

## SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 9

ImClone objects to this Interrogatory to the extent that it calls for information that is protected by the attorney client privilege and/or work product doctrine.  ImClone further objects to this Interrogatory as premature because Plaintiffs have not provided a

clear disclosure of the basis of infringement of any of the claims of the '281 patent and Plaintiffs have not produced allegedly supporting information identified in Plaintiffs' Claim Infringement Disclosure.  Consequently, ImClone reserves the right to modify and supplement this supplemental response to Interrogatory No. 9.

In supplemental response, ImClone has not willfully infringed the '281 patent because ImClone has not infringed the '281 patent for the reasons stated above in response to Interrogatory No. 1.  ImClone first became aware of the '281 patent at least as early as August 22, 1997 when Repligen contacted ImClone.  ImClone received opinions of counsel from outside counsel, Hoffman & Baron, authored by Irving Feit on May 31, 1996, June 6, 1996, July 30, 1996, February 10, 1997, September 8, 1997, September 9, 1997, and December 2, 1997, which have been scheduled on a privileged log provided to Plaintiffs on November 17, 2004.  ImClone has not decided at this time whether or not to waive attorney-client privilege and attorney work product protection of its opinions, and reserves the right to do so at the appropriate point in this case.

## SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 9

ImClone is relying upon the advice of counsel received with respect to the issue of patent exhaustion and license.  The opinions relied upon, and all documents falling within the scope of the waived subject matter, have been produced to MIT and Repligen (or will be shortly) and the other information sought by this interrogatory can be derived from these documents.

## INTERROGATORY NO. 16:

If you contend that section IX entitled "Royalties" (bates numbers REP000333-34) or section III E. entitled "Proprietary Position" (bates numbers REP000328-329) of the NCI/Damon contract did not reserve Damon Biotech's right to prohibit persons other than the United States government from making, using, offering for sale, or selling the C225 cell line within the United States, state the basis for your contention, explaining in detail why each individual paragraph or subsection of section IX "Royalties" or section III E. "Proprietary Position" did not reserve any rights for Damon Biotech.

## RESPONSE TO INTERROGATORY NO. 16:

ImClone objects to this Interrogatory to the extent that it calls for information that is protected by the attorney client privilege and/or work product doctrine. ImClone also objects to this Interrogatory to the extent it calls for legal conclusions and legal contentions. ImClone further objects to this Interrogatory as indefinite, in failing to define numerous terms, including the "NCI/Damon contract." Subject to and without waiving these objections or any of its General Objections, ImClone responds that Damon did not reserve any such patent rights for at least the following reasons. Assuming that the NCI/Damon contract refers to the contract governing the sale of the C225 cell line by Damon and Abbott to the NCI in 1990, none of the sections identified in the Interrogatory are a part of that contract.

## SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 16

In addition to the reasons stated above, the sections, even if they were incorporated into the NCI/Damon Contract, which they were not, they do not include any provision which reserves any rights of Damon that would allow the assertion of the '281

patent against the United States Government or those gaining possession of the C225 cell line from the United States Government following Damon's sale of the C225 cell line to the United States Government.

As to Objections:

Dated: June 29, 2005

Mark W. Batten (BBO #566211)
Jeremy P. Oczek (BBO #647509)
PROSKAUER ROSE LLP
One International Place
Boston, MA 02110-2600
Tel: (617) 526-9600
Fax: (617) 526-9899

Richard L. DeLucia
Michael D. Loughnane
Paul M. Richter
Anthony Giaccio
KENYON & KENYON
One Broadway
New York, NY 10004-1050
Tel: (212) 425-7200
Fax: (212) 425-5288

Attorneys for Defendant
ImClone Systems, Inc.

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

MASSACHUSETTS INSTITUTE OF
TECHNOLOGY and REPLIGEN CORPORATION,

Plaintiffs,

v.

IMCLONE SYSTEMS INC.,

Defendant.

Civil Action No. 04 10884 RGS

### CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of ImClone Systems Inc's Supplemental Responses to Interrogatories was served by facsimile and by first class mail upon opposing counsel on June 29, 2005.