# Exhibit A

# FISH & RICHARDSON P.C., P.A.

3300 Dain Rauscher Plaza
60 South Sixth Street
Minneapolis, Minnesota
55402

Telephone
612. 335-5070

Facsimile
612. 288-9696

Web Site
www.fr.com

Frederick P. Fish
1855-1930

W.K. Richardson
1859-1951

**VIA FEDERAL EXPRESS**

December 12, 2005

Paul M. Richter, Jr., Esq.
Michael Loughnane, Esq.
Kenyon & Kenyon
One Broadway
New York, NY  10004



AUSTIN

BOSTON

DALLAS

DELAWARE

NEW YORK

SAN DIEGO

SILICON VALLEY

TWIN CITIES

WASHINGTON, DC

Re:     Repligen and MIT v. ImClone Systems, Inc.
        USDC-D. Mass. (Boston) - Civil Action No. 04-10884-RGS

Dear Counsel:

Enclosed please find the following reports:

- Rebuttal Expert Report of Howard W. Bremer, and

- Rebuttal Expert Report of Dr. Kevin Struhl Re Validity of United States
  Patent Nimber 4,663,281.

Very truly yours,

Angela S. Chianelli
Litigation Case Manager

60329238.doc

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MASSACHUSETTS INSTITUTE OF
TECHNOLOGY and
REPLIGEN CORPORATION,

        Plaintiffs,

    v.

IMCLONE SYSTEMS, INC.,

        Defendant.

Civil Action No. 04-10884-RGS

---

## REBUTTAL EXPERT REPORT OF HOWARD W. BREMER

### I.    BACKGROUND & EXPERIENCE

1.    I received a B.S. in Chemical Engineering from the University of Wisconsin in 1944 and received an L.L.B. from the University of Wisconsin in 1949. From 1949 to 1960, I worked as a Patent Attorney for Procter & Gamble Co. In 1960, I left Procter & Gamble and joined the Wisconsin Alumni Research Foundation (WARF) as Patent Counsel. WARF is responsible for licensing and technology transfer associated with the University of Wisconsin— Madison. I retired from WARF in 1988 after 28 years and now provide consulting services on various intellectual property issues, but continue to specialize in licensing and technology transfer.

2.    I have been engaged as an expert for the Massachusetts Institute of Technology and Repligen Corporation to opine in rebuttal to ImClone's patent exhaustion defense, and specifically on the distribution of rights between universities and the government under Institutional Patent Agreements ("IPAs") with the Department of Health, Education, and Welfare ("DHEW") and the Bayh-Dole Act.

1

3.    Over the past 40 years I have gained significant experience in the disposition of rights in federally-funded inventions. When I first began at WARF in 1960, university licensing and technology transfer was in its infancy. At that time, the government typically received title to all inventions supported by funds from federal agencies. Just three years after I started, the government changed its patent policy in an attempt to bring about more uniformity in federal agency practices that resulted from federally-sponsored R&D projects. Under this policy, research institutions would have the opportunity and ability to retain principal rights in inventions created with the assistance of federal funding. The government's patent policy changes are explained in greater detail below.

4.    For several years after the policy change, I negotiated numerous licenses on behalf of the University of Wisconsin with various government agencies that implemented the new patent policy. At the same time, Professor William Young of the University of Wisconsin and I started negotiations with DHEW on an Institutional Patent Agreement (IPA) that would apply to all inventions created with the assistance of DHEW funding and would thereby eliminate the need to negotiate individual licenses on a case-by-case basis. In 1968, the University of Wisconsin signed the first new IPA implementing DHEW's changed patent policy. Five years later, Mr. Ruben Lorenz and I negotiated a similar agreement with the National Science Foundation (NSF) on behalf of the University of Wisconsin.

5.    Shortly after that first new IPA was executed in 1968, more than 70 other research institutions signed similar IPAs with DHEW, including MIT. For more than ten years, I worked under the terms of the IPA in my dealings with DHEW as well as the private-sector companies that wished to license patented technology from the University of Wisconsin for commercial purposes. By drafting and negotiating the IPA with DHEW and applying its terms for more than

2

10 years, I developed a clear understanding of the disposition of rights in inventions made under the aegis of the DHEW IPAs and later under the NSF IPA.

6.    In the 1970s, Senators Birch Bayh and Bob Dole proposed legislation to codify the terms of the IPAs that I negotiated with DHEW and the NSF. Because of my experience with these IPAs, I met regularly with Senator Bayh and his staff regarding the proposed legislation. I was also asked to testify twice before Congress regarding the proposed and later introduced legislation.

7.    I also gave testimony regarding the IPAs at the hearings held by the late Senator Gaylord Nelson of Wisconsin in May and June of 1978 before the subcommittee on Monopoly and Anticompetitive Activities of the Senate Select Committee on Small Business.

8.    Since the passage of the Bayh-Dole Act, I have worked within its terms and provisions and corresponding regulations on a daily basis for more than twenty years. I also participated in the drafting of the regulations now codified at 37 C.F.R. part 401. In addition, I have written several publications on the application and distribution of rights under the Bayh-Dole Act. The publications are listed in my curriculum vitae, which I have attached to this report as Exhibit A.

