**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| MASSACHUSETTS INSTITUTE OF TECHNOLOGY and REPLIGEN CORPORATION,<br><br>        Plaintiffs,<br><br>    v.<br><br>IMCLONE SYSTEMS, INC.,<br><br>        Defendant. | Civil Action No. 04-10884-RGS |

**PLAINTIFFS' OPPOSITION TO IMCLONE'S MOTION TO STRIKE THE EXPERT REPORT OF MR. BREMER**

**INTRODUCTION**

As the Court is aware, one of ImClone's defenses in this case is the doctrine of patent exhaustion. ImClone bears the burden of proof on this issue. Because plaintiffs have exposed the flaws in ImClone's original theory related to Damon's dealings with the National Cancer Institute ("NCI") in 1989-90, ImClone has crafted another theory that rests on the ill-conceived notion that the NCI, as licensee of MIT, exhausted Plaintiffs' patent rights. As part of this theory, ImClone contends that the government's limited license from MIT somehow authorized the NCI to give commercial rights to ImClone—the very rights that remained with MIT under its Institutional Patent Agreement ("IPA") with the government and the Bayh-Dole Act. Because ImClone's view of the government's limited license from MIT finds no support in fact or law (not to mention conflicts with forty years of understanding and application in the industry), ImClone now seeks to eliminate any evidence and testimony that contradicts its theory. To that end, ImClone asks the Court to strike *the entirety* of the expert report of Mr. Bremer, a recognized expert in the field of government licensing who negotiated the standard form IPA at

issue here for the entire academic community and testified twice before Congress on the proposed legislation that codified the IPA in the Bayh-Dole Act.

To justify the extreme sanction it asks the Court to impose here, ImClone wrongly characterizes Mr. Bremer's entire fifteen page report as "legal testimony." But, this misleading description is based almost entirely on the fact that Mr. Bremer has been a practicing patent attorney for forty years and has little to do with the report's substance. An analysis of the actual report reveals that it is not a "legal opinion," but instead provides background and context for the evidence relevant to ImClone exhaustion defense, provides evidence on course of dealing and usage of trade, and sets forth the intent and true meeting of the minds of the parties to the IPA. Expert testimony on these topics is entirely appropriate and admissible.

ImClone also speciously claims that Mr. Bremer's report should be stricken because it does not rebut anything submitted by ImClone's experts. This is nonsense. ImClone's decision not to submit an expert report on exhaustion cannot and does not foreclose Plaintiffs' right to file an expert report on the issue. Not a single rule or case states that the party bearing the burden of proof can determine whether either party can present an expert on that issue. To the contrary, the Federal Rules of Civil Procedure and the Court's scheduling order expressly provide all parties with the right to submit expert reports and present expert testimony.

For these reasons, ImClone's motion to strike the expert report of Mr. Bremer should be denied.

**BACKGROUND**

In the early 1980s, Drs. Tonegawa and Gillies of MIT discovered a technology that allows cells to be modified to produce large quantities of virtually any protein. Because the research leading to this invention was supported, in part, with federal funding, when the patent

application for this invention was filed, the government obtained a restricted and limited license that provided the right to practice the patent for governmental purposes.

The government's license to the patent-in-suit is not just any license negotiated by two parties in an arms-length transaction. The license was drafted to enact the policy set forth in President Kennedy's 1963 Memorandum, a policy that was later implemented in standard form IPAs between the government and numerous research institutions (including MIT), and ultimately codified in the Bayh-Dole Act. In the past 40 years, there have been countless licenses routinely issued to the government by institutions under these IPAs and the Bayh-Dole Act that provide the government exactly the same limited rights it obtained from MIT.

In 1989, the National Cancer Institute (NCI) issued a research and development contract with Damon Biotech, MIT's exclusive licensee of the cellular enhancer patent, pursuant to the government's limited license. Under this contract, Damon created four vials of the C225 cell line for the NCI, incorporating the patented cellular enhancer technology to make enhanced quantities of the C225 antibody (which ImClone now sells as Erbitux). Because the cell line and antibody were for government research purposes only and that use fell within the limited government license, the NCI received these materials royalty-free.

