UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-CV-10884-RGS

MASSACHUSETTS INSTITUTE OF TECHNOLOGY, et al.

v.

IMCLONE SYSTEMS, INC.

MEMORANDUM AND ORDER ON
CROSS-MOTIONS FOR SUMMARY JUDGEMENT

July 28, 2006

STEARNS, D.J.

On May 4, 2004, the Massachusetts Institute of Technology and its licensee, Repligen Corp. (collectively MIT), brought this Complaint against Imclone Systems, Inc. (Imclone), alleging that Imclone's manufacture of Erbitux, a lucrative cancer-fighting drug, violates U.S. Patent No. 4,663,281, "Enhanced Production of Proteinaceous Materials in Eucaryotic Cells" (the '281 patent). The '281 patent was issued to MIT by the U.S. Patent and Trade Office on May 5, 1987. MIT alleges that the '281 patent gives it exclusive rights to the C225 cell line that is used by Imclone to produce Erbitux. Before the court are cross-motions for summary judgment on the issue of patent exhaustion. On February 2, 2006, the court heard oral argument.[1]

The essence of Imclone's argument is that MIT exhausted its rights under the '281 patent by granting unrestricted licenses for use of the C225 cell line to the National Cancer Institute (NCI) and Damon Biotech, Inc. Imclone argues that as a consequence, MIT's 2004

---

[1] For present purposes, Imclone stipulates that Erbitux incorporates the C225 cell line. MIT does not allege that Imclone misappropriated the teachings of the '281 patent. Rather, MIT alleges that Imclone copied the C225 cell line from a specimen it had received from a licensee of MIT.

license of the cell line to Repligen was ineffectual and that neither of the MIT plaintiffs has a viable claim against Imclone.  MIT, for its part, argues that its licenses restricted the use of the C225 cell line to research for "governmental purposes," thereby precluding a licensee or assignee from unauthorized commercial exploitation of the cell line.

The parties agree, as they must, on the applicable case law.  The doctrine of patent exhaustion is almost as old as the patent system itself and is based on the capitalist idea that if a patentee places an article in the market for sale, and receives the asked-for consideration, "it may fairly be said that the patentee has received his reward for the use of the article." United States v. Masonite Corp., 316 U.S. 265, 278 (1942).  Consequently, nothing further may be extracted from the buyer by virtue of a patent.  The exercise for a court in a patent exhaustion case is fairly straightforward: did the patentee sell its rights under the patent and, if it did, was any residual interest in the patent retained?  "As a general matter, we explained that an unconditional sale of a patented device exhausts the patentee's right to control the purchaser's use of the device thereafter.  The theory behind this rule is that in such a transaction, the patentee has bargained for, and received, an amount equal to the full value of the goods. This exhaustion doctrine, however, does not apply to an expressly conditional sale or license. In such a transaction, it is more reasonable to infer that the parties negotiated a price that reflects only the value of the 'use' rights conferred by the patentee." B. Braun Medical, Inc. v. Abbott Labs, 124 F.3d 1419, 1426 (Fed. Cir. 1997) (citations omitted).

For Imclone to prevail, it must show by undisputed evidence that MIT made an authorized, unconditional sale (or assignment) of all of its rights under the '281 patent. Imclone argues that MIT made not one, but two separate qualifying sales: the MIT/NCI

transaction and the Damon/NCI transaction. While it is possible to bury these transactions under complex layers of largely irrelevant details, the essentials can be summarized as follows.

The MIT/NCI Transaction

In 1984, MIT filed the '281 patent application listing two MIT professors, Dr. Susumu Tonegawa and Dr. Stephen Gillies, as inventors. Because the underlying research was government-funded, MIT was required to grant the NCI a "royalty-free, non-exclusive and irrevocable license for governmental purposes," including the right "to practice and have practiced (make or have made, use or have used, sell or have sold) throughout the world by or on behalf of the Government of the United States," the invention of the '281 patent.

