UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-10884-RGS

MASSACHUSETTS INSTITUTE OF TECHNOLOGY, et al.

v.

IMCLONE SYSTEMS, INC.

FINDINGS OF FACT, RULINGS OF LAW, AND ORDER
ON PLAINTIFFS' MOTION FOR SANCTIONS

June 8, 2007

STEARNS, D.J.

On May 4, 2004, the Massachusetts Institute of Technology and its licensee, Repligen Corporation (collectively MIT), brought this patent infringement lawsuit against ImClone Systems, Inc. (ImClone). The Complaint alleges that ImClone's Erbitux, a highly profitable cancer treatment drug, infringes MIT's U.S. Patent No. 4,663,281 (the '281 patent), titled "Enhanced Production of Proteinaceous Materials in Eucaryotic Cells." The '281 patent asserts ownership of an antibody styled as the "C255 cell line." The named inventors are two former MIT professors, Dr. Susumu Tonegawa and Dr. Stephen Gillies. In pressing its allegations of infringement, MIT relied on tests that Dr. Gillies conducted in 2005 on the DNA vector that is in dispute.

On March 16, 2006, MIT moved for the imposition of sanctions against ImClone's outside counsel, Paul Richter, an attorney at Kenyon & Kenyon, a New York law firm specializing in patent litigation, for allegedly attempting to intimidate Dr. Gillies during a

February 10, 2006 deposition. MIT also argued that ImClone's in-house counsel, Thomas Gallagher, had contacted Dr. Gillies' employer, Merck KGaA (Merck), with the intent of "shuttering" Dr. Gillies as a witness in the case. MIT alleged that as a result, Dr. Gillies had informed MIT's counsel (through a lawyer retained by Merck), that he was no longer willing to voluntarily testify for MIT. In its motion, MIT requested that the court impose sanctions on ImClone, specifically: (1) that ImClone be enjoined from any direct or indirect communication with Merck concerning Dr. Gillies' role in the litigation; (2) that Gallagher be prohibited from any further access to confidential information; (3) that MIT be permitted to present evidence at trial of the alleged misconduct of ImClone's attorneys; and (4) that MIT be awarded its costs and fees. On May 4, 2006, the court heard oral argument on MIT's motion.

On July 24, 2006, the court issued an opinion stating the obvious – that it considered the allegations of witness intimidation to be extremely serious. The court ordered that a show cause hearing be held to give ImClone the opportunity to present its side of the story.[1] After further briefing, an evidentiary hearing was held on September 26, 2006. The court viewed portions of Dr. Gillies' videotaped deposition and heard testimony from five witnesses called by ImClone: attorneys Richter and Gallagher, William Golden (a lawyer for Merck), Professor Bruce Green, and attorney Robert Muldoon.[2] The parties also filed post-hearing briefs.

---

[1] The court indicated that if sanctions were warranted, they might include the disqualification of Kenyon & Kenyon as ImClone's counsel.

[2] Professor Green and attorney Muldoon were offered as expert witnesses on lawyer ethics.

FINDINGS OF FACT

Based on the credible evidence, I find the following material facts.

1. On December 23, 2004, the court entered a Protective Order requiring that all information designated by the parties as confidential or restricted "be used by the parties, consultants, experts, and counsel in this action solely for the purpose of conducting this litigation, and not for any other purpose whatsoever."[3]

2. Dr. Gillies is a former MIT professor and a named inventor on the '281 patent.[4] He is currently the President of EMD Lexigen Research Center, Inc. (EMD Lexigen), a Massachusetts corporation, with a principal place of business in Billerica. EMD Lexigen is a wholly owned subsidiary of Merck KGaA, a German pharmaceutical company.

3. Merck distributes the drug Erbitux outside of North America pursuant to a marketing agreement entered with ImClone in 1998.

4. In the late summer of 2005, at MIT's request, Dr. Gillies conducted testing at his EMD Lexigen laboratory of the DNA vector that ImClone had used to create Erbitux. Dr. Gillies concluded that ImClone had improperly appropriated the C255 cell line disclosed in the '281 patent. On December 9, 2005, MIT disclosed Dr. Gillies' test results to ImClone as part of an exchange of expert reports. ImClone moved to have the results excluded as

---

[3] The Protective Order was amended on March 29, 2005, without any modification of this provision.

