UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MASSACHUSETTS INSTITUTE OF TECHNOLOGY and REPLIGEN CORPORATION, <br><br> Plaintiffs, <br><br> v. <br><br> IMCLONE SYSTEMS INC., <br><br> Defendant. | Civil Action No.: 04-10884-RGS |

**IMCLONE'S RESPONSE TO PLAINTIFFS' MOTION *IN LIMINE* REGARDING PRIOR ART AND TESTIMONY NOT PROPERLY DISCLOSED DURING DISCOVERY**

Plaintiffs' vague and speculative motion should be denied in its entirety. Other than a select few identified exhibits (all of which clearly relate to theories advanced during expert discovery and were produced in discovery or identified well in advance of the thirty-day deadline proscribed by § 282), Plaintiffs improperly seek a blanket prohibition on <u>unidentified</u> testimony, evidence and argument that ImClone <u>allegedly</u> failed to disclose during discovery.

Plaintiffs' motion is fatally flawed for at least the following reasons:

- It misrepresents the scope of § 282 and Fed. R. Civ. P. 26;
- It misrepresents the evidence and argument disclosed during expert discovery;
- It is hopelessly vague and unspecific and fails to reasonably articulate any specific new theories, evidence, or argument; and
- It fails to articulate any unfair surprise or prejudice Plaintiffs have sustained from the <u>alleged</u> "new" disclosures.

At its core, Plaintiffs' motion is nothing more than an attempt to create the false impression that because ImClone has new counsel, any arguments or theories advanced are

1

necessarily new. To create that impression, Plaintiffs improperly focus their attention on the literal language of Dr. Aaronson's report and do not identify a single specific argument or theory that is "new" (other than a vague reference to having alluded to such an argument in the past, *see* Pl. Motion at 4). Moreover, to the limited extent Plaintiffs' motion identifies any specific evidence or argument that is allegedly new, it misrepresents the expert discovery that was conducted. Contrary to Plaintiffs' arguments, all of the issues about which Plaintiffs complain were fairly identified and covered during expert discovery or well in advance of the 30-day time limit prescribed by § 282.

In short, nothing in Plaintiffs' motion identifies any unfair prejudice or surprise to the documents and theories identified therein. Indeed, Plaintiffs included exhibits on its list that pertain to the very same issues (*see, e.g.*, Secton I.B.3, *infra*). Contrary to Plaintiffs' attempts to frame ImClone as seeking to advance "new" theories "through its new trial counsel," the few identified exhibits and arguments are entirely consistent with, and supported by, the theories and evidence developed during discovery.

**I.     ARGUMENT**

    **A.     The Federal Rules And Section 282 Do Not Restrict Evidence To The Verbatim Disclosures In Expert Reports And Discovery.**

Federal Rule 26 and 35 U.S.C. § 282 are not as restrictive as Plaintiffs assert. With respect to Rule 26, the focus is on eliminating unfair surprise and prejudice. *See, e.g.*, *Tracinda Corp. v. Daimler Chrysler AG*, 362 F.Supp.2d 487, 506 (D. Del. 2005) ("The purpose of the initial disclosures provided for in Rule 26 is to prevent a party from being unfairly surprised by the presentation of new evidence); s*ee also* 1993 Advisory Committee Notes, Fed. R. Civ. P. 26(a). "[N]o line-by-line comparison of the expert report to [the expert's] direct testimony" is

required, because the expert is "permitted a certain degree of latitude with respect to the areas in which he has been accepted as an expert." *Minebea Co. v. Papst*, 231 F.R.D. 3, 8 (D.D.C. 2005).

Similarly, § 282 is merely a notice statute. Plaintiffs wrongly argue that § 282 covers all prior art references that ImClone "failed to disclose during discovery." *See* Pl. Motion at 1. Plaintiffs further wrongly argue that § 282 requires "detailed and specific notice of [ImClone's] invalidity defenses." *Id*. at 6. Section 282 requires only that ImClone provide "notice in the pleadings or otherwise in writing to the adverse parties at least thirty days before trial." Moreover, § 282 applies only to prior art being relied upon for purposes of validity.

In short, the focus of the authority cited by Plaintiffs is on unfair surprise. Here, Plaintiffs have filed an ominbus, vague exclusion motion to exclude all possible evidence that was "not properly disclosed during discovery." Other Courts have rejected similar omnibus motions. *See, e.g., EMI Music Marketing, v. Avatar Records, Inc.*, 334 F.Supp.2d 442 (S.D.N.Y. 2004) (denying motion to preclude "any witnesses or documentary evidence not previously disclosed during the pretrial disclosure period"). In *EMI*, the Court stated: "Although it may be true that [the defendant] failed to adhere to the letter of the discovery rules, the Court is convinced that [the plaintiff] was sufficiently aware of the [evidence] in question so that it is not being subjected to trial by ambush." *Id*. at 445. As stated below, such is exactly the case here. Plaintiffs have had more than fair notice of the evidence and arguments to which they specifically complain.