9.    I am being compensated at a rate of $250 per hour for time spent in this matter. My compensation is not in any way related to the outcome of this litigation. My prior service as an expert witness in the past four years is provided in my curriculum vitae. In reaching the conclusions expressed herein, I have relied upon the materials cited throughout this report, including the information identified in Exhibit B, a discussion with Norman J. Latker, Patent Counsel for the National Institutes of Health in the 1960s and 1970s, regarding the historical

3

development of the IPAs and the Bayh-Dole Act, and my own personal experience. I reserve the right to supplement this report should additional information come to my attention.

## II.    THE GOVERNMENT'S POLICY CHANGE REGARDING FEDERALLY-FUNDED RESEARCH AND THE INSTITUTIONAL PATENT AGREEMENTS THAT IMPLEMENTED THAT POLICY.

10.    In the 1920s and 1930s, the majority of government research was done in federal laboratories by full-time government employees.[1] However, this changed during WWII. Due to increased military requirements and an increasing complexity of support services, the government quickly realized it could not keep up with the war's technological demands. Because it was important that the government utilize the best technical ability available, the government engaged many university faculty in its various projects and began sponsoring and funding research at universities and businesses.

11.    By the 1950s, the government expanded its funding beyond military applications to scientific research in many disciplines, including an all-out attack on disease. Over the next few years, more than 20 different government agencies had developed individual policies on the disposition of patent rights to inventions arising from sponsored research funded by the individual agencies. Patent policy differed significantly from agency to agency. As a result of these varying policies, the government had accumulated title (which included exclusive commercial rights) to about 28,000 or more patents. However, less than five percent of these patents had been licensed to industry, and an even smaller percentage of the technology represented by those patents had been reflected in products or processes in commercial use. Thus, the public benefits that were supposed to be expressed in the form of new products and

---

[1]    Some of the information regarding the IPAs and the Bayh-Dole Act provided in this report may also be found in my recent publications, *University Technology Transfer: Evolution and Revolution* (MIT001684-MIT001721) and *The First Two Decades of the Bayh-Dole Act as Public Policy* (MIT001727-MIT001744).

processes as a result of federally-funded research were not being realized.

12.    One reason for the failure was the uncertainty of the rights in inventions licensed from the government. It was believed that the various agencies holding title to the inventions were subject to bureaucratic and political pressures, and any license granted was susceptible to later modification or even revocation. In addition, it was the government's policy to license on a non-exclusive basis, which gave little incentive to encourage the risk of capital necessary to develop an invention for the marketplace under a government license. Moreover, if an exclusive license was being sought, the government was required to publish that fact in the Federal Register and could grant the license only after the public was given the opportunity to lodge an objection, which could result in a significant delay before development could begin and an attendant delay in getting to the marketplace. And, in cases where a license was obtained, the contractor was required to take "effective steps" toward commercialization within three years.

13.    The failure to develop and market products from government inventions was also caused by the inexperience of government personnel in the commercialization of inventions as well as the lack of inventor involvement. Even though inventors generally understand their inventions better than others, inventors were generally not sought or encouraged to participate in the licensing or overall development and commercialization process. Moreover, in many cases, the government simply lacked the resources, particularly in trained personnel and experience, to bring an invention to the commercial market through the licensing process.

14.    President Kennedy's October 1963 Memorandum changed the government's patent policy to achieve greater uniformity among the agencies and to shift the control of commercialization of inventions to contractors with the government, including research institutions and small businesses (referred to generally as "contractors" in the Memorandum).

Under the new policy, the contractor making an invention with the assistance of federal funds would retain principal or exclusive rights throughout the world to these inventions in certain circumstances.[2] The government realized that under this policy, there was a greater likelihood that inventions would be developed by the private sector for delivery to the public. In exchange, the government received an irrevocable, non-exclusive, royalty-free license throughout the world for "governmental purposes."[3]

15.     During the five-year period after the Kennedy Memorandum issued, several agencies, including DHEW, permitted contractors to petition for "greater rights" to inventions consistent with the government's new patent policy. This required contractors to negotiate an agreement for each separate invention on a case-by-case basis. I negotiated several of these "case-by-case" agreements with DHEW on behalf of the University of Wisconsin.

16.     In my experience, which is consistent with the experience of other research institutions at the time, the "case-by-case" method was generally unworkable. Often the rights granted under the case-by-case determinations contained so many restrictions that the private sector was not interested in licensing. In addition, because time was of the essence for developing a product for the marketplace, the long delays associated with obtaining individual agreements with the agency discouraged participation by the private sector. And in cases where the private sector was interested in a license, we were required to conduct an extensive analysis of the particular agreement and draft the commercialization license to conform with terms and provisions of the license obtained from the government agency.

17.     Due to the difficulty presented by licensing on a case-by-case basis, we started negotiations with DHEW with the goal of obtaining an IPA that would standardize the

---

[2]     President Kennedy Memorandum of October 10, 1963 on Government Patent Policy.
[3]     *Id.* at 10945.