Three years after the NCI identified the C225 antibody and its potential for fighting cancer, ImClone executed an agreement with the NCI to conduct joint clinical trials, which was aptly called a Clinical Trials Agreement. Now, as part of its patent exhaustion defense, ImClone claims the NCI "sold" a vial of the infringing C225 cell line to ImClone under the Clinical Trials Agreement and that the government's limited license somehow provides commercial rights in the infringing cell line vial. To make this theory work, ImClone relies exclusively on language cropped from a two-page confirmatory license document attached as an Exhibit to the IPA and

ignores everything else—including the IPA itself, the Bayh-Dole Act, and nearly forty years of industry-wide understanding and application of the license at issue here.[1]

ImClone's exhaustion theory raises several issues that are appropriately addressed through expert testimony. At the outset, if the Court does not resolve ImClone's defense through summary judgment, the trier of fact will be presented with a myriad of documents, agreements, and testimony regarding government licensing in general and the relationship between MIT and the government. Expert testimony will provide background on government patent policy and the context necessary to understand this evidence. In addition, because ImClone's interpretation of the government's limited license conflicts with forty years of understanding and practices by the government, academic institutions, and industry, expert testimony on the course of dealing in government licensing and the understood meaning of the terms at issue here is also highly relevant.

Moreover, in light of ImClone's claim that the confirmatory license is the entirety of the license agreement, testimony to assist the trier of fact in determining what documents and/or provisions actually make up the license agreement is also highly relevant. In addition, because the IPA is not an integrated agreement, testimony relating to the intent of the parties and the true meeting of the minds is also relevant and appropriate. Finally, evidence of the intent of the parties is relevant to aid the Court in determining meaning or ambiguity, and if ambiguity is found, to resolve the meaning of the ambiguous terms.

---

[1] In its brief, ImClone states that it informed Plaintiffs of its patent exhaustion defense "many years prior to the filing of this lawsuit." (ImClone Br. at 2.) However, that theory related solely to the research and development contract between Damon and the NCI. ImClone's claim that Plaintiffs' rights were exhausted by the government's limited license was not drummed up until this litigation.

# ARGUMENT

The exclusion of evidence is an "extreme" sanction to be imposed only in rare circumstances. *See Meyers v. Pennypack Woods Home Ownership Ass'n*, 559 F.2d 894, 905 (3d Cir. 1977). It should not be used as a vehicle to get rid of unfavorable evidence—yet that is precisely what ImClone is trying to do here. The substance and content of Mr. Bremer's report is admissible under the rules of evidence and was properly submitted under the Court's scheduling order. ImClone's motion to strike should be denied.

## I. Mr. Bremer's Report Contains Relevant and Admissible Subject Matter, Not "Legal Testimony" as ImClone Contends.

Throughout its brief, ImClone claims that Mr. Bremer's expert report is a legal opinion, but provides no analysis to support such a sweeping claim. In fact, the only attempt by ImClone to even explain how Mr. Bremer's report contains legal opinion is a half-page long list of bullet points that includes short phrases cropped from various paragraphs throughout the report with the words "legal effect" and "legal interpretation" placed before them by ImClone's counsel. (*See* ImClone Br. at 4.) The fact that ImClone has to go to these lengths to create the appearance of legal opinion demonstrates that its motion lacks merit.

A fair assessment of Mr. Bremer's report reveals that it is not a legal opinion nor does it contain legal testimony.[2] The substance and content of Mr. Bremer's entire report falls into one of the following categories: (1) experience and qualifications, (2) background and context for the evidence relating to ImClone's patent exhaustion defense, (3) evidence relating to course of dealing and usage of trade in government licensing under the IPAs and Bayh-Dole Act, and (4)

---

[2] ImClone claims that Plaintiffs' counsel "made it clear that Mr. Bremer intends to testify about the contractual interpretation of the relevant licensing agreements and the parties' legal obligations under those agreements as rebuttal testimony." (ImClone Br. at 6.) Plaintiffs' counsel did no such thing. Rather, Plaintiffs' counsel stated that Mr. Bremer would testify at trial consistent with his report and could provide valuable and relevant testimony at trial.

evidence relating to the intent and purpose of the parties to the IPA. Each category of testimony is admissible under the Federal Rules of Evidence.