In 1993, the NCI entered into a "Clinical Trials Agreement" with Imclone. The NCI agreed to provide Imclone with ampules of "cells that express chimeric monoclonal antibody 225" for the purpose of conducting clinical studies. Imclone argues that when MIT transferred its rights under the '281 patent to the NCI, the effect was to extinguish any residual rights that MIT held in the patent. Thus, when the NCI in turn entered into the Clinical Trials Agreement, the rights to the patent, including commercial rights, devolved on Imclone.

The Damon/NCI Transaction

In 1984, MIT granted a license (under what would become the '281 patent) to a start-up company called Damon Biotech, Inc.[2] In 1987, the license was transferred by Damon Biotech to its parent company, Damon, Inc. (Damon). Almost simultaneously, researchers at the University of California discovered an antibody that inhibited the growth of tumors in

---

[2]Damon Biotech had hired Dr. Gillies as its chief science officer.

3

mice, which they designated as the M225 antibody. The University of California obtained a patent on the M225 antibody, and following in the steps of MIT, granted the NCI the required governmental use license. Eventually, the NCI decided to chimerize the M225 antibody.[3] In 1988, the NCI issued a solicitation for bids to perform the chimerization. Damon was awarded the contract and in exchange for a payment of $150,000, chimerized the M225 cell line by successfully melding it with the C225 cell line. In 1990, pursuant to the chemerization contract, Damon gave the NCI a vial of the chimerized C225 cell line.[4] Imclone argues that when the NCI later gave it a vial of chimerized C225 pursuant to the Clinical Trials Agreement, the NCI transferred with it all of the rights that Damon had granted the NCI in 1988, as well as those that Damon had acquired from MIT in 1984. Under Imclone's theory of the case, MIT was, as a result, left with nothing under its '281 patent.

## DISCUSSION

There is a gaping hole in Imclone's argument. How Imclone can argue with any conviction that MIT and Damon surrendered all rights under the '281 patent by honoring their agreements with the NCI is beyond the court's grasp. The MIT/NCI license gave the NCI the right to use the invention of the patent "by or on behalf of the Government of the United States." Consistent with the Bayh-Dole Act, 35 U.S.C. § 202(c)(4), MIT's Institutional Patent Agreement (IPA) with the NCI allowed MIT to "retain principal rights in" any government-

---

[3]Chimerization is the process by which a part human, part mouse monoclonal antibody is created that may be safely used in human experiments.

[4]When Damon performed the chimerization, it added a "cellular enhancer" to increase the yield from the cell line. MIT argues that this cellular enhancer is taught in the '281 patent, and that when Imclone used the C225 cell line to make Erbitux, it appropriated this aspect of MIT's invention.

funded invention. The grant of rights to the NCI for government use never contemplated the surrender of any of MIT's rights beyond those required by law. Similarly, when the NCI solicited bids for the chimerization project under the Master Agreement Order (MAO), it did so pursuant to implementation of an "NO1" project. See MAO Part II, Section I, Article I.1.a. An NO1 project is by its own terms restricted to research and development. Damon incorporated the terms of the NCI solicitation into the subsequent series of agreements that led to the chimerization project, including the research and development limitation. Nothing more was given up.[5]

### ORDER

For the foregoing reasons, Imclone has failed to establish that MIT's rights under the patent are exhausted. Thus, Imclone's motion for summary will be <u>DENIED</u>. MIT's motion for summary judgment will be <u>ALLOWED</u>.

SO ORDERED.

/s/ Richard G. Stearns

_____
UNITED STATES DISTRICT JUDGE

---

[5] Imclone has also failed to establish that when the NCI transferred the vial of C225 to Imclone in 1993, it granted Imclone unfettered rights to commercialize the cell line. The NCI's agreement with Imclone concerned the conduct of clinical trials. There is nothing submitted on summary judgment that would even tend to suggest that the NCI intended to give Imclone the right to market the C225 cell line for profit. See Jazz Photo Corp. v. International Trade Com'n, 264 F.3d 1094, 1102 (Fed. Cir. 2001) ("The purchaser of a patented article has the rights of any owner of personal property, including the right to use it, repair it, modify it, discard it, or resell it, subject only to overriding conditions of the sale. . . . However, the rights of ownership do not include the right to construct an essentially new article on the template of the original, for the right to make the article remains with the patentee.").