[4] The history is somewhat complicated, but in 1984 MIT granted a license under what was to become the '281 patent to Damon Biotech, Inc., where Dr. Gillies held the post of chief science officer. In 1987, Damon Biotech transferred the license to its parent company, Damon, Inc. Sometime thereafter, Damon ceased to exist; MIT eventually granted the license to Repligen, Inc., the co-plaintiff in this case.

3

untimely produced. Because the test results were offered by way of rebuttal, the court denied the motion on the condition that Dr. Gillies, who had been previously deposed twice on other issues related to his expertise, sit for a third deposition.

5. On February 10, 2006, attorney Richter conducted the third deposition of Dr. Gillies. Richter repeatedly asked Dr. Gillies if Merck, EMD Lexigen's parent company, knew that he had made use of Merck (EMD Lexigen) facilities and employees in conducting the tests. The following excerpts of Dr. Gillies' deposition transcript are material to the motion for sanctions. (The questions are by Richter, the answers are by Dr. Gillies).

> Q: Are you still employed by Merck?
> A: Merck KG[a]A.
> Q: Are you still employed by them?
> A: Yes
> Q: Did you contact anybody at Merck to inquire as to their view on whether you should do these experiments in Exhibit 19?
> A: Not in any detail, but they're aware of this case.

Gillies Deposition, Vol. III, at 405:8-16.

> Q: When you reported this information to Merck, did you tell them that your information came from experiments you performed on behalf of MIT in the ImClone versus MIT litigation?
> A: I doubt if I would have said it that way.
> Q: Did you mention the litigation at all?
> A: They're aware of the litigation.
> Q: But did you mention the litigation at all?
> A: In the context of that presentation, I don't recall.
> Q: Did the litigation ever come up during that presentation?
> A: We don't generally talk about it in that meeting. It's a scientific review meeting.

Gillies Deposition, Vol. III, at 409:8-22.

> Q: So you have no way of knowing whether anybody at Merck knows that the

information you provided them flowed from experiments you did for the MIT versus ImClone litigation?
A: I don't know any detail of whether they do or not. It's not a big deal. It's not their litigation. They don't care.
Q: Have they ever told you that they don't care?
A: Yes.
Q: Who told you they don't care at Merck?
A: Let's get some detail. Don't care about what? The litigation?
Q: Yes.
A: Well, putting it in context, I told them when I was asked to be deposed or asked to be a witness for this, if that was an issue, and they said no because it doesn't impact their sales of Erbitux in Europe. And I would say the person I talked to would be Arno Hartman[n]. I think I've given you that name before.
Q: Anybody else?
A: He's the person I spoke to.
Q: Where were the experiments of Exhibit 19 done?
A: At EMD Lexigen.
Q. Who owns EMD Lexigen?
A: Merck KG[a]A. You have to say – in the U.S. you can't say Merck.
Q: Okay. Did you inform Merck KG[a]A that experiments were done at Facilities that they own –
A: I am Merck KG[a]A. I am very high-level executive there, so I have the authority to do that.
Q: Are you the CEO of Merck KG[a]A?
A: No. I don't think the CEO of Merck KG[a]A is informed of every experiment.
Q: Do you have a boss at Merck KG[a]A?
A: Yes, I do.
Q: Who is that?
A: Inga Luce.

\*\*\*

Q: Did you inform Ms. Luce that experiments were done at facilities owned by Merck KG[a]A, the results of which were provided to third parties outside of Merck KG[a]A?
A: I don't recall having that exact discussion.
Q: Do you believe you were obligated to make that information available?
A: No.
Q: So did you make that decision on your own?
A: Yes.
Q: Did you inform anybody else at Merck KG[a]A of that decision?
A: Not that I recall.

> Q: Do you intend to inform anybody else?
> A: I can tell them.
> Q: Do you intend to do that?
> A: If you like me to, I will.
> Q: It's not up to me.
> A: I don't find the necessity to do it.
> Q: Okay. I don't work for Merck KG[a]A, but -
> A: I'm considered fairly high-level and have the authority to do these sorts of things.
> Q: Do you have written authority to do that sort of thing?
> A: I don't think I need it.
> Q: But you believe it's within the authority that you -
> A: Within my rules and responsibilities, yes. Why don't we focus on the data . . . .

Gillies Deposition, Vol. III, at 413:17 - 415:11; 415:14 - 417:18.

6. MIT's counsel eventually suspended the deposition and under the terms of the Protective Order designated Dr. Gillies' testimony as "restricted confidential."