### B.   Plaintiffs' Specific Objections Are Baseless.

While difficult to discern, the only specific objections in Plaintiffs' motion are that ImClone should not be permitted to (1) rely upon the Weinberger/Sharp reference in support of its non-infringement position; (2) rely upon exhibits on its exhibit list that pertain to fatal infirmities in the Gillies infringement testing (Tr. Exs. ARO, ARN, ARP (also referred to as DX

3

456-458)); or (3) argue that the claims are indefinite based on the term "tissue specific cellular mammalian enhancer."

None of these complaints are justified. First, each of the underlying theories was identified and pursued in discovery (including in Dr. Aaronson's expert report and/or through expert depositions). Plaintiffs do not identify a single specific instance of prejudice based on any of the information specifically identified in their motion. Indeed, Plaintiffs themselves have identified a number of exhibits that pertain to the complained of issues. For example, with respect to the Gillies infringement testing, Plaintiffs identified a number exhibits relating to the E1A adenovirus that affects expression in 293 cells. At a minimum, this highlights the complete lack of surprise or prejudice to Plaintiffs.

Second, Plaintiffs' decision to rely upon infringement testing that created indefiniteness problems and infringement proof issues is not the makings of prejudice based on any actions <u>by ImClone</u>. Indeed, in the first instance, ImClone identified the legal ramifications of Plaintiffs' decision. Similarly, at the first opportunity, ImClone's expert gave Plaintiffs adequate notice of the problems he identified with respect to the testing and Plaintiffs' proposed definition of "tissue specific."

Third, none of these objections fairly implicates § 282. Every one of the questioned exhibits was identified to Plaintiffs well in advance of the 30-day deadline set by § 282 (August 11, 2007). These references further pertain in large part to ImClone's infringement arguments, to which § 282 does not apply. Nevertheless, nothing in ImClone's *Markman* brief should have been a surprise to Plaintiffs at that point, let alone a surprise now – nearly two months later.

### 1. ImClone's Indefiniteness Theory Was Explicitly Included In Dr. Aaronson's Report And His Deposition.

Plaintiffs misstate the record of discovery in an attempt to manufacture surprise. Contrary to Plaintiffs' assertions, Dr. Aaronson first identified the indefiniteness of the "tissue-specific" limitation in his expert report. *See* Second Decl. of Mark A. Pacella Ex. 1 (Dr. Aaronson's October 14, 2005 Expert Rep. at 43-44). During his deposition, when asked about his understanding of Dr. Struhl's definition of "tissue specific," Dr. Aaronson further testified as to the perceived indefiniteness of the term. *See* Second Decl. of Pacella Ex. 2 (Dr. Aaronson's Apr. 11, 2006 Dep., 10:23-11:22).

```
                                  10
23        Q.  What do you understand Dr. Struhl's
24   definition to be of a cellular derived enhancer
25   with tissue specificity?

                                  11
 1        A.  One of the things that came out of
 2   that transcript, to the extent I was able to read
 3   it, was that that definition is almost specific to
 4   what Dr. Struhl decides is tissue specific.
 5        Q.  What do you mean by that?
 6        A.  Well, I mean things like -- it seemed
 7   to me from his definition, it would be difficult
 8   to ever assign cell or tissue specific enhancer as
 9   being other than tissue specific until, for
10   example, you would have tested an ever-increasing
11   number of cells.
12            It could work in A, B, C, D, E, F, G
13   cells, but you could keep testing it, and
14   eventually maybe if something didn't express in
15   response to that enhancer, it could conceivably
16   still be tissue specific.
17        Q.  So what you're saying there is --
18   what I'm understanding is based on Dr. Struhl's
19   definition, it would be difficult to define
20   something as non-tissue specific?
21        A.  I think so.  I think it was pretty
22   indefinite.
```

Moreover, the legal aspects of this indefiniteness issue were repeated again during the *Markman* hearing. This is the precise stage in the proceedings where such a <u>legal</u> argument is typically raised, <u>and was raised in *Honeywell*</u>. In short, Plaintiff's "new theory" argument is nothing more than an attempt by Plaintiffs to avoid their self-created problems stemming from their proposed construction and infringement tests concerning the "tissue specific" limitation.

> **2. Plaintiffs Cannot Claim Prejudice Or Surprise By The Weinberger/Sharp Reference As It Is An MIT Scientist's Article And Is Entirely Consistent With Other Previously Cited Articles Concerning The Issue Of Tissue Specificity.**

The only exhibit specifically identified by Plaintiffs that was not disclosed prior to the *Markman* briefing was the Weinberger/Sharp reference. *See* Second Decl. of Pacella Ex. 3 (Tr. Ex. BBR (also referred to as DX 720). This reference is an additional reference supporting ImClone's longstanding position that the enhancer at issue in the present action is not tissue specific and was disclosed, in addition to similar articles previously identified by Dr. Aaronson, in the *Markman* proceeding. Tellingly, Plaintiffs do not even attempt to present an argument as to how they would be unfairly surprised by the admission of the Weinberger/Sharp reference. In fact, the only conceivable "prejudice" to Plaintiffs is the fact that this reference contradicts Plaintiffs' position and was notably co-authored by Dr. Phillip Sharp, an MIT scientist and Nobel laureate. Such "prejudice," however, is not the type of prejudice that weighs in favor of exclusion. In any event, to the extent this reference pertains to ImClone's invalidity defenses, it was disclosed well in advance of the 30-day period prescribed by § 282.