6

disposition of government rights for all inventions made with DHEW funding. After several years of negotiations, the IPA between the University of Wisconsin and DHEW was signed to implement the new patent policy set forth in the Kennedy Memorandum.[4]  It was our understanding that the IPA with the University of Wisconsin was the first of its kind.

18.    Shortly after the University of Wisconsin IPA was signed, several other research institutions, including MIT, followed suit and signed nearly identical IPAs with DHEW. Although it was signed later, the MIT IPA was given the same effective date as the University of Wisconsin IPA because MIT held an earlier IPA with DHEW and its policies comported with the new IPA rules.[5]

19.    The intent of the IPAs was to reflect and embrace the President's 1963 patent policy statement. The IPAs made this intent explicit by stating that the agreement "provides for administration by the Grantee of patents in the public interest and is consistent with the stated objectives of the President's statement and Memorandum of Government Patent Policy, issued October 10, 1963."[6]

20.    Consistent with the new policy established by President Kennedy's Memorandum, the IPAs state that "Grantee is desirous of entering into an agreement whereby it has first option to retain principal rights in and to administer inventions made in the course of or under research supported by grants and awards from the [DHEW], pursuant to the aforesaid Regulations."[7]  The term "principal rights" used in the IPA directly refers to the meaning given to the term in the President's policy statement, which is all right, title, and interest to any inventions subject to the government's license. Section VI (a) of the IPAs confirms that the

---

[4]    MIT001671-MIT001683.
[5]    *Compare* MIT001671 *with* MIT001654.
[6]    MIT001655, MIT001671.
[7]    MIT001654, MIT001671.

"principal rights" comport with all right, title, and interest to any invention made with federal funds under the IPA.[8] The grant of "principal rights" under the policy and the IPAs provided the research institutions exclusive commercial rights in the invention to effect commercial introduction into the market.[9] Section VI (b) of the IPAs defines the scope of the government's rights where an institution elects to retain principal rights. Again, consistent with the Kennedy Memorandum, the IPAs state that the government receives a "non-exclusive, irrevocable, royalty-free license for governmental purposes."[10]

21.    At the government's direction, a form Confirmatory License was attached to the IPAs as Exhibit A.[11] In the form Confirmatory License, the government defined the term "governmental purpose" using the definition provided in President Kennedy's Memorandum. The form Confirmatory License was unnecessary because the rights of the parties were spelled out in the President's policy statement and the IPA itself. For example, Section I of the IPA states that "[t]his agreement shall define the rights of the parties hereto regarding the disposition of title to inventions made in the course of or under research supported by grants and awards from [DHEW] ... ."[12] Nevertheless, DHEW insisted that institutions execute the Confirmatory License so there was a record of the grant to the government.

22.    I understand it is ImClone's position that the definition of "governmental purpose" in President Kennedy's Memorandum, which appears in the form Confirmatory License, authorizes the government to sell patented products to third parties for commercial use. ImClone's position is incorrect. By receiving the principal rights to the invention, the IPA gives

---

[8]   MIT001658, MIT001675.
[9]   MIT001659, MIT001676.
[10]  MIT001658, MIT001675.
[11]  MIT001665-66, MIT001682-83.
[12]  MIT001655, MIT001672.

8

the grantee exclusive commercial rights, which means the exclusive ability to sell a patented product for commercial purposes. If the government were allowed to sell patented articles for commercial use, the government would be retaining principal rights to the invention and not the rights provided by the IPAs. For this reason, the government's definition of "governmental purposes" limits the use of articles sold by the government to activities on behalf of the government. ImClone's interpretation of "governmental purposes" is contrary to the intent of the IPAs, conflicts with the terms and conditions of the IPAs, and defeats the primary purpose of the President's policy. Such an interpretation would have a chilling effect or even defeat the transfer of technology to the private sector by reverting to the policy in existence before the advent of the IPA and Bayh-Dole Act.

23.     A letter dated October 19, 1999 from Dr. Harold E. Varmus, NIH Director, to Ralph Nader, James Love, and Robert Weisman also shows that ImClone's interpretation of the licensed conveyed to the government is incorrect. The Varmus letter responds to a request for the NIH to provide the World Health Organization (WHO) access to government funded medical inventions. In the letter, Dr. Varmus states:

> As to inventions developed with NIH funding, the Bayh-Dole Act gives NIH grantees and contractors authority to retain title [to] patents and to license inventions that arise from NIH funding.
>
> As you have pointed out, the Government has a royalty-free license to practice and have practiced an invention it owns or has funded on behalf of the United States and on behalf of a foreign government or international organization pursuant to a treaty or other agreement with the United States. This royalty-free license provides the Government with no-cost use of a technology it invented or funded. It does not provide rights or access to a licensee's final product. The Government use contemplated by this provision has been interpreted generally to include research use, although its full scope has not been determined. Providing the owner of the technology (licensor) freedom to do further research is a common and reasonable provision of exclusive licenses. To our knowledge, the Government use license has never been employed as you propose, as a blanket measure to facilitate direct competition with a commercial license.