### A. Mr. Bremer's Background and Expert Qualifications Are Not "Legal Testimony."

Mr. Bremer is eminently qualified to address the government licensing issues raised in ImClone's patent exhaustion defense. For over 28 years, Mr. Bremer was responsible for all licensing and technology transfer for the University of Wisconsin. (Bremer Report ¶ 1.)[3] As Mr. Bremer explains in his report, in the early 1960s he negotiated several licenses that implemented President Kennedy's patent policy. (*Id.* ¶¶ 3-4.) He also negotiated the first IPA with the Department of Health, Education, and Welfare (DHEW) that implemented this new policy.[4] (*Id.*) Shortly after the IPA was executed in 1968, more than 70 research institutions used this IPA as a template and signed identical or nearly identical IPAs with DHEW, including MIT. (*Id.* ¶ 5.)

In his report, Mr. Bremer states that he worked under the terms of the IPAs for more than ten years, both in dealing with DHEW and also in dealings with third parties who wished to license technology from the University of Wisconsin for commercial purposes. (*Id.*) Through this experience, Mr. Bremer developed a clear understanding of the disposition of rights in inventions made under the IPA at issue here. (*Id.*)

To further explain his qualifications, Mr. Bremer describes his experience working with Congress on the legislation to codify the terms of the IPA that he negotiated with DHEW. (*Id.* ¶ 6.) Because of his knowledge and understanding of the IPAs, Mr. Bremer met regularly with Senator Bayh and his staff regarding the Bayh-Dole legislation and was asked to testify twice

---

[3] Mr. Bremer's report is attached as Exhibit A to ImClone's motion.
[4] Mr. Bremer also negotiated a similar agreement with the National Science Foundation on behalf of the University of Wisconsin.

before Congress. (*Id.*) He also gave testimony on the IPAs before the Senate Select Committee on Small Business. (*Id.* ¶ 7.) Mr. Bremer also states that after the passage of the Bayh-Dole Act, he worked within its terms on a daily basis for more than twenty years. (*Id.* ¶ 8.) Mr. Bremer has written several publications on the application and distribution of rights under the Bayh-Dole Act. (*Id.*)

Nothing regarding Mr. Bremer's recitation of his background and experience contains a legal opinion or even comes close. Yet, ImClone contends that paragraphs 2, 5, and 6-9 of his report contains impermissible legal testimony. (ImClone Br. at 4.) To give the appearance of legal testimony, ImClone adds the phrase "legal effect" to a partial quote of Mr. Bremer's statement that he has been engaged as an expert to opine on the distribution of rights between universities and the government under the IPAs and Bayh-Dole Act. (*Compare* ImClone Br. at 4 *with* Bremer Report ¶ 2.) ImClone also crops a statement by Mr. Bremer that he developed a clear understanding of the distribution of rights under the IPAs because he drafted, negotiated, and applied its terms for more than ten years to make it appear to be a legal opinion. (*Compare* ImClone Br. at 4 *with* Bremer Report ¶ 5.) ImClone takes the same misleading approach with a partial quote from paragraph 8 of Mr. Bremer's report and the insertion of "legal interpretation and meaning" before it. (*Compare* ImClone Br. at 4 *with* Bremer Report ¶ 8.)

These word games do not create legal testimony. Mr. Bremer's background and experience demonstrate that he is highly qualified to give expert testimony in this matter.

### B. Mr. Bremer's Report Provides Background and Context that Will Aid in the Understanding of Evidence, Which Is Permitted by the Rules of Evidence.

The rules expressly allow expert testimony where "scientific, technical, or other specialized knowledge *will assist the trier of fact to understand the evidence*." Fed. R. Evid. 702 (emphasis added). Expert testimony of this nature is especially appropriate in this case.

ImClone's patent exhaustion defense raises a number of complex issues and will require the presentation of an extensive amount of testimony and documentary evidence. Without question, expert testimony that puts the government's patent policy, the IPAs, and the Bayh-Dole Act in the proper context will assist the trier of fact to understand this evidence. As the Advisory Committee Notes to Rule 702 instruct, "[t]here is no more certain test for determining when experts may be used than the common sense inquiry whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having specialized understanding of the subject involved in the dispute." Fed. R. Evid. 702 Advisory Committee Notes.