7. Thomas Gallagher, ImClone's in-house counsel, was thereafter given a copy of the transcript of Dr. Gillies' deposition by Richter or someone at Kenyon & Kenyon acting at his direction.[5] On February 23, 2006, Gallagher sent an email to Dr. Arno Hartmann, the overseer of pharmaceutical patents at Merck.[6] The e-mail read as follows:

> Dear Arno,
>
> It has come to my attention from the Repligen & MIT v. ImClone litigation that Dr. Stephen Gillies (and others reporting to him) of EMD Lexigen, a wholly

---

[5] In a March 30, 2006 Declaration, Gallagher stated that he had "learned that Dr. Gillies' experiments had been performed using Merck KGaA personnel . . . and equipment through the deposition of Dr. Gillies." Richter testified that he was "sure" that Gallagher had obtained the transcript "from our litigation team." Hearing Tr. at 93.

[6] Gallagher testified at the hearing that he sent the email after being told by Michael Loughnane, a lawyer at Kenyon & Kenyon, that "Merck was now involved in the litigation that was ongoing with [MIT] and that they were conducting experiments on behalf of [MIT]." Hearing Tr. at 106.

owned subsidiary of Merck KGaA have recently engaged in experiments on behalf of Repligen & MIT that were apparently intended to prove that ImClone is liable for patent infringement through its making and selling of Erbitux. Those experiments were conducted at EMD Lexigen's laboratory by those EMD Lexigen employees.

Given the relationship between ImClone and Merck with regard to Erbitux, I do not understand why Merck would authorize EMD Lexigen and its employees to engage in such activities. I am out of the office and will return on Monday February 27th; accordingly would you kindly reply to this email with an explanation so that we can further discuss this matter by telephone early next week.

8. Dr. Hartmann responded to Gallagher the next day stating, "[t]hank you for your message. We will attend immediately and have to investigate. You will hear back from us during next week."

9. Gallagher replied as follows.

Dear Arno,

Again, thanks for following up on my email regarding Dr. Gillies at EMD Lexigen. I would have preferred simply to call to discuss the matter, however, I was away skiing with my family in upstate New York and I dictated to my assistant, Donna Bennen, a rather formal email instead.

To help you further understand the matter, you should know that Steve Gillies is a named inventor on the patent in suit between Repligen & MIT v. ImClone Systems. Gillies had been a post doc at MIT at the time of the patent thing. Subsequent to his time at MIT he worked at Damon Biotech, the company that chimerized C225 at the request of the National Cancer Institute (NCI) for a fee. In the chimerization process, Damon Biotech used a cellular enhancer element that is, in part, the subject of the Gillies' patent. (Damon no longer exists and the subject patent is now owned by Repligen.)

Without addressing issues of invalidity and non-infringement, ImClone has argued that Repligen's rights in the subject patent are exhausted because Damon was paid to chimerize the murine antibody without reserving any rights in the chimeric antibody.

7

> After Damon's chimerizing C225, Gillies acted as a consultant to ImClone and he even considered employment at ImClone. I do not believe that there has been contact between ImClone and Gillies for nearly ten years.
>
> Although the subject patent expired in May 2004 (and Repligen sued us one day before this patent expired). Repligen contends that ImClone is liable for damages on inventory made before the expiration of the patent. In addition to our exhaustion-of-rights argument we have much more to argue; however, the question, as you can appreciate, is why an EMD Lexigen employee would help Repligen in this matter.
>
> Let's talk early next week.

10. On March 9, 2006, MIT's counsel received a telephone call from Jason Kravitz, an attorney retained by Merck to represent Dr. Gillies. Kravitz stated that Dr. Gillies had been called to a meeting at Merck, and that as a result had decided that he would no longer cooperate with MIT in the prosecution of the lawsuit.[7] That same day, attorney Golden called Michael Kane, an attorney for MIT, and demanded that Dr. Gillies' "proprietary" test data be returned to Merck.[8]

### RULINGS OF LAW

1. Rule 3.4 of the Massachusetts Rules of Professional Conduct provides that "[a] lawyer shall not: (a) unlawfully obstruct another party's access to evidence . . . , (c) knowingly disobey an obligation under the rules of a tribunal . . . , [or] (f) request that a

---

[7] ImClone contended in its initial post-hearing memorandum that Kravitz was in the courtroom during the show cause hearing and had been observed visibly cooperating with MIT's counsel. In a reply to MIT's objection, ImClone concedes that it was mistaken in this regard.