> **3. The Remaining Identified Exhibits Pertaining To The Problems With 293 Cells Were Fairly Identified.**

Plaintiffs' remaining complaint pertains to several articles that are relevant to the infirmities of Dr. Gillies' use of 293 cells in his infringement tests. ImClone has contended since the tests were first disclosed (after the initial expert reports in fact), that the selection of 293 cells

6

was suspect because those cells included a virus that impacted in some way the function of the C225 enhancer. Plaintiffs' attempts to preclude these references and related testimony as relating to an allegedly "new" theory is an outright misrepresentation.

Plaintiffs have been on notice of ImClone's challenge to the Gillies' test data since at least as early as Dr. Gillies' third deposition in August 2005. All of the references complained of bear ImClone production numbers. *See* Second Decl. of Pacella Ex. 4 (Tr. Ex. ARM (also referred to as DX455 (I053728-735)); Tr. Ex. ARN (also referred to as DX456 (I053736-751)); Tr. Ex. ARO (also referred to as DX457 (I053752-767)); Tr. Ex. ARP (also referred to as DX458 (I053768-777))). Moreover, Dr. Aaronson referred to these references in his deposition.

```
                              90
24      Q.   You also referred to the fact that
25   the 293 cells are not naturally occurring cells?

                              91
 1      A.   Yes.
 2      Q.   Do you have an opinion as to what
 3   impact the E1A protein would have on the
 4   expression of the C225 enhancer in 293 cells?
 5           MR. RICHTER:  Objection to form.
 6      A.   I am -- I don't know that anybody has
 7   specifically asked that question, but there is
 8   data in the literature, and I would have to go
 9   through it to be firm, and I would be happy to
10   look at -- there are a number of studies that deal
11   with effects of the E1A protein on enhancers, I
12   believe, I think even on the immunoglobulin gene
13   itself, and there's differences in different
14   cells.  And so I looked at that once, and I would
15   really need to look at those papers.
16      Q.   So sitting here at this point, you
17   don't have any opinion as to what effect the E1A
18   protein in the 293 cells might have on expression
19   or the function of the C225 enhancer?
20           MR. RICHTER:  Objection to form.
21      A.   I don't, without looking at the
22   literature, have the ability to say something
23   precisely, and I would prefer to know that
```

>  24    literature, and I will be happy to look at it.
>  25        But I do know that Wasylyk and
>
>                          92
>  1    Wasylyk did the experiments in a controlled way,
>  2    and whatever the effect of the E1A enhancer, they
>  3    see that this enhancer, the C225 enhancer, does
>  4    give you several fold increase in activity.

*See* Second Decl. of Pacella Ex. 5 (Dr. Aaronson's Dep., 90:24-92:4).  Dr. Struhl was similarly asked about the presence of the E1A virus in 293 cells and its effect on related testing.  *See* Second Decl. of Pacella Ex. 6 (Dr. Struhl's Apr. 5, 2006 Dep., 94:8-98:21).  As was Dr. Gillies.  *See* Second Decl. of Pacella Ex. 7 (Dr. Gillies's Feb. 10, 2006 Dep., 442:9-444:10).  In fact, Plaintiffs attempted to include a number of references on the proposed Joint Exhibit list that appear to pertain to the same issue.  *See* Second Decl. of Pacella Ex. 8 (Plaintiffs' Exhibit List, PX18, PX24, PX32, PX51).  At the very least, this fact establishes that Plaintiffs were in no way surprised by this theory.  It further highlights that Plaintiffs' motion is solely tactical, and devoid of any merit.

Accordingly, any claim of unfair surprise or prejudice is spurious.

## II. CONCLUSION

For the foregoing reasons, Plaintiffs' motion *in limine* should be denied in its entirety.

Respectfully Submitted,

IMCLONE SYSTEMS, INC.

By Its Attorneys,

Dated: August 31, 2007

/s/ Michael R. Gottfried
Michael R. Gottfried (BBO #542156)
Anthony J. Fitzpatrick (BBO #564324)
Christopher S. Kroon (BBO #660286)
DUANE MORRIS LLP
470 Atlantic Avenue, Suite 500
Boston, MA 02210
Phone: 857.488.4200
Fax: 857.488.4201

James H. Wallace, Jr. *(pro hac vice)*
Mark A. Pacella (BBO #60255)
Robert J. Scheffel *(pro hac vice)*
Kevin P. Anderson *(pro hac vice)*
WILEY REIN LLP
1776 K Street, NW
Washington, DC 20006
Phone: 202.719.7240
Fax: 202.719.7049

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that a true copy of the foregoing document was served, by hand, upon the attorneys of record for the plaintiffs on August 31, 2007.

/s/ Michael R. Gottfried
Michael R. Gottfried