9

\* \* \*

Finally, I am concerned that granting rights to WHO for manufacture and distribution does not address the aforementioned requirement that a commercial entity develop early-stage compounds into safe and efficacious drugs. As a practical matter, it is reasonable to assume that companies will not undertake the development costs of these inventions if they believe the Government will readily allow third parties to practice the inventions.

24.     The understanding that commercial rights were not transferred to or retained by the government is emphasized under Section XII of the IPA entitled "Additional Licenses." The primary thrust of the IPAs (and eventually the Bayh-Dole Act, see 35 U.S.C. § 200, et seq.) was to utilize the patent system to transfer the inventive technology made with the aid of federal funds to the private sector for development and entry in the marketplace, which was in the public interest. That intent is made clear by the terms and Section XII, which states that if the Grantee or Licensee has not taken effective steps within three years after a patent on the invention issues to bring the invention to the point of practical application, the government has the right to require: (1) assignment of the patent to the United States; (2) cancellation of any outstanding exclusive licenses, or (3) the granting of license under the patent to an applicant on a non-exclusive, royalty-free basis or on terms reasonable in the circumstances.[13] Further, under certain conditions the government can license or require the licensing of other persons if required for public use by government regulations, if the public health, safety, and welfare requires such a license, or if the public interest would otherwise suffer unless such a license were granted.[14] Similar provisions, often referred as the government's "march-in rights," were included in the Bayh-Dole Act.

25.     From Section XII and the Varmus letter, it is clear that the primary thrust of the

---

[13]   MIT001662-63, MIT001679-80.
[14]   *Id.*

10

IPA is to license a subject invention to the private sector in an effort to deliver its benefits to the public and not for the government itself to engage in commercial practices, which was understood to be left to the private sector. Here, the MIT IPA conveyed principal rights to MIT and subsequently to MIT's licensee for commercial purposes and reserved only rights for governmental purposes.

26.    Throughout the negotiations that led to the first new IPA and in the ten-plus years that the IPA was applied by research institutions, I am not aware of a single instance where the IPA was interpreted to allow the government to sell patented products for commercial purposes where the research institution retained principal rights.

27.    I also understand it is ImClone's position that the MIT IPA granted the government greater rights than those set forth in President Kennedy's Memorandum (and consequently the Bayh-Dole Act). This position is also incorrect. The MIT IPA implemented the disposition of rights in the same manner prescribed by the President's Memorandum, as the IPA itself explicitly states. In many cases, such as the definition of "governmental purposes," the IPA uses language drafted by the government because its meaning was understood by the parties. The MIT IPA provided the government with the rights specified by the government's patent policy and nothing more.

## III.    THE BAYH-DOLE ACT CODIFIED THE INSTITUTIONAL PATENT AGREEMENTS.

28.    The IPAs signed with DHEW and various research institutions like the University of Wisconsin and MIT were very successful in stimulating technology transfer and the commercialization of inventions made with the assistance of federal funding. However, because each government agency was responsible for the distribution of rights in the inventions it funded, research institutions often had to negotiate agreements with several government agencies. It was

also common for institutions to co-mingle funds from various agencies. When that occurred, it was uncertain which agreement regarding patent rights would apply. The most restrictive agency policy was the policy that generally controlled.

29.    In the late 1970s, Congress proposed legislation that set forth a standard set of rights in federally-funded inventions that all government agencies were to apply. The terms of the IPA that I negotiated on behalf of the University of Wisconsin, and the IPA later executed by MIT, were carried into the legislation that resulted in the Bayh-Dole Act. The Bayh-Dole Act is considered to be essentially a codification of the terms and provisions of the IPAs. This is reflected in the testimony at the Hearings Before the Judiciary on S. 414 (Serial No. 96-11), which occurred on May 16 and June 6, 1979:

> The proposed Act would call for contracting procedures under which all agencies would make maximum use of the Institutional Patent Agreement approach to assign title to patents arising from Government-supported research by universities.

(statement of Elmer Staats, Comptroller General of the United States)

> In fact, the procedures outlined in the bill closely follow those currently in satisfactory use under the Institutional Patent Agreements between the Department of Health, Education, and Welfare, or the National Science Foundation, and many universities.

(statement of Gardner Stacy, American Chemical Society)

> In setting the pattern of regulations to be followed by contractors having title. S. 414 follows closely the procedures already worked out over a ten-year period by the Department of Health, Education, and Welfare, and adopted in modified form by the National Science Foundation. These procedures have been embodied in Institutional Patent Agreements (IPAs) which have been concluded with a relatively large number of DHEW and NSF contractors, primarily universities and scientific research institutions.

(statement of Willard Marcy, Research Corporation)

> And it is significant in this regard that the major thrust of the IPA and of S. 414 is the same, namely, that the contractor has first option to title to any invention made under the [research] contract.