To that end, Mr. Bremer's report provides the necessary background and context to understand the relationship between the government's patent policy, the IPAs, and Bayh-Dole Act. For example, Mr. Bremer explains that in the 1940s and 1950s the government typically retained title (which included exclusive commercial rights) to inventions arising from government-sponsored research. (Bremer Report ¶¶ 10-11.) As a result of this policy, the government accumulated title to more than 28,000 patents. However, less than five percent of these inventions had been licensed to industry, and an even smaller percentage of the technology disclosed in those patents had shown up in commercial products. (*Id.* ¶ 11; *see also* ¶¶ 12-13.)

The problems associated with the government holding title to inventions, provides a context for the government's change in patent policy, which is discussed in Mr. Bremer's report. (*Id.* ¶ 14.) Mr. Bremer explains that the policy change gave principal or exclusive rights to institutions and small businesses. (*Id.*) In exchange, the government received an irrevocable, non-exclusive, royalty-free license throughout the world for governmental purposes. (*Id.*)

After President Kennedy's Memorandum issued, several agencies, including DHEW,

8

permitted institutions to petition for principal rights to inventions consistent with the government's new patent policy on a case-by-case basis. (*Id.* ¶ 15.) However, in Mr. Bremer's experience, the process of negotiating licenses on a case-by-case basis was unworkable. (*Id.* ¶ 16.) Consequently, Mr. Bremer started negotiations with DHEW with the goal of obtaining an IPA that would standardize the disposition of government rights for all inventions made with DHEW funding. (*Id.* ¶ 17.) After several years of negotiation, Mr. Bremer secured the first IPA that implemented the new patent policy set forth in the Kennedy Memorandum on behalf of the University of Wisconsin. (*Id.*) Shortly after the University of Wisconsin IPA was signed, several other research institutions, including MIT, signed nearly identical IPAs with DHEW. (*Id.* ¶ 18.) This testimony is critical to explain the relationship between President Kennedy's Memorandum and the IPAs. The testimony is also important to understand the context and fundamental purpose of the standard form IPA that was signed by the University of Wisconsin and numerous other institutions, including MIT.

Mr. Bremer's report also explains the process by which the terms of the IPAs were codified and the legislation that became the Bayh-Dole Act. (*Id.* ¶ 28.) Mr. Bremer cites testimony at the Congressional hearings, including his own, demonstrating the intent to codify the IPA Mr. Bremer negotiated. (*Id.* ¶¶ 29-30, 38.) This testimony will demonstrate the relationship between the IPAs and the Bayh-Dole Act to the trier of fact.

For the reasons stated above, paragraphs 10-18, 28-30, and 38 are admissible because they provide background and context for the evidence pertaining to ImClone's patent exhaustion defense. Here again, however, ImClone claims that several paragraphs that fall into this category constitute legal opinion—specifically, paragraphs 14-18, 29-30, and 38. (ImClone Br. at 4.) For example, ImClone claims that the discussion in paragraphs 14-18 are impermissible because they

9

relate to the legal interpretation and meaning of the Bayh-Dole Act. However, these paragraphs describe the policy change in President Kennedy's Memorandum, Mr. Bremer's experience negotiating licenses after the Memorandum but before the IPAs, the execution of the IPAs, and the intent to codify the IPAs in the Bayh-Dole Act. (Bremer Report ¶¶ 14-18, 29-30, 38.)

ImClone also objects to paragraph 9 of Mr. Bremer's report, which states that he had a discussion with Norman J. Latker, Patent Counsel for the Institutes of Health in the 1960s and 1970s, regarding the historical development of the IPAs and the Bayh-Dole Act. (*Id.* ¶ 9.) ImClone claims that testimony relating to Mr. Latker is hearsay. (ImClone Br. at 4.) However, under Rule 703, facts of a type reasonably relied upon by experts in the particular field in forming opinions—like Mr. Latker's recollection of the historical development of the IPAs and Bayh-Dole Act—need not be admissible for the opinion or inference to be admitted. Fed. R. Evid. 703.

The substance of Mr. Bremer's report providing background and context to the relevant evidence is precisely the type of testimony contemplated by Rules 702 and 703.

### C. The Evidence Relating to the Course of Dealing and Usage of Trade in Government Licensing under the IPAs is Admissible Subject Matter.