[8] Golden testified that he had learned about Dr. Gillies' experiments from Dr. Hartmann who had contacted him after receiving Gallagher's emails. Golden stated that he was acting at the direction of Merck's general counsel in speaking with attorney Kane, but declined on grounds of attorney-client privilege to answer questions about the precise nature of the instructions he had received.

8

person other than a client to refrain from voluntarily giving relevant information to another party. . . ."

2. Rule 4.4 of the Massachusetts Rules of Professional Conduct provides that "[i]n representing a client, a lawyer shall not use means that have no substantial purpose other than to embarrass, delay, or burden a third person . . . ." When applying Rule 4.4, a court must determine whether the lawyer's conduct served some legitimate purpose other than those that are prohibited. In the Matter of the Discipline of an Attorney, 442 Mass. 660, 668, 670 (2004) (an attorney did not "undermine the legitimacy of the judicial process" by disparaging the competence of an expert witness in the presence of his superior where "he was motivated at least in part by concerns beyond gaining an immediate tactical advantage.").[9]

3. Rule 8.4(d) of the Massachusetts Rules of Professional Conduct provides that "[i]t is professional misconduct for a lawyer to: . . . (d) engage in conduct that is prejudicial to the administration of justice."

4. A court has discretion to "fashion an appropriate sanction for conduct which abuses the judicial process." Chambers v. NASCO, Inc., 501 U.S. 32, 44-45 (1991). See also Ty, Inc. v. Softbelly's Inc., 353 F.3d 528, 536-537 (7th Cir. 2003).

### ULTIMATE CONCLUSIONS OF FACT AND LAW

According to ImClone, Gallagher's emails to Dr. Hartmann were primarily motivated by an arbitration proceeding then underway in the Southern District of New York involving

---

[9]ImClone argues that the "no [other] substantial purpose" language of Rule 4.4 should be grafted onto Rule 3.4 and Rule 8.4 as well, but cites no case that is persuasive on the point.

9

a dispute between ImClone and Merck over the experimental drug 11F8. Gallagher professed to be concerned that Dr. Gillies' work on behalf of the MIT plaintiffs might augur a complete rupture of the marketing arrangement between ImClone and Merck with regard to Erbitux. As explained by ImClone: "Having learned that Dr. Gillies conducted testing for this case at Merck, purportedly with the assent of Merck, Mr. Gallagher sent two emails to his counterpart at Merck, Arno Hartmann, on February 23 and 24, 2006, in order to inquire whether this portended more bad news for the ImClone-Merck relationship and whether Merck was now involved in a relationship with Repligen." ImClone Post-Hearing Memorandum, at 13. I find this after-the-fact rationale lacking in credibility. The emails make no allusion to the arbitration proceeding or to the possibility of an accord between Merck and Repligen. They emphasize instead Dr. Gillies' efforts on behalf of MIT in the instant litigation and for all intents and purposes demand that Merck rein Dr. Gillies in. The suggestion that Gallagher was under the impression that Dr. Gillies was working with MIT with Merck's approval is belied by the deposition transcript. The thrust of Richter's critical line of questioning was to demonstrate the exact opposite.[10] The further assertion in paragraph 13 of Gallagher's Declaration that he "did not state or suggest that Dr. Gillies' testimony or data would be harmful to ImClone in the [MIT] litigation" in his emails to Dr. Hartmann is not supported by any fair reading of their texts.[11] I also find that Gallagher

---

[10] As Richter testified at the hearing, "it was clear at the beginning [of the deposition] that Dr. Gillies said that he didn't tell [Merck about the tests] until after . . . ." Hearing Tr. at 77-78.

[11] In the first email, Gallagher told Hartmann that Dr. Gillies' tests "were apparently intended to prove that ImClone is liable for patent infringement . . . . I do not understand why Merck would authorize EMD Lexigen and its employees to engage in such activities."

10

violated the court's December 23, 2004 Protective Order by disclosing to Dr. Hartmann information taken from the deposition transcript that he knew had been designated as "restricted confidential."[12] Gallagher's conduct in contacting Dr. Hartmann additionally served no legitimate purpose. Consequently, I find that his conduct violated Massachusetts Rule of Professional Conduct 4.4, as well as Rules 3.4 and 8.4(d).