12

(statement of Howard Bremer, Wisconsin Alumni Research Foundation)

30.    The intent to codify the IPAs with DHEW was also reflected in the Report of the

Committee on the Judiciary (Report No. 96-180):

> Since instituting the I.P.A. program a number of potentially important new drugs
> initially funded under HEW research have been delivered to the public through
> the involvement of private industry in developing, testing, and marketing these
> discoveries. Prior to the I.P.A. program, however, not one drug had been
> developed and marketed from HEW research because of a lack of incentives to
> the private sector to commit the time and money needed to commercialize these
> discoveries. This program has been so successful that it has been copied by other
> agencies.

(Page 21)

> Indeed, those aspects of S. 414 dealing with nonprofit organizations build very
> heavily upon the work of the subcommittee on University Patent Policy and the
> subsequent implementing amendments to the Federal Procurement Regulations.
> These efforts, in their turn, built upon the existing programs and regulations
> developed at the National Institutes of Health in 1968 and the National Science
> Foundation (NSF) in 1973.

(Page 27).

31.    The most significant feature of the Bayh-Dole Act was that it changed the

presumption of title in inventions made with federal funds from the government to the

universities. Just like the IPAs, where the contractor chooses to retain title to an invention under

the Bayh-Dole Act, the government receives an irrevocable, royalty-free license to practice the

invention for government purposes as set forth in 35 U.S.C. § 202(c)(4).

32.    I understand ImClone contends that the scope of the government's license under

the IPAs is greater than under the Bayh-Dole Act. In particular, I understand it is ImClone's

position that the government's statutory Bayh-Dole license from the University of California

does not provide the government with the right to sell for any purpose.[15]  ImClone's

---

[15]    The Confirmatory License relating to the government's Bayh-Dole license is numbered
I05147.

13

interpretation of the Bayh-Dole Act is incorrect. The government's license under the Kennedy Memorandum and the IPAs allows the government to "practice or have practiced" the invention. The government's definition of governmental purposes included a parenthetical after "practice and have practiced" to specify that practicing a patent included all forms of infringement under 35 U.S.C. § 271 (i.e., making, using, and selling). The Bayh-Dole recites the same "practice or have practiced" language as used in the IPAs and those terms continue to be defined by § 271.

33.    A recent discussion with Norman Latker confirmed my understanding that the parenthetical terminology "make or have made, use or have used, sell or have sold" in the Confirmatory License, which was carried over from President Kennedy's Memorandum and upon which ImClone has placed much emphasis, was later considered by the Committee on Government Patent Policy to be redundant and unnecessary. As a result, the language is not present in the Bayh-Dole Act.

34.    The equivalence in scope of the IPAs and the Bayh-Dole Act is further evidenced by the fact that invention activity reporting under the IPAs was subsumed by the Bayh-Dole reporting requirements within a relatively short time after the Bayh-Dole Act became effective. The government saw no reason to distinguish between licenses under the IPAs and the statutory licenses created by the Bayh-Dole Act.

## IV.    SUMMARY OF CONCLUSIONS

35.    The IPAs, including those of the University of Wisconsin and MIT, implemented President Kennedy's Memorandum on patent policy to give commercial rights to research institutions and provide the government a license for governmental purposes. With respect to the government's ability to practice or have practiced a subject invention, the IPAs provided only the rights specified in the President's Memorandum and did not provide any additional rights to the government.

14

36.    The Confirmatory License issued by research institutions under the IPAs and the Bayh-Dole Act are unnecessary and on their own do not control the disposition of rights in federally-funded inventions.  The terms of the IPA and the provisions of the Bayh-Dole Act determine the distribution of rights.

37.    The government's definition of "governmental purposes," which appears in President Kennedy's Memorandum and in the Confirmatory License attached as an Exhibit to the IPAs limits the use of articles sold by the government to activities on behalf of the government.

38.    The terms of the IPAs were carried into the legislation that ultimately became the Bayh-Dole Act.  The Bayh-Dole Act is referred to as a codification of the terms and provisions of the IPAs.

39.    The scope of the government's license under the Bayh-Dole Act and the IPAs is not different with respect to the right to sell.  The government can sell under both licenses for governmental purposes, but cannot convey the right to use the materials sold for commercial purposes.

40.    The preceding paragraphs summarize the conclusions and opinions described in this report.  However, these conclusions are not in any way intended to limit the scope of my testimony.   I may supplement this report in view of additional information or testimony of others.

Dated: 9 December 2005                    Howard W. Bremer
                                          Howard W. Bremer

## EXHIBIT A

| | |
|---|---|
| **Name:** | *Howard W. Bremer* |
| **Business Address:** | *WISCONSIN ALUMNI RESEARCH FOUNDATION*<br>*614 Walnut Street, Madison, WI 53705*<br>*Tel: 608-263-2831* |
| **Home Address:** | *1106 Brookwood Road, Madison, WI 53711*<br>*Tel: 608-271-4638* |

**Education:**

| | |
|---|---|
| *B.S., Chemical Engineering,* | |
| *University of Wisconsin* | *-1944* |
| *L.L.B., University of Wisconsin* | *-1949* |

**Admissions to Practice:**

| | |
|---|---|
| *State Bar of Wisconsin* | *-1949* |
| *U.S. Patent and Trademark Office* | *-1954* |
| *Supreme Court of the United States* | *-1957* |
| *Court of Appeals for the Federal* | |
| *Circuit (formerly Court of Customs* | |
| *and Patent Appeals)* | *-1959* |
| *District Court (So. Dist. of Ohio)* | *-1960* |