It is well-settled that contracts to which the federal government is a party are governed by the principles of general contract law. *Fomby-Denson v. Dept. of Army*, 247 F.3d 1366, 1373-74 (Fed. Cir. 2001). One acceptable source for general contract law is the Restatement of Contracts. *Mobil Oil Exploration & Producing Southeast, Inc. v. United States*, 530 U.S. 604, 607 (2000). Courts will also look to the Uniform Commercial Code as a source of general contract law. *Group One, Ltd. v. Hallmark Cards, Inc.*, 254 F.3d 1041, 1047-1048 (Fed. Cir. 2001).

The UCC provides that the course of dealing between parties or usage of trade in the vocation or trade which they are engaged "is relevant in ascertaining the meaning of the parties'

agreement, may give particular meaning to specific terms in the agreement, and may supplement or qualify terms of the agreement." Uniform Commercial Code §§ 1-303(d), 2-202; *see also* Restatement (Second) of Contracts § 220 (reciting a similar provision). The code defines a course of dealing as "a sequence of conduct concerning previous transactions between the parties to a particular transaction that is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." *Id.* § 1-303(b). Similarly, a "usage of trade" is "any practice or method of dealing having such regularity of observance in a place, vocation, or trade as to justify the expectation that it will be observed with respect to the transaction in question." *Id.* § 1-303(c). The existence and scope of such usage are to be proved as facts. *Id.* § 1-205(2); Restatement (Second) of Contracts § 222.

      Courts frequently approve the use of experts to establish a course of dealing or usage of trade. *E.g.*, *Commercial Union Ins. Co. v. Seven Provinces Ins. Co.*, 217 F.3d 33, 38-39 (1st Cir. 2000) (affirming reliance on expert testimony on trade usage to interpret the terms of an insurance policy); *Den Norske Bank AS v. First Nat. Bank of Boston*, 75 F.3d 49, 57 (1st Cir. 1996) (affirming decision to allow 40-year banking veteran to give testimony on usage of trade); *WH Smith Hotel Serv., Inc. v. Wendy's Int'l, Inc.*, 25 F.3d 422, 429 (7th Cir. 1994) (deeming proper expert testimony on custom and usage to interpret ambiguous language in a contract); *Scapa Tapes North Am., Inc. v. Avery Dennison Corp.*, 384 F. Supp. 2d 544, 550-51 (D. Conn. 2005) (using trade usage to define the term "particle"). As the Fifth Circuit explained, "[c]ertainly the parol evidence rule does not preclude evidence of course of dealing or usage of trade, for such evidence merely delineates a commercial backdrop for intelligent interpretation of the agreement." *Chase Manhattan Bank v. First Marion Bank*, 437 F.2d 1040, 1046 (5th Cir. 1971). "[U]nless a judge considers a contract in the proper commercial setting, his view is apt to

be distorted or myopic." *Id.*

Mr. Bremer's report provides evidence regarding the course of dealing and the usage of trade concerning the IPA and Bayh-Dole licenses at issue here. For example, to demonstrate the industry-wide understanding of the government's patent rights, Mr. Bremer cites a letter from the NIH director to Ralph Nader, James Love, and Robert Weisman in response to a request for the NIH to provide the World Health Organization access to government-funded medical inventions. (Bremer Report ¶ 23.) The letter states the government's license does not provide access to final commercial products and that the government's license has never been employed to facilitate direct competition with a commercial license. (*Id.*) According to the NIH director, "the Bayh-Dole Act gives NIH grantees and contractors authority to retain title [to] patent and to license inventions that arise from NIH funding." (*Id.*)

The report also cites Mr. Bremer's own personal experience relating to the commonly understood meaning of the IPA and its application. (*Id.* ¶ 26.) Mr. Bremer states that throughout the negotiations that led to the first IPA and in the ten-plus years the IPA was applied by research institutions, he was unaware of a single instance where the IPA was interpreted to allow the government to sell patented products for commercial purposes where the research institution retained principal rights. (*Id.*) Mr. Bremer also explains the industry-wide understanding of "governmental purposes" and "principal rights," as those terms appear in President Kennedy's Memorandum and the IPAs. (*Id.* ¶¶ 20, 34.)