I do not disagree with ImClone's contention that Richter's questioning of Dr. Gillies was for the most part civil and courteous. I am also willing to accept the proposition that a brief probing of Dr. Gillies' boast that "I am Merck KG[a]A" might have had some tangential impact on Dr. Gillies' credibility (although Richter was well aware of the fact that Dr. Gillies was not "the CEO of Merck"). I do not, however, credit Richter's testimony that the repeated questioning of Dr. Gillies about his failure to obtain the permission of his superiors at Merck and his alleged misuse of Merck property was intended to expose Dr. Gillies' "cloaking" of his "questionable" test results in the shroud of the "greater legitimacy of a giant pharmaceutical like Merck." Hearing Tr. at 61. I find that the questioning was instead undertaken as part of a deliberate stratagem to deprive MIT of Dr. Gillies' services as an expert witness.[13] I conclude that the stratagem was deliberate for two reasons: (1)

---

In the second, he instructs Hartmann that "[i]n addition to our exhaustion-of-rights argument we have much more to argue; however, the question, as you can appreciate, is why an EMD Lexigen employee would help Repligen in this matter."

[12]ImClone's suggestion that no violation of the Protective Order occurred because Gallagher "privately" inquired of Merck about admittedly confidential information covered by the Order (rather than disclosing it publicly) is the kind of argument that gives sophistry a bad name.

[13]The suggestion that the lack of objection to this line of questioning by Dr. Gillies' counsel in some respect validated its legitimacy is particularly misplaced. The Federal

the persistence with which Richter pursued the questioning of Dr. Gillies about the propriety of his involvement with MIT given the fact that he worked for Merck; and (2) his motive in transmitting the deposition transcript to Gallagher. The transmittal I find was made with the express intent that Gallagher protest Dr. Gillies' activities to Merck in the expectation that Merck would lean on Dr. Gillies to cease cooperating with MIT.[14] In so doing, I find that Richter violated Rules 3.4 and 8.4(d) of the Massachusetts Rules of Professional Conduct.

Finally, I find that the actions of ImClone through its attorney-agents prejudiced MIT's ability to prosecute the litigation by depriving it of the cooperation of the witness who as a principal inventor of the '281 patent was arguably the person most knowledgeable about the validity of MIT's claims against ImClone.[15]

ORDER

For the foregoing reasons, MIT's motion for sanctions is ALLOWED. ImClone is prohibited from communicating with Dr. Gillies and/or Merck regarding any matter involving this lawsuit without the prior permission of the court. Attorney Gallagher is

---

Rules are emphatic on the obligation of a witness to answer even objectionable questions absent an assertion of personal privilege. See Fed. R Civ. P. 30(c).

[14]It is this intent that is objectionable. I am not suggesting that Richter violated any canon of the ethics rules (or provision of the Protective Order) by sharing the results of the deposition with his client. A lawyer has an affirmative duty to keep his client informed.

[15]I find the argument advanced by ImClone's counsel that MIT is not prejudiced, but "only inconvenienced" by the loss of the opportunity to prepare Dr. Gillies' testimony for trial in a cooperative setting, an astonishing statement coming as it does from experienced trial counsel. ImClone's expert witness, Professor Green, readily acknowledged that the inability to prepare a critical witness for trial "leaves you worse off." Hearing Tr. at 165.

prohibited from any further access to or use of information designated confidential or restricted under the terms of the Protective Order. At trial, MIT will be permitted to offer evidence of the improper conduct of ImClone's attorneys to lay a foundation for an instruction permitting the jury to draw an inference that ImClone believed that Dr. Gillies' 2005 test results supported MIT's claims in the litigation.[16] ImClone will reimburse MIT for the reasonable costs and attorneys' fees it has incurred in prosecuting this motion. MIT will file a statement documenting such costs and fees within twenty-one (21) days of the date of this Order. ImClone may file an opposition to the fee request within fourteen (14) days thereafter.[17] Trial will commence on Monday, September 10, 2007, at 9:00 a.m. in Courtroom 21. The Clerk will issue a Trial Order in the ordinary course.

        SO ORDERED.

        /s/ Richard G. Stearns

        _____
        UNITED STATES DISTRICT JUDGE

---

[16] MIT is, of course, under an ethical obligation to promptly inform the court should Dr. Gillies decide to renew his cooperation with the litigation.

[17] The court has considered, but has decided against the disqualification of Kenyon & Kenyon as ImClone's counsel. The court agrees that disqualification is a drastic measure that should be imposed in only the most extreme circumstances. The court further agrees that disqualification would overly punish ImClone for the transgressions of its counsel. Moreover, it would unduly delay the trial of the case.