**Military:**

| | |
|---|---|
| *U.S. Navy* | *-1944-46* |

**Employment:**

| | |
|---|---|
| *Patent Attorney,*<br>The Procter & Gamble Co. | *-1949-60* |
| *Patent Counsel,*<br>*Wisconsin Alumni Research Foundation* | *-1960-88* |
| *Consultant* | *-1988-present* |

**Professional Memberships and Activities:**

*Patent, Trademark & Copyright Section, State Bar of Wisconsin*

| | |
|---|---|
| *Secretary* | *-1965-66* |
| *Vice Chairman* | *-1966-67* |
| *Chairman* | *-1967-68 and 1979-80* |
| *Council Member* | *-1977-79* |

*Wisconsin Intellectual Property Law Association*

| | |
|---|---|
| *Council Member* | *-1981-82* |
| *Bd. of Directors* | *-1981-83* |
| *President Elect* | *-1988-89* |

i

| | |
|---|---|
| *President* | *-1989-90* |
| *Bd. of Directors* | *-1990-91* |

*Council on Governmental Relations (COGR)*

| | |
|---|---|
| *Patent, Trademark &* | |
| *Copyright Committee* | *-1975-85* |
| *COGR Intellectual Property* | |
| *Advisory Group* | *-1987-90* |
| *Member - Grants and Contracts* | |
| *Policies Committee* | *-1990-93* |

*Association of University Technology Managers (AUTM) formerly Society of University Patent Administrator (SUPA)*

| | |
|---|---|
| *Trustee* | *-1977-78* |
| *President* | *-1978-80* |
| *Trustee* | *-1980-82* |
| *Trustee* | *-1985-87* |
| *Committee Chairs  -* | *Public Affairs Past Presidents* |
| *Editorial Advisory Board -* | *AUTM Journal* |

*International Advisory Board Member - Industry and Higher Education (Periodical) London, U.K.*

*Advisory Panel Member - Office of Technology Assessment - Assessment of commercial development of biotechnology:*

> *November 8, 1981 - September 30, 1982*
> *October 1, 1982 - August 31, 1983*

*Alternate Member, Advisory Commission on Patent Law Reform:*

> *March 1991 - August 1992*

*American Bar Association*
| | |
|---|---|
| *Chairman -* | *Special Committee on University Intellectual Property Law ABA Years 1993/94, 1994/95* |
| *Chairman -* | *Committee on Government Relations to Patents ABA Year 1995/96, 1996/97* |
| *Chairman -* | *Committee on Cooperation with Foreign Patent Office ABA Year 1997/98, 1998/99* |

ii

Chairman-    *Committee on Inventors*
*ABA Year 1999-2000, 2000-2001*

*American Intellectual Property Law Association*
Chairman -    *University Relations Committee 1996/97, 1997/98, 1998/99*

**Awards/Recognitions:**
*Bayh-Dole Award 1980 (AUTM)*

*Honorary Recognition Award – University of Wisconsin, College of Agricultural and Life Sciences, 2000*

*Five yearly scholarships offered by the Association of University Technology Managers (AUTM) entitled the "Howard W. Bremer Scholarship" to attend the Annual Meeting of the organization.*

**Papers Presented:**
*Testimony at ERDA Hearing, Germantown, Maryland - November 18-19, 1975.*

*Statement on Behalf of the American Council on Education Before the Subcommittee on Banking, Currency and Housing - June 1976.*

*Statement on Behalf of the National Association of College and University Business Officers Before the National Commission for the Protection of Human Subjects of Biomedical and Behavioral Research - December 11, 1976.*

*Property Rights and the Development of Medical Technology - Report Prepared for the Committee on Technology and Health Care, National Academy of Science - August 1977.*

*University Technology Transfer - Publish and Perish - Presented at Patent Policy Symposium of the American Chemical Society, Anaheim, California, March 13-14, 1978.*

*University Policies to Promote Invention Transfer - Conference on Development of Therapeutic Agents Found With Government Support - National Institute of General Medical Sciences of the National Institutes of Health, Bethesda, Maryland, May 31, 1978.*

*Institutional Patent Agreements for Universities - Statement Before the Monopoly and Anticompetitive Activities Subcommittee Senate Small Business Committee, June 20, 1978.*

*Public Patents - Public Benefit - Synonyms or Antonyms? - Wisconsin State Bar Mid-Winter Meeting, Pfister Hotel, Milwaukee, Wisconsin - January 26, 1979.*

iii

*Academia - A Prospective Business Partner - Talk given at Eastern Regional Meeting on the Licensing Executives Society - April 27, 1979.*

*Statement on University and Small Business Patent Procedures Act, S. 414 before the Subcommittee on the Constitution, Committee on the Judiciary - June 6, 1979.*

*Statement on University and Small Business Patent Procedures Act, H.R. 2414, and Other Proposed Innovation-And Patent-Related Legislation before the Subcommittee on Courts, Civil Liberties and the Administration of Justice of the Committee on the Judiciary - April 17, 1980.*