Mr. Bremer cites additional evidence relating to the understanding of the IPAs and Bayh-Dole Act by both the government and institutions. (*Id.* ¶¶ 34, 39.) Mr. Bremer explains that the equivalency in scope of the IPAs and Bayh-Dole Act is further demonstrated by the fact that the reporting requirements under the IPAs was subsumed by the Bayh-Dole reporting requirements a

short time after Bayh-Dole became effective. (*Id.* ¶ 34.) Apparently, the government saw no need to distinguish between license under the IPAs and the statutory licenses created by the Bayh-Dole Act. (*Id.*)

Testimony on the course of dealing and usage of trade is both appropriate and admissible. Mr. Bremer should be allowed to provide testimony on these topics.

### D. The Evidence in Mr. Bremer's Report Regarding the Intent of the Parties to the IPAs Is Also Admissible.

The interpretation of an integrated agreement is directed to the meaning of the terms in light of the circumstances. Restatement (Second) of Contracts § 212. This is not limited to cases where it is determined that the language used is ambiguous. *Id.* § 212 cmt. b. "Any determination of meaning or ambiguity should only be made in light of the relevant evidence of the situation and relations of the parties, the subject matter of the transaction, preliminary negotiations and statements made therein, usages of trade, and the course of dealing between the parties." *Id.* Evidence relating to the intent and purpose of the parties to an agreement is also admissible when a contract term is ambiguous or where the writing is not a complete integration of the parties' agreement. Restatement (Second) of Contracts §§ 209-210, 214-215; *Chase Manhattan Bank*, 437 F.2d at 1048.

Here, the evidence relating to the negotiations of the IPA and the intent of the parties provided by Mr. Bremer is admissible to determine the agreement's meaning. This evidence may also be admissible to determine whether the agreement is integrated. For example, the IPA at issue here does not have an integration clause and expressly references other documents. It is also possible that the Court could find certain disputed terms in the agreement to be ambiguous. In that case, the testimony from Mr. Bremer on the intent of the parties would be admissible on that ground as well.

Mr. Bremer's report provides his personal knowledge and expert opinion regarding the intent of the government and academic institutions in negotiating the standard IPA language. Indeed, Mr. Bremer is in a unique position to provide this testimony because he actually negotiated the standard form IPA at issue here. According to Mr. Bremer's report, the intent of the IPAs was to reflect and embrace President Kennedy's Memorandum. (*Id.* ¶ 19.) As evidence of this intent, Mr. Bremer points out the reference to the Memorandum in the IPA and the incorporation of the term "principal rights," which is introduced in the Memorandum and defined to give institutions exclusive commercial rights in the subject inventions. (*Id.* ¶¶ 19-20.)

Mr. Bremer also addresses ImClone's position that the definition of "governmental purposes" in President Kennedy's Memorandum (and in the confirmatory license) authorizes the government to sell patented products to third parties for commercial use. (*Id.* ¶¶ 22, 24-25.) Mr. Bremer explains that ImClone's position is incorrect because it conflicts with the intent of the IPAs and the government's patent policy the IPAs were designed to implement. (*Id.*) If the government were allowed to sell patented articles for commercial use as ImClone contends, then the government would be retaining principal rights and not the institution. (*Id.*) According to Mr. Bremer, such an interpretation would defeat the purpose of the IPAs and revert to the policy in existence before the advent of the IPAs and the Bayh-Dole Act. (*Id.*)

The report also addresses ImClone's position that the MIT IPA granted greater rights than those set forth in President Kennedy's Memorandum (and thus the Bayh-Dole Act). (*Id.* ¶¶ 27, 35.) Mr. Bremer explains that the standard IPA, which MIT and numerous other research institutions signed, was intended to implement the disposition of rights in the same manner set forth in President Kennedy's Memorandum. (*Id.*) Further, Mr. Bremer explains that in many cases the IPA uses language drafted by the government, such as "governmental purposes,"

14

because its meaning was explained in the Kennedy Memorandum and understood by the parties. (*Id.*) These statements go directly to the intent of the parties and the common meaning of these terms in the field of government licensing.

Mr. Bremer also addresses ImClone's contention that the scope of the government's license from the IPAs is greater than the government's statutory license under Bayh-Dole. (*Id.* ¶¶ 32-33.) In particular, Mr. Bremer provides evidence relating to the intent of the parenthetical that appears after the language "practice or have practiced" in the IPA he negotiated, upon which ImClone hinges its exhaustion defense. (*Id.*) Mr. Bremer explains that the parenthetical (i.e., making, using, selling) was included to specify that practicing the patent included all forms of infringement under § 271. (*Id.* ¶ 32.) Mr. Bremer states that the parenthetical was dropped in the Bayh-Dole Act because it was considered to be redundant by the Committee on Government Patent Policy to be redundant and unnecessary. (*Id.* ¶ 33.) This evidence directly relates to the intent of the parties in drafting the IPAs and also the custom and usage of the terms in the government licensing industry.