*Patent Policies for Government-Supported Research - Seminar on Comparative Studies of Policies and Practices for Basic and Applied Science in Japan and the United States, Honolulu, Hawaii - August 24, 1981.*

*Technology Transfer and PL 96-517 - Energy Bureau Inc. Conference on Genetic Engineering in Food and Agriculture - December 6, 1982.*

*Research Applications and Technology Transfer - Talk given at Industry/ University/Government Laboratory Research Corporation for Economics Growth Workshop - November 30, 1984.*

*Commentary on Rosenzweig Paper entitled "Research as Intellectual Property: Influences Within the University" - Published in Science, Technology, Human Values, Vol. 10, Issue 2, Spring 1985, No. 51.*

*"University Technology Transfer: Where have we been? Where are we going?" - Published in Journal of the Association of University Technology Managers, Vol. 1, No. 1 - Spring 1989.*

*"Trends in Intellectual Property Law", Howard W. Bremer, Kathleen R. Terry, and Warren D. Woessner. Journal of the Association of University Technology Managers, Vol. II, 1990.*

*"The Impediments to Technology Transfer from the Higher Education Sector. The Education and Training Requirements for their Removal". World Patent Information, Vol. 12, No. 3, 1990 (a joint periodical of the Commission of the European communities and the World Intellectual Property Organization). Maxwell Online Inc. at Pergamon Press plc.*

*Statement on H.R. 1613, To Authorize Appropriations for the Patent and Trademark Office before the Subcommittee on Intellectual Property and Judicial Administration of The Committee on the Judiciary - May 8, 1991.*

*Statement on S.2605 and H.R. 4978, "Patent System Harmonization Act of 1992," April 30, 1992 before a joint hearing of the Subcommittee on Patents, Copyright and*

*Trademark of the Committee on the Judiciary, U.S. Senate and the Subcommittee on Intellectual Property and Judicial Administration of the Committee on the Judiciary, U.S. House of Representatives.*

*"Prior User Rights - Con" International Town Meeting on Harmonization of Patent Laws, The John Marshall Law School, Center for Intellectual Property Law, May 7-8, 1992, Chicago, Illinois*

*Testimony on the Effectiveness of the Bayh-Dole Act - Journal of the Association of University Technology Managers, Volume V, pp. 27-35, 1993. (Presented on behalf of the Council on Governmental Relations at hearings of the Department of Commerce, October 25, 1993.*

*Testimony on the Bayh-Dole Act: A Review of Patent Issues in Federally Funded Research before the Subcommittee on Patents, Copyrights and Trademarks, Committee on the Judiciary United States Senate on April 19, 1994. (Presented on behalf of the Association of University Technology Managers and Council on Governmental Relations.)*

*"Do the Results of University Research Benefit National Industries—in the United States" a paper given at Patinnova '94. Proceedings of the Third European Congress on Innovation, Management and Patents, 2-4 June 1994, Copenhagen Denmark.*

*History of Laws and Regulations Affecting the Transfer of Intellectual Property", Association of University Technology Managers, AUTM Manual, Volume III, Chapter 2, 1995. (Revision 2001)*

*"University of Technology Transfer - Evolution and Revolution" Presented at 50th Anniversary celebration of the Council on Governmental Relations; October 28-30, 1998, Washington, D.C.*

*Technology Transfer from Universities in the United States—Presented to Japanese Patent Office, February 1999—to be published in Patent Studies No. 28, Journal of the Japan Patent Office, September 1999.*

*"The Autonomous University"—Presented at the Capstone Symposium for the Centennial Celebration of Graduate Education, Research and Creative Activity. University of Nebraska, Lincoln, Nebraska, April 13, 2000. ("The Kept University vs. The Autonomous University and Trends in Funding and Graduate Education")*

*"The First Two Decades of the Bayh-Dole Act as Public Policy". Presentation to the National Association of State Universities and Land Grant Colleges, November 11, 2001, Washington, D.C. Available on the NASULGC website: www.NASULG.org*

*"What do we Gain and What do we Lose with Patent Harmonization? A University Perspective". Presentations at nationwide seminar by University of Washington School of Law – Center for Advanced Study & Research on Intellectual Property, December 10, 2001,*

v

*New York; December 12, 2001, Chicago; December 14, 2001, Berkeley, California. (posted on AUTM and CASRIP websites: www.autm.org and www.law.washington.edu/CASRIP.*

*"Technology Transfer – the American Way" Presentation at International Licensing Seminar 2003, Tokyo, Japan, January 28, 2003*

*"Managing legal issues and litigation in academic patenting" – Presentation at High level Seminar on Intellectual Property Rights Issues Related to Public Research Institutions, Beijing, China April 22-23, 2004*

*"University Technology Transfer in the United States – A Learning Experience" – presentation at the International Symposium on University Technology Transfer and Entrepreneurial Activities. Tokyo Medical and Dental Universities, Tokyo, Japan, February 10, 2005*

*"What works?? Accounting for University Sourced Commercialization Successses." Presentation at the conference on "University-Sourced Commercialization: What works?" University of Texas at Dallas and University of Texas Southwestern Medical School, October 20, 2005, Dallas, Texas*

*"Rights and Obligations and the Bayh-Dole Act as Amended". Presented at the Population Council "Day of Dialogue – on Public Sector Pricing of Pharmaceutical Products" October 24, 2005, New York, New York.*

## *Prior Service as an Expert Witness*

*To Deposition Stage Only*

1. *Marquip Inc. v. Fosber America Inc.*, District Court, Western District of Wisconsin, Case No. 96-C-726-S. Deposition: 14 February 1997, Madison, Wisconsin.