Mr. Bremer also discusses the confirmatory license attached as Exhibit A to the IPAs, which ImClone contends is the entirety of the government's license. Mr. Bremer explains that the controlling agreement was the actual IPA and not the confirmatory license. (*Id.* ¶ 21.) Mr. Bremer's report states that the confirmatory license was unnecessary, but was included because DHEW insisted that institutions execute the confirmatory license to provide a record of the grant to the government. (*Id.*) The Court may hear this testimony to determine if the confirmatory license is the fully integrated agreement. *Lodge No. 12 of Dist. 37, Int'l Ass'n of Machinists & Aerospace workers v. FMC*, 551 F. Supp. 83, 85 & n.1 (S.D. Tex. 1982) (noting that the court heard expert testimony at trial to determine whether a document which on its face appeared to be

15

a fully-integrated agreement was, in fact, not a contract).

Mr. Bremer's report is not legal testimony and ImClone's motion should be denied.

## II.    Mr. Bremer's Report Was Submitted In Accordance With the Court's Scheduling Order and the Federal Rules of Civil Procedure.

### A.    Mr. Bremer's Report Was Properly Submitted as a Rebuttal Report.

As with its invalidity defenses, ImClone bears the burden of proof on its patent exhaustion defense.  *Jazz Photo Corp. v. Int'l Trade Comm'n*, 264 F.3d 1094, 1101-02 (Fed. Cir. 2001).  Pursuant to the Court's June 3, 2005 Order, ImClone's deadline for the submission of expert reports on invalidity and patent exhaustion was September 7, 2005 (D.I. 50), which was later extended to October 14, 2005 by agreement of the parties.  ImClone submitted an expert report on invalidity, but declined to submit a report on patent exhaustion.

Under the scheduling order, the deadline for the submission of rebuttal expert reports on issues where the parties do not bear the burden of proof was October 3, 2005, which the parties later extended to December 9, 2005.  In accordance with this schedule, on December 9, 2005, Plaintiffs submitted Mr. Bremer's report on patent exhaustion.  ImClone does not dispute this fact.

But now, after choosing *not* to submit an expert report on the patent exhaustion issue, ImClone asks the Court to strike Mr. Bremer's report "because it does not rebut anything that ImClone's experts have said in their opening reports." (ImClone Br. at 1.)  According to ImClone, the party bearing the burden of proof on any issue can control whether either party can introduce expert testimony.  To support its argument, ImClone cites Fed. R. Civ. P. 26(a)(2)(C), which governs the timing of expert report submissions in the absence of a scheduling order. (ImClone Br. at 9.)  However, neither Rule 26(a)(2)(C) nor any other rule of procedure supports ImClone's nonsensical theory.

Rule 26(a)(2)(C) states that, *in the absence of direction from the court*, the parties are directed to make expert disclosures 90 days before trial and submit rebuttal reports that contradict or rebut another party's expert within 30 days after the submission of initial reports. Because the Court issued a scheduling order that governs the submission of expert reports, the timing of disclosures in Rule 26 do not apply in this case. ImClone's argument fails on that ground alone.

But even if the timing of submissions in Rule 26 did somehow apply to Mr. Bremer's report—which it does not—ImClone's argument would still fail. The language cited by ImClone from Rule 26 does not mean that a party can only submit a report if the other side does so first. To the contrary, the rule states that *all* parties may submit an expert report on *any* issue 90 days before trial. This fact is made clear in the Advisory Committee Notes:

> Normally the court should prescribe a time for these disclosures in a scheduling order under Rule 16(b), and in most cases the party with the burden of proof on an issue should disclose its expert testimony on that issue before other parties are required to make their disclosures with respect to that issue. In the absence of such a direction, disclosures are to be made *by all parties* at least 90 days before the trial date or the date by which the case is to be ready for trial, except that an additional 30 days is allowed (unless the court specifies another time) for disclosure of expert testimony to be used solely to contradict or rebut the testimony that may be presented by another party's expert.