2. *NTL Processing Inc. v. Medical College of Wisconsin*, Case No. 92-CV-796. Circuit Court, Waukesha, Wisconsin. Deposition: 20 July 1997, Madison, Wisconsin.

3. *Picker International, Inc. v. Mayo Foundation, et al.*, Case No. 1:95 CV 2028 U.S. District Court, Northern District of Ohio Deposition: 22 May 1998, Milwaukee, Wisconsin.

4. *Pavel Sebor, an individual, v. Dieter J. Rief, D/B/A Rief Designs*, an individual. Case No.: CI 92-6128 Circuit Court of the Ninth Judicial Circuit, in and for Orange County, Florida. Deposition: 5 December 1998, Orlando, Florida.

5. *The Regents of the University of California, v. Genentech, Inc.* Case No: C-90-2232 CAL U.S. District Court, Northern District of California. Deposition: February 11, 1998, Chicago, IL: October 15, 1999, San Francisco, CA.

6. *Dhuler et al v. MCNC, Wood et al v. MCNC* Civil Action No. 00-CVS-1233, Civil Action No. 00-CVS-12334, State of North Carolina, County of Wake, General Court of Justice Superior Court Division, Deposition: January 17, 2002.

7. *Bayer AG and Bayer Corp. v. Housey Pharmaceuticals, Inc.* Civil Action No. 01-148-SLR U.S. District Court for the District of Delaware – Deposition July 24, 2002. Chicago, IL.

8. *Proneuron v. the Regnents of the University of California*, Superior Court of the State of California, county of San Diego, Case No. GIC 769430, February 26, 2003.

*At trial*

1. *Orion Corporation v. BioTie Therapies* Markka Jalkanen and Sirpa Jalkanen. District Court of Helsinki, Helsinki, Finland. January 24, 2002.

2. *NOMOS Corporation, Inc. v. ZMED, Inc.* U.S. District court, District of Massachusetts, Boston, Massachusetts. Civil Action No. 01-CV-10765 MEL. October 1, 2002. Deposition taken September 30, 2002.

# EXHIBIT B

- Memorandum of Law In Support of ImClone's Motion for Summary Judgment of Non-Infringement Due to Patent Exhaustion dated August 16, 2005

- Declaration of A. Antony Pfeffer In Support of Defendant's Motion for Summary Judgment dated August 15, 2005 and attached Exhibits 1-9

- Memorandum in Opposition to ImClone's Motion for Summary Judgment and In Support of Plaintiffs' Cross-Motion for Summary Judgment That Plaintiffs' Patent Rights Have Not Been Exhausted dated September 14, 2005

- Declaration of William R. Woodford In Opposition to ImClone's Summary Judgment Motion and in Support of Plaintiffs' Summary Judgment Motion on the Issue of Patent Exhaustion dated September 13, 2005 and attached Exhibits 1-64.

- ImClone's Combined: (1) Reply Brief In Support of Its Motion for Summary Judgment of Non-Infringement Due to Patent Exhaustion; and (2) Brief In Opposition to Plaintiffs' Cross-Motion For Summary Judgment That Their Patent Rights Have Not Been Exhausted dated October 19, 2005

- Reply Declaration of A. Antony Pfeffer In Support of ImClone's Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment dated October 19, 2005 and attached Exhibits 10-24

- Reply Memorandum In Support of Plaintiffs' Motion for Summary Judgment that Plaintiffs' Patent Rights Have Not Been Exhausted dated November 21, 2005

- Supplemental Declaration of William R. Woodford In Support of Plaintiffs' Summary Judgment Motion on the Issue of Patent Exhaustion dated November 18, 2005 and attached Exhibits 65-72

- Institutional Patent Agreement between the Department of Health, Education, and Welfare and the Regents of the University of Wisconsin (MIT001671-MIT001683)

- The Bayh-Dole Act, 35 U.S.C. § 200, et seq.

- 37 C.F.R. § 401

- Hearings Before the Committee on the Judiciary, United States Senate on the University and Small Business Patent Procedures Act (S. 414), Serial No. 96-11

- Report of the Committee on the Judiciary, United States Senate on the University and Small Business Patent Procedures Act (S. 414), Report No. 96-180

- Various annual reports on government patent policy by the United States Federal Council for Science and Technology

- A letter from Dr. Harold Varmus, NIH Director, to Ralph Nader, James Love, and Robert Weismann dated October 19, 1999 (MIT001722-MIT001725)