Fed. R. Civ. P. 26 Advisory Committee Notes (1993) (emphasis added). Rule 26 actually defeats ImClone's argument.

The cases relied upon by ImClone also fail to support its theory. For example, in *Baldwin Graphics Sys., Inc. v Siebert, Inc.*, the defendant attempted to add arguments to a rebuttal report that did not appear in his initial report on the issue. No. 03 C 7713, 2005 WL 1300763, at *2 (N.D.Ill. Feb. 22, 2005). Likewise, in *Crowley v. Chait* the issue was whether an expert could get a "do over" by indicating in a rebuttal report that he reviewed additional deposition material that was not included in his first report. 322 F. Supp. 2d 530, 551 (D.N.J.

17

2004).  In both of these cases, the experts received the opportunity to file an initial report, but were attempting to supplement the report with new evidence.  These cases have nothing to do with the issue presented here.

The relevant case law demonstrates that ImClone's argument has no merit.  In *Clipco, Ltd. v. Ignite Design, LLC*, the court had issued a scheduling order that required the parties to submit reports on issues for which it was their burden of proof followed by rebuttal reports, just as the Court did here.  No. 04-C-5043, 2005 WL 2861032, at *1 (N.D. Ill. Oct. 28, 2005).  And just like ImClone did here, the plaintiff in *Clipco* elected not to file an expert report on an issue for which it had the burden of proof and then moved to strike the rebuttal report filed by the other side "because infringement was not addressed in [plaintiff's] initial expert disclosures."  *Id.*.  The court rejected this argument and declined to strike the rebuttal report, just as the Court should do here.  *Id.*

Nor was Mr. Bremer's report untimely under the Court's scheduling order simply beause Plaintiffs submitted it at the time for rebuttal reports.  The only justification ImClone provides for this assertion is that Mr. Bremer's opinions "go to the heart of Plaintiffs' infringement case."  (*Id.*)  However, the submission deadlines in the Court's scheduling order were determined by burdens of proof—which ImClone bears on the issue of patent exhaustion—not by some arbitrary determination of what the issue goes to the "heart" of.  ImClone's argument fails completely on this score.

> **B.    There Is Nothing Prejudicial About Plaintiffs' Submission of Mr. Bremer's Report.**

Because the rules of procedure and applicable case law fail to support its claims, ImClone asks the Court to strike Mr. Bremer's report because, according to ImClone, the report is unfair.  (ImClone Br. 1-2, 12-13.)  According to ImClone, Plaintiffs engaged in "tactical ambush" that

"foreclosed any opportunity for ImClone to provide any countering rebuttal opinion" simply by filing a report at the appropriate time under the scheduling order. (ImClone Br. 1-2, 12.) But of course, ImClone had every opportunity to support its strained version of events with an expert report on patent exhaustion, but for reasons known only to it, chose not to. Accordingly, any prejudice that befalls ImClone is purely of its own doing, and the only unfairness that would result would be from striking Mr. Bremer's valuable and detailed testimony.

## CONCLUSION

For the foregoing reasons, ImClone's motion to strike the expert report of Mr. Bremer should be denied.

Dated: January 26, 2005

/s/William R. Woodford
William R. Woodford (*pro hac vice*)
3300 Dain Rauscher Plaza
60 South Sixth Street
Minneapolis, MN 55402
Telephone: (612) 335-5070
Facsimile: (612) 288-9696

*Of Counsel*:

| | | |
|---|---|---|
| Gregory A. Madera | Jonathan E. Singer | Juanita Brooks |
| FISH & RICHARDSON P.C. | Michael J. Kane | FISH & RICHARDSON P.C. |
| 225 Franklin Street | John C. Adkisson | 12390 El Camino Real |
| Boston, MA 02110-2804 | FISH & RICHARDSON P.C., P.A. | San Diego, CA 92130 |
| Telephone: (617) 542-5070 | 3300 Dain Rauscher Plaza | Telephone: (858) 678-5070 |
| Facsimile: (617) 542-8906 | 60 South Sixth Street | |
| | Minneapolis, Minnesota 55402 | |
| | Telephone: (612) 335-5070 | |
| | Facsimile: (612) 288-9696 | |

*Attorneys for Plaintiffs Massachusetts Institute of Technology & Repligen Corporation*

60335142.doc